**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:12-cv-00685-RBJ-MEH

DAVID HELMER,
FELICIA MUFTIC,
MICHAEL MUFTIC,
CRAIG KANIA, and
OLIVER MARTIN, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

THE GOODYEAR TIRE & RUBBER COMPANY, an Ohio Corporation,

      Defendant.

---

# EXHIBIT G

- - - - -

**GOODYEAR'S RESPONSE TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| DAVID HELMER; | ) |
| FELICIA MUFTIC; | ) |
| MICHAEL MUFTIC; | ) |
| CRAIG KANIA; and | ) |
| OLIVER MARTIN, on behalf of themselves | ) |
| and all others similarly situated, | ) |
| v. | ) Case No. 1:12-cv-00685-RBJ-MEH |
| THE GOODYEAR TIRE & RUBBER CO., | ) |
| an Ohio Corporation | ) |

## EXPERT REPORT OF BRUCE A. STROMBOM, PH.D.

# EXPERT REPORT OF BRUCE A. STROMBOM, PH.D.

## TABLE OF CONTENTS

I.    QUALIFICATIONS ........................................................................................ 1

II.    ASSIGNMENT ............................................................................................... 2

  A.  Summary of Plaintiffs' Claims ...................................................................... 2

  B.  Definition of the Putative Class .................................................................... 2

  C.  Assignment ................................................................................................... 3

III.    DOCUMENTS AND INFORMATION CONSIDERED ................................ 4

IV.    SUMMARY OF OPINIONS .......................................................................... 4

V.    BACKGROUND ............................................................................................ 5

  A.  Description of the product ............................................................................. 5

  B.  Manifestations of the Alleged Defect ........................................................... 8

VI.    ANALYSIS AND BASES OF OPINIONS .................................................... 9

  A.  The low rate of failure of hydronic heating systems identified by plaintiffs is inconsistent with the claims that all of members of the Putative Class have been harmed and that the experience of the Named Plaintiffs is typical of the class.......................................................... 9

  B.  Inspection and testing of Entran 3 in a sample of homes does not support the Plaintiffs' claim that the alleged defect is present in the homes of all members of the Putative Class and that the experience of the Named Plaintiffs is typical.............................................................. 11

  C.  Results from Quality Assurance and Quality Control programs do not support the Plaintiffs' claim that quality control issues at Goodyear's manufacturing plant led to class-wide defects in Entran 3 hose................................................................................................. 14

  D.  The quantum of economic damages, if any, cannot currently be determined for the overwhelming majority of Putative Class members. ............................................................... 16

    1.  Damages, if any, cannot currently be determined for Putative Class members with Entran 3 hose that have exhibited no evidence of the alleged defect claimed by the Plaintiffs, but whom Plaintiffs contend will experience some type of problem at some indeterminate date in the future. .............................................................................................. 16

      a)  The amount of damages, if any, to any member of the Putative Class will vary widely depending on the manifestation of the alleged defect....................................................... 16

      b)  For any particular system, individual inquiry is needed to determine the appropriate method of addressing the claimed defect and mitigating damages.................................... 18

c)    The current cost of replacing all Entran 3 hose is neither an appropriate nor a reasonable measure of economic damages. ....................................................................... 19

d)    While Plaintiffs' claim diminution in home value as a category of damage, determining the existence and magnitude of any such diminution in value will require individual inquiry........................................................................................................... 20

2.    Even for residences in which leaks or other problems have been experienced, individual inquiry is required to establish that the alleged defect at issue in this matter is the cause of the reported problem.......................................................................................................... 22

3.    The Putative Class as defined leads to duplicative and conflicting claims on the same residence and includes members who may not have been harmed while excluding others who may be harmed in the future. ......................................................................................... 23

a)    The Putative Class includes both current and former owners and consequently can include multiple class members with duplicative and conflicting claims related to the same residence. ........................................................................................................... 23

b)    The Putative Class includes members who have not been, and may never be, harmed as a result of the claimed defect. ........................................................................................ 24

# EXPERT REPORT OF BRUCE A. STROMBOM, PH.D.

## I.    QUALIFICATIONS

1.      My name is Bruce A. Strombom.  I am a Managing Principal in the Los Angeles office of Analysis Group, Inc., an international economic, financial and strategy consulting firm with ten offices throughout North America.  Analysis Group employs over 550 staff, most with advanced degrees in economics, management, statistics, or law.  I hold a Ph.D. in economics from the University of California, Irvine and a B.A. in economics from San Jose State University.  My areas of specialization include applied microeconomics, and quantitative and statistical analysis.

2.      For the past 20 years I have been employed as an economist and have served as a consulting and testifying expert in public policy matters and commercial litigation.  Previously I was Executive Vice President of Business Valuation for a middle market merger and acquisition firm and Manger in the Financial Advisory Services group of the public accounting firm Price Waterhouse.  I have testified on topics involving economics, sampling and statistics, quantitative analysis, and econometrics in numerous federal and state courts and in arbitrations.  In that testimony, I have addressed issues related to class certification, liability, loss causation and damages.  A resume detailing, *inter alia*, my experience, testimony within the past four years, and publications within the past ten years is attached to this report as **Appendix A**.  There are widely accepted principles of statistical and economic analysis that are within my fields of expertise and that are directly relevant in addressing the central questions presented in a class-certification determination, including:  whether the universe of potential class claimants is capable of being determined and shown to be sufficiently numerous to warrant class treatment; whether the named class members' claims can be statistically established as being typical of the claims and damages experienced by unnamed class members; and whether the damages claimed by the class are capable of being addressed in an aggregate or standardized manner or whether the damages are so uniquely individual that aggregate treatment is impossible or impracticable.  I have frequently utilized these principles of statistical and economic analysis as an expert witness

to aid courts in determining the viability of class treatment in numerous federal and state class actions.

3.      Analysis Group is compensated at a rate of $620 per hour for the time I spend on this matter; the rates for other staff members range from $245 to $470 per hour.  Analysis Group's compensation is not dependent on the outcome of this matter.

