IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-00685-RBJ-MEH

DAVID HELMER, FELICIA MUFTIC, MICHAEL MUFTIC, CRAIG KANIA, and OLIVER
MARTIN, on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

THE GOODYEAR TIRE & RUBBER CO., an Ohio corporation,

    Defendant.

---

ORDER

---

## I.    Introduction

    Plaintiffs are owners of homes in Colorado and Wisconsin who used defendant

Goodyear's Entran 3 brand of rubber hose in their radiant heating systems.  They allege that

Entran 3 tubing degrades and leaks—a problem, they believe, caused by a defective design that

will cause inevitable failure in all Entran 3 tubing.  They are suing Goodyear under a theory of

strict liability for design defect, and they purport to represent other owners of property in

Colorado and Wisconsin where Entran 3 tubing was installed.  Their motion for class

certification has been fully briefed and was argued on February 28, 2014.  For the reasons that

follow, I conclude that plaintiffs have met the requirements of Rule 23 for purposes of certifying

the Colorado class.

## II.    Facts

    Entran 3 hose is a component of a radiant heating system.  Basically the hose is

embedded in various parts of a home (the floor, walls, or driveways, for example) and conveys

heated fluids through those areas, dispersing heat in the process.  Of course, the hose itself is only part of the radiant heating system.  It must be connected to a manifold that heats the fluid and pumps it through the hose.  The hose is connected to the manifold using clamps or adhesives.

Over the last two decades, Goodyear has manufactured different versions of Entran hose for an intermediary called Heatway.  An earlier version, Entran II, was the subject of extensive litigation, including class litigation.  Even before that litigation began, however, Goodyear began designing Entran 3.  [ECF No. 88, Ex. 5 and 6.]  This new design would be an inner tube of EPDM rubber surrounded by an ethylene vinyl (EVOH) barrier designed to prevent oxygen transmission.  The entire hose was encased in an EPDM outer cover.  [*Id.* at Ex. 9, p. 3.]

Plaintiffs define the injury in this case as the design defect common to all members of the putative class.  Specifically, plaintiffs identify two defects that, they claim, will lead to inevitable failure resulting from ordinary use.  [ECF No. 99, Ex. B (Moalli Rebuttal) at 5, 7, 9.]  The first alleged defect is "the use of EPDM rubber in Entran 3 to carry hot liquid for the lifetime of homes where the product was installed."  [ECF No. 99 at 2.]  The second alleged defect is inconsistent thickness and bonding between the EVOH and EPDM layers of the Entran 3 hose.  [ECF No. 99 at 7 n.8.]

According to the testimony of one of the plaintiffs, David Helmer, the Entran 3 hoses in his home have caused significant problems.  The hose is brittle and crispy (Helmer Dep., pp. 22-23); black particles from the hose have ended up in other components of the heating system (*id.* at 29); and he has found fluid leaking from the system (*id.* at 36).  The Muftic plaintiffs have also experienced problems with their heating system.  In June 2010, the Entran 3 hose in their home

split and caused a massive leak resulting in damage to the flooring, walls, and fixtures.  (Felicia Muftic Dep., pp. 35-39, 46-47, 52-55).[1]

Plaintiffs offer the opinion of Dr. John E. Moalli in support of their arguments. According to Dr. Moalli, using EPDM rubber for use in radiant heating systems and attempting to bond a rigid layer of EVOH to a flexible hose were poor design choices.  These choices led to a product that was destined to fail under foreseeable use.  [ECF No. 99, Ex. B (Moalli Rebuttal) at 5, 7, 9.]  Dr. Moalli performed several tests to reach this conclusion.

Goodyear attacks Dr. Moalli's opinion, claiming that his analysis was limited to one section of hose which was destroyed after testing and was therefore unavailable to Goodyear's experts.  Goodyear offers the competing expert opinion of Dr. Jorgen Bergstrom.  Dr. Bergstrom performed additional laboratory tests on Entran 3 hose, including some joint testing with Dr. Moalli.  He concluded that Entran 3 is not defective, and any crispiness, embrittlement, or leakage of the hose would be due to improper installation.  [ECF No. 116 at 228-33 (Dr. Bergstrom's testimony regarding his conclusions).]  Bolstering Dr. Bergstrom's conclusions, Goodyear also provides the reports of Mr. Gary Tompkin, a former chief chemist at Goodyear, who examined hose in plaintiffs' homes.  He concluded that improper clamps and adhesives were used, and that hoses were subject to excessive bending near the manifold connection.  [ECF No. 93, Ex. B (Tompkin Report) at 2-20.]