## II.      ASSIGNMENT

### A.      Summary of Plaintiffs' Claims

4.      Plaintiffs Mr. David Helmer, Dr. Michael Muftic, Mrs. Felicia Muftic, Mr. Craig Kania and Mr. Oliver Martin (collectively "Named Plaintiffs") have filed suit individually and on behalf of similarly situated individuals (the "Putative Class").[1]  The Named Plaintiffs contend that The Goodyear Tire & Rubber Company ("Goodyear") designed, manufactured, tested, marketed, and sold a defective product, Entran 3, which under ordinary use in hydronic radiant heating and snowmelting systems, will leak and/or burst, resulting in catastrophic property damage.[2]

5.      As a direct result of the Alleged Defect, Plaintiffs argue that they and members of the Putative Class have incurred damages related to the full replacement of the defective Entran 3 hose, damages related to any repairs and replacement to the heating system, personal property, and/or homes, and consequential damages, including loss of use of homes during repairs and replacements, and diminution of the value of the homes.[3]

### B.      Definition of the Putative Class

6.      The first proposed Putative Class consists of "[a]ll persons, trusts corporations, partnerships, associations, and/or entities in the United States that own or owned real property in which Entran 3 hose has been installed.  Excluded from the Class are Goodyear, any entity in which Goodyear has a controlling interest or which has a controlling interest of Goodyear, and

---

[1] Amended Class Action Complaint, October 4, 2013, (hereafter "Amended Complaint"), p. 1.
[2] Amended Complaint, ¶¶ 2 – 4.
[3] Amended Complaint, ¶ 38.

2

Goodyear's legal representatives, assigns and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family."[4]

7.     The Alternative Putative Class proposal consists of two groups defined as follows:

　　a.  <u>State of Colorado Class</u>: "All persons, trusts corporations, partnerships, associations, and/or entities in the State of Colorado that own or owned real property in which Entran 3 hose has been installed.  Excluded from the Class are Goodyear, any entity in which Goodyear has a controlling interest or which has a controlling interest of Goodyear, and Goodyear's legal representatives, assigns and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family."[5]

　　b.  <u>State of Wisconsin Class</u>: "All persons, trusts corporations, partnerships, associations, and/or entities in the State of Wisconsin that own or owned real property in which Entran 3 hose has been installed.  Excluded from the Class are Goodyear, any entity in which Goodyear has a controlling interest or which has a controlling interest of Goodyear, and Goodyear's legal representatives, assigns and successors.  Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family."[6]

**C.     Assignment**

8.     I have been retained by counsel for Goodyear to provide expert testimony in this matter.  Specifically, I have been asked to apply principles of statistical and economic analysis to independently assess whether the universe of potential class claimants is capable of being determined and shown to be sufficiently numerous to warrant class treatment; whether the named class members' claims can be statistically established as being typical of the claims and damages experienced by unnamed class members; and whether the damages claimed by the class are

---

[4] Amended Complaint, ¶ 43.
[5] Amended Complaint, ¶ 44.
[6] Amended Complaint, ¶ 44.

capable of being addressed in an aggregate or standardized manner or whether the damages are so uniquely individual that aggregate treatment is impossible or impracticable.

## III.    DOCUMENTS AND INFORMATION CONSIDERED

9.      For this report, I and staff under my direct supervision have reviewed, among other things, the Plaintiffs' amended complaint, answers and objections to interrogatories, deposition testimony of the Plaintiffs, Site Inspection Reports by Bighorn Consulting Engineers Inc., Goodyear Entran 3 invoices, Goodyear Entran 3 Quality Control Laboratory Testing documents, and other production documents. In preparing my expert report, I also had discussions with Mr. Gary Tompkin, Mr. Terry Graber and Mr. Shawn Brill.  **Appendix B** lists the documents and information I have considered in reaching my conclusions.  My analysis and conclusions are based on the information available at the present time.  I understand that Plaintiffs' experts have not yet filed reports. If additional materials become available, I reserve the right to update my analysis as appropriate.

## IV.    SUMMARY OF OPINIONS

The following is a summary of my opinions to date:

A.      The low rate of failure of hydronic heating systems identified by Plaintiffs is inconsistent with the claims that all of members of the Putative Class have been harmed and that the experience of the Named Plaintiffs is typical of the class.

B.      Inspection and testing of Entran 3 in a sample of homes does not support the Plaintiffs' claim that the alleged defect is present in the homes of all members of the Putative Class and that the experience of the Named Plaintiffs is typical.

C.      Results from Quality Assurance and Quality Control programs do not support the Plaintiffs' claim that quality control issues at Goodyear's manufacturing plant led to class-wide defects in Entran 3 hose.

D.      The quantum of economic damages, if any, cannot currently be determined for the overwhelming majority of Putative Class members.

1.      Damages, if any, cannot currently be determined for Putative Class members with Entran 3 hose that has exhibited no evidence of the alleged defect claimed by the

4

Plaintiffs, but whom Plaintiffs contend will experience some type of problem at some indeterminate date in the future.

- The amount of damages, if any, to any member of the Putative Class will vary widely depending on the manifestation of the alleged defect.

- For any particular system, individual inquiry is needed to determine the appropriate method of addressing the claimed defect and mitigating damages.

- The current cost of replacing all Entran 3 hose is neither an appropriate nor a reasonable measure of economic damages.

- While Plaintiffs claim diminution in home value as a category of damage, determining the existence and magnitude of any such diminution in value will require individual inquiry.

2.   Even for residences in which leaks or other problems have been experienced, individual inquiry is required to establish that the alleged defect at issue in this matter is the cause of the reported problem.

3.   The Putative Class as defined leads to duplicative and conflicting claims on the same residence, and includes members who may not have been harmed while excluding others who may be harmed in the future.

## V.   BACKGROUND

### A.   Description of the product

10.   Entran 3 is a special purpose hose that Goodyear manufactured and sold exclusively to Chiles Power Supply, Inc. d/b/a Heatway Radiant Floors and Snowmelting ("Heatway")[7] where it was used as a component part in the company's custom design hydronic

---

[7] Heatway filed for Chapter 11 bankruptcy in February 2000 and was subsequently acquired by Watts Industries. *See*, "Heatway Files for Bankruptcy, Receives Offer," RubberNews.com, March 1, 2000. (http://www.rubbernews.com/article/20000301/NEWS/303019999/heatway-files-for-bankruptcy-receives-offer, last viewed on October 30, 2013) and Mazurkiewicz, Greg, "Manufacturers for the Week: Watts Industries, Inc. and Heatway," Air Conditioning, Heating and Refrigeration, The News, September 20, 2000. (http://www.achrnews.com/articles/84468, last viewed on October 30, 2013.)

in-floor radiant heating and snowmelt systems.[8]  The hose consists of an inner ethylene propylene diene monomer ("EPDM") rubber tube, rayon or aramid yarn reinforcement, an ethylene vinyl alcohol ("EVOH") barrier film, and a cover made from either Hypalon or EPDM rubber.[9]

11.    Hydronic heating systems heat buildings by pumping heated fluid from a boiler, solar heater, or a combination of the two through tubing embedded under the floor.  Likewise, a snowmelt system operates similarly with the hose embedded in driveways, walkways, stairs, parking lots, roofs, etc.