Dr. Moalli and the plaintiffs respond that Dr. Bergstrom's methods were incapable of capturing the "progressive degradation and embrittlement of the hose from the failing rubber. [ECF No. 99, Ex. B (Moalli Rebuttal) at 3-6, 9-10.]  Moreover, Mr. Tompkin's testimony was

---

[1] Named plaintiffs in the putative Wisconsin class also suffered damage allegedly caused by defects in Entran 3 hose.  However because I decline to certify the Wisconsin class for lack of numerosity, I do not summarize the alleged injuries experienced by the named plaintiffs in Wisconsin.

based primarily on visual field inspections and little scientific testing.  [Def.'s Br. at 10.]  These inspections, Dr. Moalli states, do not account for degradation of the interior of the hose.

Finally, evidence from the home of an unnamed putative class member, the Malmgren home, exhibits a leak in a hose that was otherwise installed correctly.  [ECF No. 99, Ex. B (Moalli Rebuttal) at 7 ("The Malmgren hose was operated at relatively low temperatures, was not noted to be subjected to excessive bending stresses, and also had a constant tension clamp at the connection point."); ECF No. 93, Ex. B (Tompkin Report) at 15.]  As Dr. Moalli points out, this supports the theory of a design defect and tends to undermine Goodyear's argument that individualized factors contributed to injuries among the putative class.  [ECF No. 99, Ex. B (Moalli Rebuttal) at 7.]

### III.    Discussion

#### A.  Strict Liability for Design Defect.

At the hearing on class certification plaintiffs abandoned all claims except strict liability for design defect.  "To recover on a theory of strict products liability [in Colorado], a plaintiff must establish that: (1) the product is in a defective condition unreasonably dangerous to the user or consumer; (2) the product is expected to and does reach the consumer without substantial change in the condition in which it was sold; (3) the defect caused the plaintiff's injuries; (4) the defendant sold the product and is engaged in the business of selling products; and (5) the plaintiff sustained damages."  *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1106 (D. Colo. 2000) (citing *Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536-37 (Colo. 1997).

#### B.  Class Certification Requirements.

It is axiomatic that a class action lawsuit is an exception to the general rule that "litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v.*

*Dukes*, 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701

(1979)) (internal quotation marks omitted).  Federal Rule of Civil Procedure 23 sets out the

parameters governing class actions in federal courts.  Rule 23(a) requires plaintiff to prove that

> (1) the class is so numerous that joinder of all members is impracticable; (2) there
> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites "limit the class claims to those fairly encompassed by

the named plaintiff's claims.  *Dukes*, 131 S.Ct. at 2550 (quoting *General Telephone Co. of*

*Northwest v. Falcon*, 457 U.S. 147, 156 (1982)) (internal quotation marks omitted).

In addition to satisfying the four prerequisites in Rule 23(a), the putative class must fall

into one of the categories listed in Rule 23(b).  Plaintiffs here rely on the third category which

permits certification if "the court finds that the questions of law or fact common to class

members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).

The U.S. Supreme Court recently emphasized that Rule 23 imposes weighty obligations

on plaintiffs and certifying courts.  *Dukes*, 131 S.Ct. at 2551 (quoting *Falcon*, 457 U.S. at 161)

("certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the

prerequisites of Rule 23(a) have been satisfied'").  "Frequently that 'rigorous analysis' will entail

some overlap with the merits of the plaintiff's underlying claim."  *Id.*  Put another way,

"sometimes it may be necessary for the court to probe behind the pleadings before coming to rest

on the certification question."  *Id.* (quoting *Falcon*, 457 U.S. at 160).