12.    Installation of hydronic in-floor radiant systems, and associated costs, vary by site and depends on the size of the building, the floor covering, remoteness of the site, and the cost of labor.[10]  Common installation methods include:

- *Slab*, the most commonly used method, where the system tubing is embedded into the foundational concrete of the building;

- *Thin-set*, where the system is embedded in a thin slab of concrete or other masonry then placed on top of an existing slab on grade;[11]

- *Staple-up*, where the system is attached to the sub-floor structure with staples or other fasteners;[12]

- *Snowmelt*, where the system is installed for the purpose of melting snow or ice.[13]

---

[8] Amended Complaint, pp. 1 – 2; Goodyear's Answer to Plaintiffs' Class Action Complaint and Jury Demanded, April 12, 2012, pp. 2 – 4.
[9] Goodyear's Answers and Objections to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production of Documents to Defendant, August 29, 2013, p. 3.
[10] "Radiant Heating," U.S. Department of Energy.  *See* http://energy.gov/energysaver/articles/radiant-heating, last viewed on October 30, 2013.
[11] Radiant Heat Installation Manual, Heatway, 1993, p. 2. (GY-Helmer-0013354 - 409 at 360.)
[12] Radiant Heat Installation Manual, Heatway, 1993, p. 19. (GY-Helmer-0013354 - 409 at 377.)
[13] Radiant Heat Installation Manual, Heatway, 1993, p. 34. (GY-Helmer-0013354 - 409 at 392.)

13.     Goodyear produced Entran 3 in various sizes with diameters ranging from 3/8" to 1", to accommodate these different installation methods.  From 1992 to 1996, Goodyear manufactured and sold approximately 33 million[14] linear feet of Entran 3.[15]

14.     As mentioned previously, Goodyear designed, manufactured, and tested Entran 3 exclusively for use in Heatway's heating and snowmelting systems.[16]  Specifications for the product including, but not limited to, the diameter, burst strength, tensile strength, and adhesion were provided by Heatway.[17]  Initially, Heatway represented to Goodyear that Heatway would custom design, install (or at least supervise installation by certified installers) and inspect all installations of Heatway systems.[18]  Contrary to these representations, Heatway instead packaged and sold Entran 3 often to wholesalers.[19]  Though Heatway provided installation instructions, contractors ultimately designed and installed Heatway's hydronic heating systems.[20]

15.     Due to the wide variation in application, building size, and installation techniques, there are no documented estimates of the number of installations using Entran 3.  However, in my review of documents and research I have observed the following:

- The average size home among the 22 residences inspected by Shawn Brill of Bighorn Consulting Engineers, Inc., is 3,926 sq. ft.[21]

- The U.S. Census Bureau reports that the average size of a single-family home

---

[14] This figure includes manufacturing of hose labeled Entran 3, Entran E3D, and ONIX.  I understand that specifications of the hose changed at least four times from 1992 to 1996.  In particular, Hypalon, the construction material used in the covering on the hose, was replaced with EPDM effective March 30, 1995 due to a shortage of Hypalon. Entran 3 products embodying the new material were subsequently rebranded "Entran E3D." (Goodyear's Answers and Objections to Plaintiffs' First Set of Interrogatories and First Set of Requests for Production of Documents to Defendant, August 29, 2013, pp. 4 – 5; Conversation with Gary Tompkin, former manager of Engineered Products Development and Chief Chemist at Goodyear, October 18 and November 4, 2013.)

[15] I understand that a portion of Entran 3 was used in installations in Canada and that these installations are not part of the proposed Putative Class.

[16] Goodyear's Answer to Plaintiffs' Class Action Complaint and Jury Demanded, April 12, 2012, ¶¶ 2 - 3.

[17] Conversation with Terry Graber, Goodyear Director of Global Process Engineering, November 15, 2013.

[18] Memorandum from Dave Maguire to Bob Becker, et. al, re: Visit Heatway Systems, April 28, 1989. (COLGY003021 – 022.)

[19] Deposition of Chris Haldiman, taken June 13, 2000, pp. 237 – 238.

[20] *See for example,* Radiant Heat Installation Manual, Heatway, 1993. (GY-Helmer-0013354 - 409 at 377.)

[21] Bighorn Consulting Engineers, Inc. Site Inspection Reports, Shawn Brill.

completed between 1992 and 1996 is 2,101 sq. ft.[22]

16.     Because on average, one linear foot of hose is needed to heat approximately 1 sq. ft. of space,[23] based on the information above I estimate that the average installation used approximately 2,000 – 4,000 linear feet of hose.  This implies approximately 8,250 (33 million / 4,000) - 16,500 (33 million / 2,000) Entran 3 installations.

### B.     Manifestations of the Alleged Defect

17.     Plaintiffs contend that under normal use and conditions, the inner layer of Goodyear's Entran 3 hardens and brittles, developing cracks and holes that radiate through other layers of the hose.[24]  According to Plaintiffs, the accelerated deterioration caused heated fluids to leak from the hose which resulted in catastrophic property damage.[25]

18.     Named Plaintiff Mr. Helmer contends that the Entran 3 hose in his home "…has become cracked and has leaked," particularly near manifolds.[26]  These leaks allegedly resulted in water damage to the home, caused a potential growth of mold, and necessitated the replacement of his boiler.[27]

19.     Named Plaintiffs Mr. Kania and Mr. Martin contend that their heating system stopped working in November 2003.[28]  Mr. Martin stated Rouse Heating and Cooling ("Rouse") inspected the problem and "…found that there was material in the hose that was blocking it or preventing it from being able to heat, for it come through because it was like gum."[29]  Though flushing and cleaning the system temporarily put the heating system back into operation, the hose would re-clog and cause the entire system to malfunction.[30]  After attempts to fix the

---

[22] "The Median and Average Square Foot of Floor Area in New Single-Family Houses Completed by Location," The U.S. Census Bureau. (http://www.census.gov/const/C25Ann/sftotalmedavgsqft.pdf, last viewed November 17, 2013.)

[23] Conversation with Gary Tompkin, former manager of Engineered Products Development and Chief Chemist at Goodyear, October 18 and November 4, 2013.

[24] Amended Complaint, ¶¶  22 – 23.

[25] Amended Complaint, ¶¶ 4 and 22.

[26] Deposition of David Helmer, taken September 24, 2013 ("Helmer Deposition"), pp. 36 - 40.

[27] Plaintiffs' Responses and Objections to Defendant's First Set of Interrogatories and First Set of Requests for Production of Documents, August 30, 2013, ("Plaintiffs' Interrogatory Response") ¶3.

[28] Plaintiffs' Interrogatory Response, ¶3.

[29] Deposition of Oliver Martin, taken September 4, 2013 ("Martin Deposition"), p. 31.