Nevertheless, a peek at the merits is not an invitation to "turn the class certification

proceedings into a dress rehearsal for the trial on the merits."  *Messner v. Northshore Univ.*

*HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012).  On the contrary the Supreme Court, after its

decision in *Dukes*, explained that "Rule 23 grants courts no license to engage in free-ranging

merits inquiries at the certification stage.  Merits questions may be considered to the extent—but

only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for

class certification are satisfied."  *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct.

1184, 1194-95 (2013).  Keeping these broad principles in mind I turn to an analysis of each of

the requirements.

 1. Numerosity.

 A certifiable class must be so numerous that joinder is impracticable.  *Trevizo v. Adams*,

455 F.3d 1155, 1162 (10th Cir. 2006).  Numerosity also requires that the members of the class be

ascertainable with the use of objective criteria.  *Joseph v. Gen. Motor. Corp.*, 109 F.R.D. 635,

638 (D. Colo. 1986) (finding numerosity in a class of at least 1,760 potential class members

where those members could be identified as former owners or lessees of allegedly defective

Cadillacs notwithstanding the fact that some of them were satisfied customers with no wish to

assert claims against the defendant).

 In the instant case, the plaintiffs have so far identified 132 homes in Colorado and 6

homes in Wisconsin that have Entran 3 installed.  [ECF No. 115.]  Based on the fact that

Goodyear produced approximately 33 million feet of Entran 3 hose, the plaintiffs project that

many more homes in Colorado and Wisconsin contain Entran 3.  *Id.*

 The rub, if there is one, is that plaintiffs have only identified 10 homes in which the

Entran 3 hose is causing problems.  *Id.* at 18.  Goodyear argues that relying on such a small

number of allegedly problematic Entran 3 systems to demonstrate numerosity is impermissibly

speculative.  *See Dukes*, 131 S.Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard.

A party seeking class certification . . . must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").  In my view, however, Goodyear's challenge misses the mark.  The plaintiffs' theory is that the design defects in the Entran 3 hose will lead to inevitable failure in a product designed to function indefinitely.  Therefore the relevant inquiry for purposes of determining numerosity is who owns or owned property with Entran 3 installed, not who owns or owned property with presently malfunctioning Entran 3.

Plaintiffs have proven that at least 132 homes in Colorado contain the allegedly defective product.  These members are not only ascertainable, they are ascertained.  Moreover, other unidentified members are relatively easily ascertainable.  People with Entran 3 in their homes can "ascertain if they're a class member by going to their basement, looking at the pipe, and seeing if it says Heatway. . . . It's objective."  [ECF No. 116 at 26.]  *Cf. Carrera v. Bayer Corp.*, 727 F.3d 300, 308 (3rd Cir. 2013) (finding that a class in a false advertising case could not be ascertained using retailer sales records and affidavits from members attesting to prior purchases).

A related issue is whether joinder of a group of plaintiffs of this size is impracticable.  In the Tenth Circuit, "there is 'no set formula to determine if the class is so numerous that it should be certified.'"  *Trevizo*, 455 F.3d at 1162 (quoting *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)).  Prior cases offer little in the way of concrete guidance.  *Compare Trevizo*, 455 F.3d at 1162 (holding that a district court did not abuse its discretion in determining a putative class of 84 members could be joined rather than certified) *with Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 09-2757, 2012 WL 1378531, at *2 (D. Colo. Apr. 20, 2012) (granting class certification where the putative members were an unidentified group of patrons of 249 retail stores using non-accessible entrances).

Here, even looking only at the number of homes identified to date, the putative Colorado class is larger than the putative class in *Trevizo*. The relatively large size of the group and the geographic diversity of the members—who are scattered throughout relatively remote mountain towns in the state—suggest that joinder would be difficult to manage. Judicial economy and convenience to the parties supports a finding of numerosity for the Colorado class.

The Wisconsin class, however, is a different story. The six members identified to date are a far smaller group than the Colorado class. There probably are additional homes in Wisconsin that have Entran 3 hose, but we are starting with a very small number. Applying the "rigorous analysis" standard, and holding plaintiffs strictly to their burden to support certification, I cannot conclude that joinder of the Wisconsin class would be impracticable. Rather, I conclude that plaintiffs have not established the numerosity required by Rule 23(a).[2] There is no reason that the Wisconsin plaintiff cannot seek certification in Wisconsin of a Wisconsin class if he is insistent on class treatment and can develop an appropriate case for it.