[30] Martin Deposition, p. 52.

problem, a baseboard heating system was installed and the Entran 3 tubing was subsequently disconnected.[31]   Otherwise, there was no visible damage to the home.[32]

20.      Lastly, Named Plaintiffs Dr. and Mrs. Muftic contend that the Entran 3 hose in their home burst and leaked in June 2010.[33]  Mr. Hayes, Mr. and Mrs. Muftic's caretaker, described the source of the leak as a "linear split" along a one foot section of the hose.[34]  This section of the hose was replaced and the Muftic's heating system has functioned properly since with the exception of a zone valve malfunction in June 2013.[35]


## VI.      ANALYSIS AND BASES OF OPINIONS

### A.      The low rate of failure of hydronic heating systems identified by plaintiffs is inconsistent with the claims that all of members of the Putative Class have been harmed and that the experience of the Named Plaintiffs is typical of the class.

21.      The Plaintiffs contend that the alleged defects in Entran 3 hose cause it to become "crispy" and "crunchy" after use and that the defects cause the inner layer of the hose to become hardened and embrittled, leading to cracks radiating through the layers of the hose and to leaking at connections.[36]  However as discussed below, there is scant evidence that this problem has been experienced by any meaningful number of Putative Class members.

22.      As discussed above, Entran 3 hose was installed largely between 1992 and 1996 in approximately 8,250 - 16,500 sites.  Of these installations I understand that to date Plaintiffs have only identified three sites (those of the Named Plaintiffs) that they contend experienced problems with their Entran 3 hose related to the claimed defect.[37,38]  Thus to date, more than 20 years after Entran 3 first began to be installed, **less than one-tenth of one percent** or 0.1% of the

---

[31] Plaintiffs' Interrogatory Response, ¶5.
[32] Plaintiffs' Interrogatory Response, ¶6.
[33] Plaintiffs' Interrogatory Response, ¶5.
[34] Deposition of Michael Hayes, taken October 15, 2013, pp. 19 – 21.
[35] Deposition of Felicia Muftic taken October 16, 2013 ("Muftic Deposition"), pp. 81 – 82.
[36] Amended Complaint, ¶ 23.
[37] Plaintiffs' Interrogatory Response, p. 5.  Plaintiffs' response includes problems with Entran 3 both related and unrelated to the alleged defects discussed in the complaint.
[38] This would include two sites in the Colorado Class (Helmer and Muftic sites) and one site in the Wisconsin Class (Kania / Martin site).

sites with Entran 3 are alleged to have experienced any problems, including those discussed in the complaint, with their Entran 3 hose. Stated differently, over 99.9% of installations have not been identified as having experienced any problems with their Entran 3 hose related to the claimed defect.

23.     Because the number of sites that have been allegedly harmed by defects in Entran 3 hose is *de minimus* compared to the entire base of sites with Entran 3, the available evidence indicates that harm has not been suffered by the class in a common or systematic manner. Furthermore, the low number of sites allegedly harmed also shows that the Named Plaintiffs' experience, even assuming it is attributable to the alleged defect, is not typical of members of the Putative Class.

24.     In addition, I understand that Plaintiffs contend that while the number of failures to date is small, all Entran 3 will eventually fail (*i.e.*, become crispy and crunchy). In many situations a standard type of statistical analysis, known as hazard analysis, can be used to estimate the future rate of product failure based upon the observed rate of failure in the early part of a product's life.[39] To perform such an analysis, one would use the pattern of observed failures over time in a sample to estimate the rate at which failures have occurred, and will occur in the future, in the population. (In this case, the population would be all homes with Entran 3.) However, to conduct such an analysis, there must be enough observed failures to produce statistically reliable estimates of the parameters of the hazard model. The minimum number of observed failures required to perform such an analysis is many times greater than the three alleged failures identified by the Plaintiffs. In other words, the rate of alleged failure is so low that this standard statistical analysis cannot even be performed.

25.     My conclusions that the low rate of failure of hydronic heating systems is inconsistent with all members of the Putative Class having been harmed and that the experience of the Named Plaintiffs' is not typical of the class would not change even if Plaintiffs identify many times the number of sites containing allegedly defective Entran 3 hose as they have to date.

---

[39] *See for example,* Green, William H., (1997). *Econometric Analysis*. 3rd Ed. Upper Saddle River: Prentice-Hall, Inc., pp. 984 – 1000.

**B.**     **Inspection and testing of Entran 3 in a sample of homes does not support the Plaintiffs' claim that the alleged defect is present in the homes of all members of the Putative Class and that the experience of the Named Plaintiffs is typical.**

26.     The Plaintiffs' claim that even if actual leaks or other problems to date are rare, all Entran 3 has the claimed defect and will fail as a consequence.[40]  However the results of inspections and tests conducted by the Defendant indicate that Entran 3 is performing as expected and that none of the sites inspected showed the hardening or embrittlement indicative of the claimed defect.

27.     I understand that the Defendant has inspected twenty-two homes with Entran 3 installed in Colorado, New Mexico, and Utah.  The inspections took place between November 2012 and November 2013 and included homes in which hydronic heating systems were installed between 1992 and 1996.[41]  The inspections included an analysis of the type of system in use, the types of connections used in the system (*e.g.*, the types of clamps used), the temperature and pressure at which the system operates, the pH of the fluid being used in the system, the amount of propylene glycol (antifreeze) in the water, a visual and tactile examination of the condition of the Entran 3 hose, and a test of the hardness of the Entran 3 hose.[42]  **Exhibit 1** summarizes the results of these inspections.

28.     Eleven of these homes in Colorado were inspected based on their owners responding to a request from the Defendant to inspect their hydronic heating systems.[43]  I understand that the owners of these eleven homes responded to a mailed request from Defendant. Defendant mailed the letters to all homes in the Aspen and Vail Colorado areas that were known to contain Entran 3, which its counsel identified based on their consultations with local building

---

[40] Amended Complaint, ¶¶ 4, 36 – 37.
[41] The Sharpe Residence was remodeled in 2000 and 2005.  This did not appear to have an effect on the hydronic heating system. (Bighorn Consulting Engineers, Inc., Site Inspection Report, Shawn Brill.)
[42] Conversation with Shawn Brill, consultant at Bighorn Consulting Engineers, Inc., November 1 and November 19, 2013.  *See also*, Bighorn Consulting Engineers, Inc. Site Inspection Reports, Shawn Brill.
[43] I discuss the additional eleven homes below.