    2. <u>Commonality</u>.

In order to satisfy the prerequisite of commonality, a putative class must raise a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. In *Dukes*, the Court found a lack of commonality where the putative class raised a contention that basically asserted the members had all suffered the same violation of law: gender-based employment discrimination in violation of Title VII. Such a violation, however, could have arisen in any number of ways—either intentionally or via a

---

[2] Because I conclude that the Wisconsin class lacks sufficient numerosity, I do not address any of the parties' related arguments about how differences in tort law between Colorado and Wisconsin might impact the Rule 23 analysis of commonality, typicality, or predominance. Claims will be analyzed according to Colorado law.

disparate impact theory, for example—and certifying a class based on such a variety of facts and

theories would not promote a classwide resolution.  As the Court put it, the plaintiffs in *Dukes*

> wish[ed] to sue about literally millions of employment decisions at once.  Without
> some glue holding the alleged *reasons* for all those decisions together, it will be
> impossible to say that examination of all the class members' claims for relief will
> produce a common answer to the crucial question *why was I disfavored*.

*Dukes*, 131 S.Ct. 2552.

By contrast, the plaintiffs in this case have provided the glue.  They claim that Goodyear

designed a defective product, identify two alleged defects, and provide scientific and technical

evidence to support their theory.  Certifying a class based on this claim and asking a fact-finder

to decide whether the product is indeed defective in the way that the plaintiffs allege would

"generate common answers apt to drive the resolution of the litigation."  *Id.* at 2551.  Moreover,

"[f]actual differences between class members' claims do not defeat certification where common

questions of law exist.  *DG ex rel. Stricklin v. Devaugh*, 594 F.3d 1188, 1195 (10th Cir. 2010)

(holding that commonality existed in a putative class of children exposed to the same risk of

harm from defendant agency's inadequate oversight despite the fact that the vast majority of

children in the program suffered no physical harm).

Goodyear argues that recent rulings from the U.S. Supreme Court have made it harder to

certify a class and require a stronger showing that the putative class meets all the requirements of

Rule 23.  To be sure, *Dukes* and *Comcast* arguably raised the bar on class certification, but they

do not appear to overrule the Tenth Circuit's earlier holdings in *Stricklin* in any way that is

relevant to the instant case.  In *Dukes* the Court found a lack of commonality where factual

differences among the gigantic purported class would have made it impossible to determine

whether discrimination took place and what caused it.

Like the plaintiffs in *Stricklin*, however, the potential class members in this case were exposed to the same injury regardless of the factual differences between them.  In *Stricklin* it was the unacceptably high risk of child abuse.  In this case it is the allegedly inevitable degradation of a product embedded in concrete that is designed to function appropriately for a long time.

To require absolute homogeneity of factual and legal circumstances among a putative class would grant defendants in products liability actions like this one a trump card of sorts. Merely by alleging that some members used the product improperly and thereby caused injury, a defendant could instantly raise enough doubt about commonality to defeat certification.  It is not necessary for the plaintiffs to pick a perfect plaintiff who can demonstrate at the class certification stage that he can prove each element of the tort and is subject to no defenses.  This is not a motion for summary judgment; it is a motion for class certification.

3.  <u>Typicality</u>.

"[T]ypicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."  *Stricklin*, 594 F.3d at 1199.  As the U.S. Supreme Court has noted, the commonality, typicality, and adequacy requirements "tend to merge."  *Dukes*, 131 S.Ct. 2541, 2550 n.5 (quoting *Falcon*, 457 U.S. 157-58 n.13).  It should be no surprise, then, that many of the same factors bearing on the commonality analysis above are relevant to the typicality analysis as well.

Goodyear repeats its arguments that the Entran 3 owned by most members of the putative class has not manifested a defect.  It claims or estimates that no problems with Entran 3 have been experienced in 99.9 % of homes in which it has been installed, and that Dr. Moalli's experiments that purport to prove a defective design were based only on one sample of Entran 3 hose that was subsequently destroyed and never made available to Goodyear's experts.