11

inspectors.[44]  This selection process has no apparent bias as to whether the homes inspected are more or less likely than average to have experienced problems with Entran 3.  I understand that Shawn Brill, the engineer who conducted the site inspections has concluded that the Entran 3 hose at all eleven of these homes were supple and showed no evidence of cracking.[45]  In addition, I understand that the hardness measurements taken by Mr. Brill were all within a range that is inconsistent with Plaintiffs' claim that the hose has become hardened.[46]

29.   The inspection results for these eleven homes identified independently by Defendant's counsel are inconsistent with a claim that most of the Putative Class members are experiencing problems or will experience problems with their hydronic heating systems due to the alleged defects in the Entran 3 hose.  As discussed above, although all of the systems installed in these eleven Defendant-identified homes inspected by Mr. Brill were installed more than fifteen years prior to the inspection, none of them showed signs of the alleged defects in the Entran 3 hose asserted by Plaintiffs.  If Plaintiffs' theory that nearly all of the hose was defective were correct, then the site inspections would have been expected to turn up some evidence of the alleged defects.  In fact, given the results of Mr. Brill's inspections of these eleven homes, the likelihood that the true defect rate in the population is greater than 50 percent is nearly zero.  For example, my statistical analysis of these inspection results shows that the probability that 90 percent of the sites in the class could have manifestations of the alleged defect is **one-one-billionth of one percent** or 0.000000001%.[47]  Furthermore, my analysis shows that the probability that even 50 percent, or a majority of the sites in the class could have manifestations of the alleged defect is less than 1/20[th] of one percent or 0.048%.  In other words, the results of Mr. Brill's inspections of these eleven homes indicate that *at most* only a tiny fraction of the

---

[44] Letters from Gary Tompkin, (GY-Helmer-0047640 – 659, GY-Helmer-0043926 – 4008.)

[45] Conversation with Shawn Brill, consultant at Bighorn Consulting Engineers, Inc., November 1 and November 19, 2013. *See also*, Bighorn Consulting Engineers, Inc. Site Inspection Reports, Shawn Brill.

[46] Conversation with Gary Tompkin, former manager of Engineered Products Development and Chief Chemist at Goodyear, November 4, 2013.

[47] This is the probability under the binomial distribution of obtaining zero defects in a sample of 11 if the defect rate in the population is assumed to be 90 percent.  This is equal to $(1-0.9)^{11}$.  This analysis assumes that the sample observations are random.  The fact that the owners of these 11 houses inspected by Mr. Brill opted to have their systems inspected without any indication as to whether or not they had experienced issues with their hydronic heating systems is similar to a random selection process.  As I discuss below, the additional 11 houses inspected by Mr. Brill were either self-selected by their owners because they had problems, or were selected for reasons that I am unaware of at this time from the homes identified in Plaintiffs' list marked as Plaintiff 0001-0008.

Putative Class is likely to have experienced problems related to the alleged defect, even after more than 15 years of use.

30.     In addition to the eleven homes discussed above, I understand that Defendants have inspected an additional eleven homes.  Two of these were homes of the Named Plaintiffs. Five others were identified by the Plaintiffs using a procedure of which I am unaware at this time.  One was identified by a plumber during an inspection of one of the five sites identified by the Plaintiffs.[48]  Finally three homes in New Mexico were identified by the Defendant from the homeowners identified in Plaintiffs' list marked as Plaintiff 0001-0008.  I understand that Mr. Brill has concluded that the Entran 3 hose at all eleven of these homes showed no signs of the defect alleged by the Plaintiffs.[49]  Even though the inspection results of these eleven homes show little problem with their heating systems, to the extent that any do have problems with their hose that are shown to be caused by the claimed defect, their experience cannot be used to draw statistical inferences about the rate of problems likely to have been suffered by the class.  This is because these eleven homes cannot be assumed to be representative of the class.  Two of these homes are those of Named Plaintiffs, who self-identified as having problems and therefore are more likely to have problems than the population as a whole.  I am unaware how the other six homes were identified by the Plaintiffs.[50]  Without such information, I cannot determine whether they are representative of members of the Putative Class.  Finally, I cannot draw statistical inferences from the New Mexico homes identified by the Defendants because as discussed above they were selected from the homeowners identified in Plaintiffs' list marked as Plaintiff 0001-0008, and I am unaware of how Plaintiffs compiled that list.

31.     In summary, the results of the inspections further refute the Plaintiffs' claim that most Putative Class members have suffered or are suffering any harm.  They also show that the Named Plaintiffs' experience is not typical of the Putative Class.

---

[48] It is my understanding that while inspecting the Hand residence, the plumber on site identified an additional site nearby containing an Entran 3 installation – the Pulaska Residence. (Conversation with Shawn Brill, consultant at Bighorn Consulting Engineers, Inc., November 1 and November 19, 2013.)

[49] His inspection did find evidence of past dripping at both the Helmer and Muftic residences, however this prior leaking did not appear to be due to hardening of the Entran 3 hose.  In addition, I understand that segments of hose at the Helmer and Malmgren homes were alleged to have tears, but these segments of hose were not made available to Mr. Brill to inspect. (Bighorn Consulting Engineers, Inc. Site Inspection Reports, Shawn Brill.)

[50] I include the Pulaska residence in this group.

**C.**    **Results from Quality Assurance and Quality Control programs do not support the Plaintiffs' claim that quality control issues at Goodyear's manufacturing plant led to class-wide defects in Entran 3 hose.**

32.    There is little evidence to support Plaintiffs claim that Entran 3 hose is defective due to quality control issues in the manufacturing process.  The amended complaint claims the following.

> Upon information and belief, the Entran 3 hose is further defective as a result of quality control issues in Goodyear's manufacturing plants including, but not limited to, improper manufacture of the elements of the hose leading to non-uniformity of those elements and even breaks in the polyethylene vinyl alcohol ("EVOH") plastic oxygen barrier layer that occurred before such hose left the manufacturing plant.[51]

33.    Entran 3 was manufactured exclusively at a Goodyear plant in Mt. Pleasant, Iowa and shipped directly to Heatway Systems in Springfield, Missouri.[52]  It is my understanding that multiple products, including Entran 3, were produced on the same manufacturing line at this plant.  Each time the line switched to the production of Entran 3, the setup was evaluated and signed off by the operator.[53]  Goodyear performed quality assurance tests on manufactured product on per lot, monthly, and quarterly bases to ensure that Entran 3 adhered to Heatway's specification requirements.  For each lot produced, Goodyear obtained three 7 foot samples[54] to tests the following specifications: (1) interior diameter; (2) exterior diameter and concentricity; (3) burst strength; (4) length change between 10 and 200 psi; (5) adhesion; (6) tensile strength; and (7) elongation.[55]  Additionally, at Heatway's request, Goodyear conducted constriction tests using bullets sized 80% of the interior diameter of the hose.[56]  On a weekly and monthly basis, Goodyear tested Entran 3 samples specifications after exposing it to various conditions such as prolonged immersion in water, oil, or coolant, or high temperatures.