Ultimately the problems experienced by the named plaintiffs were caused by faulty installation, according to Goodyear.

Goodyear cites a case out of the Northern District of Illinois that seems to suggest that typicality is not met where the putative class includes "[plaintiffs] who have claims and [plaintiffs] who do not have claims." *Korsmo v. American Honda Motor Co., Inc.*, 2012 WL 1655969, at *6 (N.D. Ill., May 10, 2012). The *Korsmo* court, however, based this conclusion on the fact that the plaintiffs were suing based on alleged deceptive advertising and therefore would have to prove reliance on the defendant's statements. Deposition evidence revealed that many putative class members did not rely on those statements and were not deceived. In the Seventh Circuit, beliefs of the proposed class members cannot be presumed in fraud cases, so the court concluded that in light of evidence that disproved reliance by some class members, the claims of those who were deceived were not typical of the rest of the class. *Id.* at *6 (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513, 515 (7th Cir. 2006).

To hold that the named plaintiffs' claims in this case are not typical of the proposed class would require this Court to conclude at this stage that the named plaintiffs' injuries were caused by something other than the alleged design defect (i.e., caused by excessively tight angles on the hoses, improper clamps, etc.). The plaintiffs have demonstrated, however, that in homes where the installation was proper—even by Goodyear's estimation—similar cracking and rupturing can occur and has occurred. [ECF No. 99, Ex. B (Moalli Rebuttal) at 7; ECF No. 93, Ex. B (Tompkin Report) at 15.] They also offer arguably persuasive evidence in rebuttal to Dr. Bergstrom's conclusions that the EPDM rubber was sufficient for its intended purpose.

Goodyear also alleges that there is no evidence that all Entran 3 will inevitably fail during its expected lifetime. According to Goodyear, the plaintiffs cannot "simply make that allegation

and have [themselves] a class action." [ECF No. 116 at 18.] I agree. However the named plaintiffs do more than offer unsubstantiated evidence of inevitable failure. Here they demonstrated that failure occurred in several homes owned by named plaintiffs. They also demonstrated that Dr. Bergstrom's conclusions did not fully explain the failure of the Entran 3. As a result, plaintiffs have demonstrated the typicality of named plaintiff's claims and Goodyear's defenses to those claims.

    4. Adequacy.

    Rule 23(a) also requires that the plaintiffs adequately represent the class. This prerequisite incorporates many of the same factors analyzed above in the commonality and typicality sections. However, it also requires consideration of 1) whether there are any conflicts between members of the class or class counsel and 2) whether the named class members and their counsel will vigorously prosecute the case. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997)).

    Goodyear suggests that there are conflicts among class members, namely, between present and former owners of the same property. "Classes of those who 'own or owned' property are inherently conflicted as current and former owners of the same property vie for priority." [ECF No. 93 at 32]. Goodyear does not further explain the nature of the conflict, and as such, the argument (to which the motion devotes three conclusory sentences) appears to be a make-weight. Current and former owners might have different degrees of damage, but given that the plaintiffs ask to certify a class only for liability purposes that seems to be a distinction without a difference. Goodyear offers no evidence to support the idea that these two groups have different interests at the liability phase.

Goodyear also argues that the plaintiffs have failed to pursue this case energetically. Again, the record demonstrates no such lack of vigorous prosecution. The sharpest arrow in Goodyear's quiver is the fact that after the stay of proceedings was "automatically lifted on January 29, 2013 when the Court granted Goodyear's motion [to disqualify certain of plaintiff's original counsel]," it took approximately seven months for the plaintiffs to initiate discovery. Actually, during that hiatus, if one could call it that, plaintiffs were apparently seeking new counsel, as several new entries of appearance were filed in mid-June. Plaintiffs' delay in commencing discovery, and their plan to go forward with discovery, were explained in a Joint Status Report filed on June 20, 2013. [ECF No. 66].