---

[51] Amended Complaint, ¶ 5.
[52] *See for example,* Goodyear Shipping Document, April 18, 1994. (GY-Helmer-0001654.)
[53] Conversation with Terry Graber, Goodyear Director of Global Process Engineering, November 15, 2013.
[54] Quality Assurance Manual, Heatway Radiant Floors & Snowmelting, September 1, 1994, p. 1.  (GY-Helmer-0043741 -764 at 749.)
[55] *See for example,* Date Code Quality Assurance Test Results Year: 1994.
[56] Quality Assurance Manual, Heatway Radiant Floors & Snowmelting, September 1, 1994, p. 1.  (GY-Helmer-0043741 -764 at 749.); Conversation with Terry Graber, Goodyear Director of Global Process Engineering, November 15, 2013.

34.     Lots that did not meet specification were resampled and retested, and Heatway was notified.  It is my understanding that from 1992 to 1996, the entire period Goodyear manufactured Entran 3, only five lots failed Goodyear's quality assurance tests.[57]  For four of these five lots, Heatway decided to accept the lot after retesting, noting that the deviation from specification was acceptable under their standards.[58]  These five lots represent **less than one percent** of the 600+ documented lots manufactured and tested by Goodyear from 1992 to 1996.[59]

35.     Once Entran 3 was delivered to Heatway, Heatway's hose department was required to inspect and test every foot of the product that was processed.[60]  It was Heatway's policy to reject all hose that did not meet both functional and aesthetic specifications.[61]  As stated in Heatway's Quality Assurance Manual, reasons for rejection include both functional reasons such as "inside diameter out of spec" or "burst under pressure," to more cosmetic reasons such as "dirty," "mislabeled length," or "rough".[62]  From 1992 to 1996, Heatway returned approximately 233,409 linear feet, **less than one percent** of Entran 3 produced.[63]  It is my understanding that virtually all 223,409 linear feet were returned by Heatway due to aesthetic, not functional, issues.[64]

36.     This evidence demonstrates that Goodyear consistently manufactured Entran 3 to Heatway's specifications.  Goodyear experienced few, if any, quality control issues that would compromise the functionality of Entran 3 and result in a class-wide defect of the product.  Even

---

[57] Quality Assurance Test Failure & Material Release Notices. (GY-Helmer-0006070; GY-Helmer-0006072; GY-Helmer-0000450; GY-Helmer-0006216; GY-Helmer-0006331; GY-Helmer-0006332; GY-Helmer-0000454; GY-Helmer-0000455; GY-Helmer-0006965.)

[58] It is my understanding that the specifications set forth by Heatway far exceeded the functional requirements of Heatway's heating system.  For example, though Heatway set the burst minimum specification at 800 psi, a functional Heatway hydronic heating system would never exceed 200 psi.  (Conversation with Gary Tompkin, former manager of Engineered Products Development and Chief Chemist at Goodyear, November 4, 2013.)

[59] Calculated as 5/600 = 0.8%

[60] Quality Assurance Manual, Heatway Radiant Floors & Snowmelting, September 1, 1994, p. 1.  (GY-Helmer-0043741 – 764 at 756.)

[61] Quality Assurance Manual, Heatway Radiant Floors & Snowmelting, September 1, 1994, p. 1.  (GY-Helmer-0043741 – 764 at 756.)

[62] Quality Assurance Manual, Heatway Radiant Floors & Snowmelting, September 1, 1994, p. 1.  (GY-Helmer-0043741 – 764 at 763.)

[63] Calculated as 233,409/(32,890,714+233,409) = 0.7%. (Goodyear Entran 3 Invoices and Credit Memos from 1992 to 1996.)

[64] Conversation with Terry Graber, Goodyear Director of Global Process Engineering, November 15, 2013.

if Plaintiffs were correct regarding "non-uniformity" of elements, individual inquiry would be required to determine whether the Entran 3 in the homes of any particular class member was defective.  This is of particular significance given that the Plaintiffs are claiming that a manufacturing defect – as distinct from a design defect – may have been a cause of the alleged damages.  Assuming the alleged defect is presented as a "non-uniform" production of hose, it is entirely plausible that hundreds of thousands of feet of hose may be entirely free from the alleged defect, while some much smaller subset might bear signs of the alleged non-uniformity.

### D. The quantum of economic damages, if any, cannot currently be determined for the overwhelming majority of Putative Class members.

37.     I understand that in order for a class to be certified, it must be possible to calculate economic damages using a common, class-wide method.  As I discuss below, for many reasons, including because only a small fraction of the Putative Class can be shown to have potentially suffered harm, economic damages cannot currently be calculated for most individuals in the Putative Class, let alone for the class as a whole.

> *1.     Damages, if any, cannot currently be determined for Putative Class members with Entran 3 hose that have exhibited no evidence of the alleged defect claimed by the Plaintiffs, but whom Plaintiffs contend will experience some type of problem at some indeterminate date in the future.*

38.     Plaintiffs have not proposed a common class-wide method of calculating economic damages and no such method exists because the amount of damage, if any, is highly individualized and dependent on the type of installation, the nature of the product failure (should any occur), the timing of such failure and other factors that vary across members of the Putative Class.

> a)     The amount of damages, if any, to any member of the Putative Class will vary widely depending on the manifestation of the alleged defect.

39.     I understand that Plaintiffs claim the alleged defect results in hardening and embrittlement of the Entran 3 hose which Plaintiffs claim can cause cracks, holes and breaks in the hose that, in turn, can lead to leaks at points of connection with manifolds and at other places in the hose (*i.e.,* "in-line leaks").  According to the Plaintiffs, the material that leaks from the

Entran 3 hose can damage "…the hose itself,… other parts of the radiant heating system and the floors, walls, ceilings and other structural support of the consumer's home" as well as "personal property in the home itself."[65]

40.    Because damage resulting from the claimed defect can in some, but not all, cases extend beyond the hose itself to other components of the heating system, elements of the home, and even personal property, the amount of damage can vary widely, even for systems with similar amounts of hose.  If evidence of the alleged defect is detected before any significant leaks occur, then damages, if any, may be minimal.  On the other hand, if a major leak were to occur, substantial damages to the home and its contents could result.