This is a complex case. Already it has been the subject of extensive motion practice, and even now, despite the resolution of the class certification issue, several motions including motions for summary judgment and partial summary judgment (filed by both sides) remain pending. The vigor with which the class issue was litigated, including the expert and non-expert testimony developed and presented at the certification hearing, demonstrates that the plaintiffs are litigating the case with substantial resolve. Plaintiffs' lawyers are experienced in similar litigation. The record of this case hardly suggests inadequate representation.

**B. Rule 23(b)(3) Requirements.**

In addition to the prerequisites in Rule 23(a), the putative class must fit into one of the categories described in Rule 23(b). This case falls into the third category of predominance and superiority.

1. <u>Common Issues Predominate</u>.

In order to meet the predominance requirement, plaintiffs must prove that the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S.

at 623.  The Supreme Court recently elaborated on the stringency of this test in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct. 1184 (2013) and *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013).  "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."  *Comcast*, 133 S.Ct. at 1432.

In *Amgen*, the Court held that proof of materiality of alleged misrepresentations was not a prerequisite to class certification in a securities fraud case.  *Amgen*, 133 S.Ct. at 1191.  Because materiality is judged by an objective standard, whether the misstatements were material was a question common to the class.  *Id.*  So if plaintiffs could not prove materiality, individual questions would not predominate; rather the entire case would fail.  *Id.*

In the instant case, proof of a design defect and causation will be objective.  If the plaintiffs cannot prove these elements, the class will lose.  The presence of various factors defeating the defect or proof of causation would end the case, not cause individual questions to predominate over common ones.  *See Amgen*, 133 S.Ct. at 1196.  Goodyear essentially asks this Court to require what the Supreme Court rejected in *Amgen*—that the plaintiffs prove at the outset "that [they] will win the fray."  *Id.* at 1191.

*Comcast* presents a slightly more daunting hurdle for plaintiffs.  Yet for all its language about the stringency of the predominance requirement, *Comcast* is not quite on point here.  The Supreme Court's reversal of certification in *Comcast* was motivated by two considerations not present in this case.  First, the Court held that certifying courts may not refuse to consider arguments relevant to Rule 23 simply because those arguments also relate to the merits of the case.  *Comcast*, 133 S.Ct. at 1432-33.  That is not a concern here.  This Court is considering all evidence and arguments relevant to the requirements of Rule 23, even evidence and arguments related to the merits.  What this Court will not do, however, is refuse to certify a class that

otherwise meets the requirements of Rule 23 simply because the defendant raises potentially persuasive arguments about why the plaintiffs will fail on the merits.

Second, the district court in *Comcast* certified the class based on one theory of liability while simultaneously accepting expert evidence of damages that relied on several theories of liability in its calculations (including a few that were previously dismissed by the district court). *Id.* at 1433. Acceptance of those damage calculations was internally inconsistent and would have led to "[q]uestions of individual damage calculations . . . inevitably overwhelm[ing] questions common to the class." *Id.* Damages are not at issue in this case because the purported class is a liability-only class.

*Comcast* prompted the Supreme Court to vacate and remand a few products liability cases to lower courts for reconsideration in light of the opinion. Examining how these circuits dealt with *Comcast* on remand further supports certification in this case. In *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013), the Seventh Circuit upheld its earlier approval of class certification in a case involving allegedly defective front-loading washing machines that developed a mold problem. Writing for the Seventh Circuit, Judge Posner pointed out that in an effort to demonstrate a lack of predominance

> Sears argued that most members of the plaintiff class had not experienced any mold problem. But if so, we pointed out, that was an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate Sears—a course it should welcome, as all class members who did not opt out of the class action would be bound by the judgment.

727 F.3d 796, 799 (7th Cir. 2013) *cert. denied*, 13-430, 2014 WL 684064 (U.S. Feb. 24, 2014).

The Court of Appeals for the Sixth Circuit also received a remand in light of *Comcast*, again dealing with allegedly defective Whirlpool washing machines. Like the Seventh Circuit, the Sixth followed *Amgen*'s lead. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab.*

*Litig.*, 722 F.3d 838, 859 (6th Cir. 2013).  Finding that Whirlpool pointed to a "fatal similarity" in the plaintiffs' case—i.e. the failure to prove an element of liability—rather than a fatal dissimilarity, the court opted to uphold its earlier approval of class certification.  *Id.*

In this case, Goodyear likewise fails to demonstrate a fatal dissimilarity that would defeat plaintiffs' showing of predominance.  Under Colorado law, proof of a design defect requires proof of causation, *see Barton v. Adams Rental, Inc.*, 938 P.2d 532, 536-37 (Colo. 1997), although it should be noted that "the focus [of a strict products liability suit] is on the nature of the product rather than the conduct of either the manufacturer or the person injured."  *Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 727 (Colo. 2010).