41.    The available evidence confirms that the range of damages from leaks in hydronic heating systems can vary widely.  For example, in the case of the Muftic residence, a burst hose and subsequent flood allegedly resulted in damage to their 4,400 sq. ft. home[66] and personal property.  The Muftics incurred costs of approximately $13,270 to replace or repair wood floors, drywall, fixtures, and rugs.[67]  Leakage at the Helmer residence allegedly caused water damage to drywall, the potential growth of mold, and the impairment of the boiler.[68]  Mr. Helmer incurred costs of approximately $5,495 to replace[69] and repair these items in his 5,200 sq. ft. home.[70]  Lastly, Craig Kania and Oliver Martin's malfunctioning in-floor heating system caused no visible damage to the 576 sq. ft. section[71] of home where it was installed.[72]  In total, Mr. Kania and Mr. Martin incurred less than $3,000 of expenses including the cost of service calls and installation of a replacement heating system.[73]

42.    The amount of damages to members of the Putative Class from the failure of their systems cannot accurately be determined at this time: until there is some manifestation of the claimed defect, it is impossible to know whether the problem will be detected early and damages

---

[65] Amended Complaint, ¶ 22
[66] Muftic Deposition, p. 23.
[67] Plaintiffs' Interrogatory Response, pp. 6 – 8.
[68] Plaintiffs' Interrogatory Response, p. 6.
[69] Plaintiffs' Interrogatory Response, p. 8.
[70] Helmer Deposition, p. 10.
[71] Deposition of Craig Kania taken September 4, 2013, p. 10.
[72] Plaintiffs' Interrogatory Response, p. 9.
[73] Plaintiffs' Interrogatory Response, p. 8.

will be small or whether a catastrophic leak will occur resulting in substantial damages. Attempting to assess damages on a class-wide basis at this time would be speculative.

> b)  For any particular system, individual inquiry is needed to determine the appropriate method of addressing the claimed defect and mitigating damages.

43.   As discussed in Sections IV.A through IV.C above, the evidence indicates that only a tiny fraction, if any, of the members of the Putative Class have hydronic heating systems in which hardening and embrittlement of Entran 3 hose is currently evident, or in which leaks have developed as a result of the alleged defect.  I understand that, to determine the appropriate and most cost effective method for addressing the claimed defect, information about the design, functioning, and current status of the system is required.[74]  Such information can only be gained through individual inquiry into each system. If a system is designed and installed properly and there are no signs of any current problems related to the alleged defect, then no action may be warranted.  On the other hand, if nascent signs of the alleged defect are detected, then I understand it may be possible to take relatively low-cost preemptive measures to avoid leaks and delay or eliminate the need for more costly repairs to the system, thereby mitigating damages.  I understand these measures may include correcting features of the system that are out of compliance with Heatway's recommendations such as replacing non-compliant clamps with constant tension clamps, adding corrosion inhibitors to the system's fluids, maintaining appropriate levels of glycol, and lowering the temperature of the fluid in the system.  I also understand that, depending on the design and current condition of the system, other appropriate interventions might include replacing sections of hose at manifolds and reestablishing connections using recommended methods, and installing a heat exchanger, to name a few.  In yet other situations, I understand that replacement of all the hose in the system is claimed to be the most technically appropriate and economically efficient response.

44.   Given that the vast majority of systems with Entran 3 are not leaking and do not show other evidence of the alleged defect, individual inquiry would be required to determine

---

[74] Conversation with Gary Tompkin, former manager of Engineered Products Development and Chief Chemist at Goodyear, November 4, 2013.

whether *any* intervention is warranted and, if so, what the most appropriate and cost effective course of action would be.

      c)      The current cost of replacing all Entran 3 hose is neither an appropriate nor a reasonable measure of economic damages.

45.     From the materials I have reviewed, it is unclear to me whether the Plaintiffs in this matter are seeking the current replacement of (or damages equal to the current cost of replacing) all Entran 3 hose.  Regardless of whether this is a remedy sought by the Plaintiffs, it is neither an appropriate nor a reasonable measure of economic damages in this case.  It is not appropriate because the cost of replacing all Entran 3 cannot be determined on a class-wide basis without resorting to individual inquiry.  Among the factors that will affect the cost of replacement that will require individual inquiry are the following:

- the amount of Entran 3 hose in a particular system which may depend on whether the entire building is heated by the radiant system and whether the system is a mixed system (*i.e.,* includes other types of hose in addition to Entran 3);

- the type of system (radiant heating or snow melt) in which the hose is used;

- if used in a hydronic heating systems, the method of installation (e.g., in-slab, staple-up, exposed staple-up, thin-set, baseboard, etc.);

- if used in a snow melt systems, whether the hose is used in driveways, parking lots, walkways, stairs, or decks, and whether the hose is embedded in concrete or asphalt;

- how accessible or inaccessible the hose is; and

- the cost of building materials and construction services in the local market.

46.     Second, even if the cost of replacing the Entran 3 hose still in use today could be determined, that cost would likely far exceed the present value of waiting to address problems in the future when, and if, the alleged defect become evident.  This is the case for several reasons including the following:

19

- Because such a small number of systems, if any, have experienced problems related to the claimed defect in the approximately 20 years since Entran 3 was first sold, it may be many, many years before more than a handful of problems purportedly related to the claimed defect occur.  To my knowledge, Plaintiffs do not claim to know when any particular system will fail or even the overall rate at which future failures will occur.  Thus replacing all Entran 3 hose when only a small fraction might be expected to suffer from the alleged defect will greatly overstate damages.  It does not make economic sense to replace all of the product that has been working properly for nearly twenty years in a vast majority of its installations and that shows no signs of failing in the foreseeable future.

- The further in the future that a problem occurs, the lower the present value of addressing the problem will tend to be.  This is because the present value of a dollar spent today is greater than the present value of a dollar spent in the future.  Further, even under Plaintiffs' theory of eventual failure, current owners may remodel, replace, sell or abandon their home, or replace their hydronic heating system for reasons unrelated to the claimed defect, before any manifestation of the alleged defect, and suffer no economic damages as a consequence.

- As discussed in the preceding section, when a problem does occur, the appropriate method of addressing it may be less costly than replacing all the hose in the system at that time.

47.    For these reasons, the current cost of replacing all Entran 3 hose is neither an appropriate nor a reasonable measure of economic damages in this matter.

       d)      While Plaintiffs' claim diminution in home value as a category of damage, determining the existence and magnitude of any such diminution in value will require individual inquiry.

48.    Among the categories of damages claimed by Plaintiffs are "…consequential damages, including… diminution in the value of the homes."[75]  At this time, Plaintiffs have not

---

[75] Amended Complaint, ¶ 38.

proposed a class-wide method of calculating the diminution in home value purportedly suffered by class members as a consequence of the claimed defect and, in my opinion, no such method exists.