Goodyear's strongest argument, again, is that incorrect installation caused the named plaintiffs' injuries.  If true, Goodyear suggests, this mode of causation would cause individualized questions to overwhelm common questions.  Goodyear supports this argument with evidence that the type of malfunction varies from named plaintiff to named plaintiff, that upon inspection Goodyear could find nothing wrong with the hose in several homes, and that only three named plaintiffs exhibit hose that is "crispy" or "crunchy" in accordance with plaintiffs' theory of defect.[3]

---

[3] Goodyear offers testimony from Dr. Bruce Strombom, an expert in economic and statistical analysis, concluding that "the likelihood that the true defect rate in the population is greater than 50 percent is nearly zero."  [ECF No. 93, Ex. G, 12 at ¶ 29.]  It follows, Dr. Strombom states, that individual inquiry would be required to distinguish between the defects caused by faulty installation and those caused by a defect in the Entran 3 hose.  *Id.* at 22-23.  The Court respects Dr. Strombom's analysis but thinks his statistics do not drive the legal conclusion he reaches.  The devil is in how Dr. Strombom defined "true defect" as a manifested defect.  Plaintiffs, however, allege that their injury includes hardened and brittle Entran 3 which will fail and manifest a defect during the expected life of the product.  Therefore the rate of defect, according to the plaintiffs, is 100 percent.  Moreover, the rate of "true defect" does not necessarily tell us anything about whether the defect can only be uncovered through individual inquiry rather than through scientific testing and analysis.

None of this evidence changes the facts supporting certification.  The type of malfunction does not appear to vary from plaintiff to plaintiff.  Just because one plaintiff experienced a split in the hose and another experienced leaking around the manifold and particles in the tank does not suggest different injuries.  In fact, both of those types of malfunctions seem to be precisely the type of malfunction that would result from degradation of the interior of the hose as demonstrated by Dr. Moalli.  And again, the plaintiffs put forward several named plaintiffs, including some who did not exhibit the type of improper installation alleged by Goodyear to cause the injury.

In other words, this range of facts looks like the typical, normal range of installations that all purchasers of the tubing would employ.  Therefore a class directed at answering the question of whether the rubber was bound to degrade and the EVOH was improperly bonded would generate common answers rather than require an individualized inquiry in each case.  If the plaintiffs cannot show that these alleged defects existed and caused the injury, then the entire class will lose on the merits, but the facts do not suggest that individual questions would predominate.

2.  <u>Class Treatment Superior</u>.

Finally, Rule 23(b)(3) also requires proof that class treatment is superior to individualized litigation.  The rule requires consideration of the following: "(a) class members' interest in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action."

I am convinced that the class action is a superior method to resolve this case, especially in light of the bifurcation of liability and damages. Individual members have little or no interest in controlling this litigation in light of the economic cost of bringing individual actions. To the Court's knowledge, other class members have not initiated litigation concerning this controversy. And consolidating litigation in this forum presents significant benefits. Judge Kane succinctly described these benefits years ago in a different case:

> First, relitigation of the same issues and presentation of the same evidence in hundreds of individual actions or arbitration proceedings would be grossly inefficient and wasteful of judicial resources. Second, maintenance of individual actions would be prohibitively expensive. Many of the crucial issues in this case will require substantial discovery, expert testimony, and trial time, all of which would render uneconomical individual actions.

*Joseph v. General Motors Corp.*, 109 F.R.D. 635, 642 (D. Colo. 1986).