49.     All the items discussed in the preceding three sections that either necessitate individual inquiry or cause damages calculated at this time to be speculative apply to this purported category of damages as well.  In particular, the impact, if any, on the value of a home may depend on many factors including:

- current condition of the hose and other elements of the heating system;

- expected remaining life of the home, driveway, walkway, etc. in which the hose is installed;

- features of the particular system including the amount of Entran 3 hose in the system, type of system, method of installation and location of the hose, and accessibility of the hose; and

- factors affecting the cost of repair or replacement, should that become necessary, such as the cost of construction services in the local market, and the cost and quality of finishes that may be disturbed in the event that repair or replacement is required.

50.     Whether, and by what amount, the sales price of a home may be affected by the presence of Entran 3 (assuming it is shown to be defective) will depend on additional factors including the perceptions, preferences, negotiating skill and bargaining positions of the buyer and seller, real estate market conditions in the local area, and the circumstances surrounding particular transaction.  Further, the representation, warranties, and indemnifications made, and rights and claims retained, by the seller in any particular transaction would be expected to affect the amount, if any, by which the sales price could be affected by the presence of Entran 3.

51.     The experience of Plaintiffs Mr. Kania and Mr. Martin provides an example of the problems with calculating diminution of value on a class-wide basis.  Their home was sold by

their lender in foreclosure.[76]  The impact of the presence of Entran 3 in a foreclosure sale may reasonably be expected to differ from the impact in other types of sales.  Further, in this and similar cases, individual inquiry is required to determine whether the damage from any diminution in value, assuming there was any, was borne by the Named Plaintiffs or the lender, both of whom are members of the Putative Class.

52.    In summary, I am aware of no reliable class-wide method of calculating the diminution in the value of particular homes due to the presence of Entran 3.

2.    *Even for residences in which leaks or other problems have been experienced, individual inquiry is required to establish that the alleged defect at issue in this matter is the cause of the reported problem.*

53.    I understand that hydronic heating systems may leak or otherwise fail for a number of reasons unrelated to the claimed defect.  Those reasons include but are not limited to: improper installation of hose or other components of the heating system; failure of hose other than Entran 3 also used in the system; use of screw clamps or other hardware not recommended by Heatway; failure to use an appropriate joint compound; punctures of hose during or after installation; pH levels outside of recommended ranges; freezing of the fluid in the system; fluid temperature in excess of recommended levels; and ingress of oxygen through system components other than the hose.[77]

54.    The inspections of hydronic heating systems undertaken by the Defendant's expert, Mr. Brill, in this matter confirm that individual inquiry will be required to determine whether the claimed defect was the cause of any observed leaks or other problems with hydronic heating systems containing Entran 3.  As discussed above, of the 22 systems for which Entran 3 hose was inspected, no issues were observed that would indicate any problems with the Entran 3 hose: all the hose was supple and Shore "A" hardness readings were at acceptable levels. Nonetheless problems or potential problems were observed with some systems that were not related to the alleged defect in the hose.  For example, Mr. Brill noted at the Marlon Residence that, "… the drips noted [throughout the system] were due to improper joint connection

---

[76] Martin Deposition, pp. 64-65.
[77] Conversation with Gary Tompkin, former manager of Engineered Products Development and Chief Chemist at Goodyear, November 4, 2013.

assembly, *i.e.*, no joint adhesive was noted at any connection and the use of screw clamps instead of constant tension clamps. Nothing was observed that would indicate any problems with the Entran 3 hose."[78] Likewise, Mr. Brill also noted at the Oken and Sharpe residences that the staple-up hose had detached from the underside of the floor causing the space above not to heat properly.[79] Such issues are related to the installation methods employed at these sites rather than the alleged defect.[80] Without individual inquiry it is impossible make this distinction. A lack of individual inquiry would also make it impossible to properly apportion damages if the cause of any damage is due to multiple parties, only one of which is the Defendant.

> 3.    *The Putative Class as defined leads to duplicative and conflicting claims on the same residence and includes members who may not have been harmed while excluding others who may be harmed in the future.*

> a)    The Putative Class includes both current and former owners and consequently can include multiple class members with duplicative and conflicting claims related to the same residence.

55.    The National Class and Alternative Class definitions include "All persons, trusts corporations, partnerships, associations, and/or entities in the United States that own or owned real property in which Entran 3 hose has been installed..."[81] In cases where real estate has had two or more owners, there will be two or more members of the Putative Class with claims that derive from their ownership of a single property. In order to determine the amount of damages and how any recovery should be distributed between these Putative Class members, individual inquiry into the facts and circumstances of each case will be required. Among the areas for investigation will be the following:

- timing and nature of the heating system failure;

- status of the heating system at the time ownership was transferred;

---

[78] Bighorn Consulting Engineers, Inc., Site Inspection Report, Marlon Residence, November 11, 2013.
[79] Bighorn Consulting Engineers, Inc., Site Inspection Report, Oken Residence, January 17, 2013; Bighorn Consulting Engineers, Inc., Site Inspection Report, Sharpe Residence, February 19, 2013.
[80] Other problems or potential problems observed by Mr. Brill include: a possible backflow condition from the boiler to the water heater (Bradley residence); some areas of the home were not heating well (Buttram residence); low pressure at various points in the system (Carmody, Century LP, and Waldin residences); minor corrosion (Oken and Kornasiewicz residence); past and/or present dripping (Helmer and Muftic residence). (Bighorn Consulting Engineers, Inc. Site Inspection Reports, Shawn Brill.)
[81] Amended Complaint, ¶¶ 44 and 45.

- nature of any disclosures made by the seller;

- results of inspections made by the buyer;

- how the transfer and assignment of claims and allocation of rights in these transactions may affect the amount of recovery that may be due to each class member; and

- evidence related to whether the purchase price was affected by the presence of Entran 3, and if so, by what amount.

56.     I note that the class representatives in this matter include the former, but not the current, owners of one residence in Wisconsin and the current, but no former owners, of two residences in Colorado.  Further, I note that the Putative Class excludes future owners who may own the home when, according to Plaintiffs, the system will fail.

> b)     The Putative Class includes members who have not been, and may never be, harmed as a result of the claimed defect.

57.     Because so few hydronic heating systems with Entran 3 have shown any signs of the claimed defect, the Putative Class will include members who have not been, and may never be, harmed as a result of the claimed defect.  For example, former owners who sold their homes before there was any evidence of problem with their systems and before the Plaintiffs' claims in this matter were widely known are unlikely to have experienced any damages as a result of the claimed defect.  Similarly, current owners who have not experienced defect-related problems to date and will not experience defect-related problems before their system is retired, abandoned or replaced are also unlikely to be harmed.

Submitted on November 22, 2013

_____

Bruce A. Strombom, Ph.D.
Los Angeles, California