Goodyear claims certification would consume as much if not more time than individual trials. However, Goodyear gets it backward. Rejecting a similar argument by the defendants in *Amgen*, the U.S. Supreme Court explained that requiring proof of materiality before certification would require a "mini-trial [on that issue] at the certification stage." *Amgen*, 133 S.Ct. at 1201. And if certified, that issue would have to be proven again at trial. *Id.* On the other hand if certification failed, "nonnamed class members would not be bound by that determination. They would be free to renew the fray, perhaps in another forum, perhaps with a stronger showing of materiality." *Id.* (citation omitted).[4]

Similarly, refusing to certify a class for liability purposes here would not save time. It is possible that certification would not save as much time as the plaintiffs allege, but at least

---

[4] At the hearing, the Court asked counsel to explain the possible effect of collateral estoppel if the class was not certified but plaintiffs nonetheless prosecuted the design defect issue to final judgment. No clear answer was provided. Ultimately it appears that there is no guarantee that other courts in future proceedings would use collateral estoppel to bind these parties or others on the issue of liability for design defect.

certification presents a possibility of judicial efficiency.  Indeed, it would appear to be more than a mere possibility.  Getting the issue of liability out of the way is likely to save considerable time in the future since repeated litigation of that element would require presentation of repetitive evidence.

### C.  Article III Standing

Goodyear also raises an argument unrelated to Rule 23, arguing that even if certification is proper under the rule, the putative class lacks standing to bring these claims under Article III of the U.S. Constitution.  Standing to bring suit requires every plaintiff to demonstrate a concrete and particularized injury.  *Hollingsworth v. Perry*, 133 S.Ct. 2652, 2661 (2013).  The alleged injury must also be actual or imminent.  *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1230 (10th Cir. 2012).  Injury that is merely speculative will not satisfy the requirements of Article III.  *Id.* at 1235.

Here, Goodyear claims that many members of the putative class have suffered no injury because their Entran 3 systems have not malfunctioned.  However, plaintiffs have introduced evidence demonstrating that Entran 3 hoses will degrade over time, within the expected lifetime of the product, and that such degradation will cause malfunctions.  That theory, if proven, would establish actual, concrete injury to any homeowner with Entran 3 installed.  The value of the home would be instantly reduced.  Replacement and repair would be required to avoid damage to other parts of plaintiffs' property.

The cases cited by Goodyear do not stand for the proposition that any plaintiff bringing suit for a latent defect lacks Article III standing until the defect manifests.  Rather they stand for the proposition that losses cannot be speculative.  They cannot be guesses.  *See, e.g.*, *In re Deepwater Horizon*, 732 F.3d 326, 340-43 (5th Cir. 2013) ("There is a distinction here between

19

whether a claim is colorable and whether it is meritorious.  A plaintiff's claim is colorable if he can allege standing and the elements necessary to state a claim on which relief can be granted—whether or not his claim is ultimately meritorious—whether he can prove his case."); *Wyoming*, 674 F.3d at 1235 (noting that the economic data about lost future tax revenue was purely speculative).

Goodyear cites as persuasive authority a bench ruling from the District of New Jersey dismissing a different case involving Entran 3.  [ECF No. 93, Ex. J.]  That case, *Nagy v. Goodyear Tire & Rubber Co.*, 12-cv-4235-MAS-DEA (D. N.J. Aug. 21, 2013), dealt with class certification in a suit for breach of implied warranty against Goodyear.  The court held that the plaintiffs could not establish injury in fact merely by pointing to hard and brittle hose that had not failed.  [ECF No. 93, Ex. J at 13-16.]  It seems to me that the plaintiffs in the instant case have presented a stronger argument for inevitable failure by identifying plaintiffs who are currently experiencing problems from the manifest defect as well as by putting forward scientific evidence supporting their theory.  In addition, the fact that the *Nagy* court was asked to certify a class under a breach of contract theory rather than a products liability theory casts doubt on the case's persuasive value here.

## IV.   Conclusion

For the forgoing reasons, the Court finds that plaintiffs have met the requirements of Rule 23, and the motion to certify a class [ECF No. 88] is GRANTED in part.  Only the Colorado class is certified, and only for the purposes of determining strict liability for design defect.

DATED this 21th day of March, 2014.

BY THE COURT:

R. Brooke Jackson
United States District Judge