IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-685-RBJ-MEH

DAVID HELMER, FELICIA MUFTIC, MICHAEL MUFTIC, CRAIG KANIA, and OLIVER MARTIN, on behalf of themselves and all others similarly situated,

    Plaintiffs,

vs.

THE GOODYEAR TIRE & RUBBER COMPANY,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
Trial Preparation Conference

_____

      Proceedings before the HONORABLE R. BROOKE JACKSON, Judge, United States District Court for the District of Colorado, occurring at 9 a.m. on the 19th day of December, 2014, in Courtroom A901 United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Tamara Hoffschildt, 901 19th Street, Room A251, Denver, Colorado, 80294, (303) 292-1088

**APPEARANCES**

1

2     RICK BAILEY, Burg, Simpson, Eldredge, Hersh & Jardine,

3  PC, 40 Inverness Drive East, Englewood, CO 80112; MICHAEL

4  FLANNERY and KATHERINE VAN DYCK, Cueno Gilbert & LaDuca, LLP,

5  300 North Tucker Boulevard, Suite 801, St. Louis, MO 63101; and

6  JASON S. RATHOD, Whitifield Bryson & Mason, LLP, 1625

7  Massachusetts Avenue, NW, Suite 605, Washington, DC 20036,

8  appearing for the Plaintiffs.

9     ROGER THOMASCH and DAVID STAUSS, Ballard Spahr Andrews

10 & Ingersoll, LLP, 1225 17th Street, Suite 2300, Denver,

11 Colorado 80202-5596; and MICHAEL BROOKS, Well, Anderson & Race,

12 LLC, 1700 Broadway, Suite 1020, Denver, CO  80290; DAVID LENYO,

13 Garfield & Hect, PC, 601 East Hyman Avenue, Aspen, CO  81611,

14 appearing for the Defendant.

15                    *   *   *   *   *

16                      **PROCEEDINGS**

17

18    (In open court at 9:00 a.m.)

19     *THE COURT:*  Good morning.  12-cv-685, David Helmer et

20 al versus The Goodyear Tire & Rubber Company.  Trial

21 preparation conference this morning.

22     Appearances, starting with the Plaintiff.

23     *MR. BAILEY:*  Good morning, Your Honor.  Rick Bailey

24 with the law firm of Burg, Simpson on behalf of the Plaintiffs.

25     *MR. FLANNERY:*  Good morning, Your Honor.  Michael

 1    Flannery, with Cuneo Gilbert and LaDuca, on behalf of the

 2    Plaintiffs.

 3              *MS. VAN DYCK:*  Good morning, Your Honor.  Katherine

 4    Van Dyck with Cuneo, Gilbert and LaDuca, on behalf of the

 5    Plaintiffs.

 6              *MR. RATHOD:*  Good morning, Your Honor.  Jason Rathod,

 7    with Whitifield Bryson & Mason, LLC, for the Plaintiffs.

 8              *THE COURT:*  Well, it seems that the Plaintiffs are

 9    well represented by plenty of lawyers.  How about the

10    Defendants?

11              *MR. THOMASCH:*  Same group, Your Honor.  Roger Thomasch

12    on behalf of the Defendant.

13              *MR. STAUSS:*  David Stauss on behalf of the Defendant.

14              *MR. LENYO:*  Your Honor, David Lenyo, Garfield & Hecht,

15    on behalf of Goodyear.

16              *MR. BROOKS:*  And Michael Brooks from Wells, Anderson &

17    Race, on behalf of Goodyear.

18              *THE COURT:*  Thank you.  Gentlemen and lady, within the

19    past few days you have collectively filed nine motions in

20    limine.  You have filed responses to four of those.  There are

21    no replies.  There are no responses to five of the motions.

22    Even yesterday we had four more motions filed and two

23    responses.  That was all done, literally, on the eve of the

24    Christmas and New Year's holiday, and less than three weeks

25    before trial.

1          I intended to say, Are you kidding?  If you were to

2     continue briefing these that would occupy your time during the

3     holidays.  If you were to expect the Court then to read all of

4     your motions, all of your responses, all of your replies, and

5     give you decisions before your trial, you would be occupying

6     the Court's time throughout the holidays.

7          The bad news is the Court's law clerk on this case,

8     will be leaving, understandably so, for the holidays, this

9     weekend.  The Court's judicial assistant/secretary will be

10    leaving and gone all next week, and even the old Judge will be

11    in and out.

12         Now, you folks have a bevy of associates to churn the

13    paper, I can see that, but that doesn't assist me,

14    particularly.  Therefore, I'm going to give you rulings right

15    now, today, on every motion.

16         I will invite you, if you wish to make further

17    argument, briefly, on those motions to which no response has

18    been filed.  I will go through them one by one, and if the

19    other side wants to stand up and make a short response, you

20    may, and then you will get my rulings for better or for worse.

21         We will start with Number 155, number refers to the

22    electronic filing system.  This was a motion filed by the

23    Plaintiff, no response from the Defendant, it's a Motion To

24    Exclude Expert Bergstrom's Computer Model.

25         Does the Defendant wish to present brief oral argument

1    in opposition?

2            *MR. STAUSS:*  We do, Your Honor.  I will be brief,

3    Your Honor.

4            *THE COURT:*  That's true, you will.

5            *MR. STAUSS:*  Dr. Bergstrom's report dated -- it was

6    the second to last report that was issued, he noted that we've

7    seen many instances where the hose has been installed with a

8    tight bend radius, and he said that's improper to install a

9    hose with a tight bend radius, and that it can result in

10   stresses being applied to the hose which are improper.  What he

11   said in his report is that if an Entran 3 hose is bent close to

12   the fitting then the stress and strain in the hose will become

13   even larger due to the force and the bend at the bar fitting on

14   the inside of the hose.

15           *THE COURT:*  All right.  That's not what the motion is

16   about.  The motion is about excluding his computer model on the

17   basis that it was not disclosed in the reports.

18           *MR. STAUSS:*  Absolutely, Your Honor.  And then next

19   sentence --

20           *THE COURT:*  Is there anything you need to say beyond

21   that?

22           *MR. STAUSS:*  Yes, Your Honor.  The next sentence says,

23   This can be illustrated through computer simulations, in his

24   report he notes that.  Then he produced, as part of his file --

25           *THE COURT:*  Well, wait a minute.  In your papers, you

1    said there was no reference to the computer model in the

2    report.  Now you are telling me that's not correct.

3         *MR. STAUSS:*  I'm Defense, Your Honor.  That's not

4    correct.  He specifically referred that it could be illustrated

5    through computer simulations.  I think what the Plaintiffs'

6    point was -- in fairness to the Plaintiffs.

7         *THE COURT:*  I should have said the Plaintiffs said

8    this was no reference in the --

9         *MR. STAUSS:*  There was, Your Honor.  In fairness to

10   the Plaintiffs I think what they are saying is what

11   Dr. Bergstrom explained was after he had issued his report he

12   did the computer simulations to confirm his opinion, those were

13   produced as part of his supplemental production on October 27,

14   2014.  He was deposed on November 18th, 2014, about three weeks

15   later, he was asked about -- questions about his computer

16   modeling for 30 or so pages about it, as he explained it

17   illustrates and confirms his opinion about the bend radii being

18   too tight.  There was an argument about -- so in other words,

19   this was fully disclosed.  It was fully produced.  He was

20   deposed on it.  Any questions that needed to be asked were

21   asked.  There was a question as to reliability, he explained

22   how he uses computer simulations.  It's, you know, it takes a

23   Ph.D. from M.I.T. to be able to explain some of it, but if you

24   are interested in liability, Your Honor --

25         *THE COURT:*  Let me ask you, what I wrote in my notes

1   from the Plaintiffs' motion was the model was not disclosed in

2   his reports.  In his November 18, 2014, deposition, he

3   testified that none of his opinions were based on the model,

4   which was created in October 2014.  And I noted, just for

5   myself, that the deadline for expert disclosures in the

6   original scheduling order was way before then, and I couldn't

7   find any extension of it, other than for class reports.

8          In any event, Plaintiff says Bergstrom's final

9   rebuttal report of November 6th, 2014, also doesn't reference

10  the model.

11         You are telling me those statements aren't true?

12         *MR. STAUSS:*  I don't want to characterize opposing

13  counsel's statements as being untrue.

14         *THE COURT:*  So they were true?

15         *MR. STAUSS:*  No.

16         *THE COURT:*  Well, which is it?

17         *MR. STAUSS:*  Well, Your Honor, it says, on page 51 of

18  his report, This can be illustrated through computer

19  simulations.

20         *THE COURT:*  That's all it says?

21         *MR. STAUSS:*  That's all it says.  Computer simulations

22  were produced as part of his file.  On November -- I'm sorry.

23  On October 27th, computer simulations were produced as part of

24  his file.

25         *THE COURT:*  And you are claiming you are prejudiced by

1    this?

2          *MR. STAUSS:*  Plaintiffs are claiming they are

3    prejudiced by this.

4          *THE COURT:*  All right.  Thank you.  Any response,

5    briefly?

6          *MR. BAILEY:*  Brief response.  The language you read,

7    or that was read by Mr. Stauss, from the October 7th report of

8    Dr. Bergstrom is the only reference and it says it --

9          *THE COURT:*  I thought your motion said there was no

10   disclosure in the reports.

11         *MR. BAILEY:*  Well, we don't believe it's a disclosure.

12   It is just a statement, it may be illustrated through a model.

13         *THE COURT:*  But you didn't say that, did you, in your

14   motion?

15         *MR. BAILEY:*  Well, we certainly weren't trying to

16   mislead anyone.  The way we read that is it's just a

17   hypothetical; that it could.  It had not been produced at that

18   time.  It was produced three weeks -- three weeks later, among

19   thousands of pages of documents, and we found it there.  The

20   second point --

21         *THE COURT:*  How is it prejudicial to you?

22         *MR. BAILEY:*  It's prejudicial because the model itself

23   is not a model of Entran 3 hose.  It's a model of some other

24   hose, with assumptions made by Plaintiff -- Mr. Bergstrom

25   Dr. Bergstrom.

1         *THE COURT:*  Next is Number 156.  Plaintiffs' Motion To

2    Exclude Certain Testimony Of Bruce Strombom on the basis that

3    Strombom, the economist extrapolated from a small unscientific

4    and biased Goodyear survey.

5         *MR. LENYO:*  Yes, Your Honor, Dave Lenyo.  You may

6    recall Dr. Strombom has a Ph.D. in economics, and he conducted

7    essentially three types of statistical analysis.  One involved

8    the quality-control records, which I do not believe is the

9    subject of their motion, but I just want to make that clear.

10   The second one is the Plaintiffs identified, depending upon the

11   timeframe, between three or ten systems that they claim are

12   having problems.  Dr. Strombom did a statistical analysis based

13   on that information, which is also not the subject of their

14   motion.

15        What their motion is about is what they

16   mischaracterize as a survey that was performed, by

17   Dr. Strombom, and we strongly dispute that their

18   characterization of his analysis as a survey under the *Auraria*

19   case, or the handbook that they cited, is correct.  A survey --

20   a poll is an opinion survey where one side sends out

21   interrogatories to a group of individuals and asks them

22   questions regarding their subjective observations, which may be

23   relevant in certain cases.  For example, in a patent case, send

24   out a survey to people, Are you confused whether or not this

25   product is the same as this product, and you come back and you

1   may or may not be able to use those subjective answers in order

2   to present evidence in a particular case.

3           In this case, Goodyear did not send out an opinion

4   poll to Entran 3 users asking them, How is your Entran 3 system

5   working?  Have you had any problems?  All Goodyear did was send

6   out a number of letters to people they have identified that had

7   Entran 3 systems, and asked them would they permit an

8   inspection.  So the -- to characterize that as survey evidence

9   is just not correct.  Their argument, at most, goes to the

10  weight not admissibility of the evidence.  And I would also say

11  there's going --

12          THE COURT:  How can Strombom base any opinion on a

13  handful of letters that were, obviously, on their face biased

14  to begin with?

15          MR. LENYO:  Well, Your Honor, first of all, we

16  disagree they were biased.  They were just letters saying,

17  There is a dispute, there's litigation pending.  We understand

18  you have a system.  Will you allow us to come inspect your

19  system?

20          THE COURT:  Well, there wouldn't be any problem if

21  that's all it was, but he is drawing big conclusions from it

22  according to the Plaintiffs.

23          MR. LENYO:  But he is drawing conclusions not based on

24  any subjective answers to the letter.  He is drawing his

25  conclusions based on the inspections, and what the physical

 1   evidence shows, and those underlying experts will testify

 2   independently, regardless of the survey.  So the underlying

 3   information is coming into evidence, but they are

 4   mischaracterizing it as an opinion survey, and they are relying

 5   strictly on that case law and that's just wrong, Your Honor.

 6           THE COURT:  Thank you, Mr. Lenyo.

 7           THE COURT:  All right.  Any follow up by the Plaintiff

 8   on that motion?  Briefly.

 9           MR. RATHOD:  Yes, Your Honor.  I think that opposing

10   counsel has given an unduly narrow definition of what a survey

11   is.  In fact, the first I ever heard of a survey characterized

12   as just a set of interrogatories, and the key point is that

13   there's the same problem with whether it's a consumer survey or

14   a patent survey or a letter campaign that is soliciting

15   feedback from homeowners, in this instance, and that problem is

16   what our expert, Dr. Duane Steffy said is nonresponse bias, and

17   nonresponse bias is if the letter is written in a biased manner

18   then it could skew the responses totally in one way.  And

19   that's -- in the motion we gave evidence from a homeowner who

20   saw this letter and said, I told you that I had a problem, and

21   I tried to deal -- I tried to get you to deal with it and you

22   didn't, and so there is a whole population --

23           THE COURT:  I thought the problem was he was drawing a

24   conclusion from this little bit of a survey that the percentage

25   of defects is beyond one billionth or something like that.

12

1        MR. BAILEY:  That's absolutely right.  The survey is

2   how he got his source information, which was the eleven

3   homeowners that he is extrapolating from, but that population

4   of eleven, I think, is improper to draw broad conclusions from.

5        THE COURT:  Thank you.  Now, 162 is Motion In Limine

6   To Exclude Testimony About Leaks Or Hose Failures Where The

7   Hose Was Not Preserved For Inspection.  That's a Defendant

8   motion.  Any response?  You don't have to.

9        MR. BAILEY:  Your Honor, with regard --

10       THE COURT:  Please use the microphone.  I have Tammy

11  helping us today, instead of Kara, my court reporter, who has

12  flown off to Panama.  I'm so used to Kara saying, Please use

13  the lectern that I have been conditioned, now.

14       MR. BAILEY:  Thank you, Your Honor.  With regard to

15  the motion on the hose samples, first I want to indicate

16  Your Honor has previously considered this very issue in the

17  context of the Muftic case on the summary judgment motion,

18  where defendants made virtually the same argument with regard

19  to the first Muftic leak, and said that it's -- an issue for

20  the individual damages trial, and that Dr. Moalli's opinion is

21  not unsupported.  But I would go on to say that in each and

22  every case that they mention, or situation, that they mention

23  there, number one, when these leaks occur, and they have

24  occurred at various times, they occur at awkward times, often

25  times, or in most cases, the homeowners had no idea there was a

1    lawsuit.  They had, you know, serious water damage going on,

2    they have a plumber fix it, and in some of the cases the hose

3    with the leak in itself was preserved.  In every case there

4    was -- there was the ability for the defendants to inspect the

5    home.  They did inspect the home.  They took numerous

6    questions, in every case, but I believe one, they -- they have

7    the piece of hose that leaked.  The defendants and the

8    plaintiffs together had done destructive testing of the hose.

9    We have thousands of pictures on both sides of the hose.

10   There's more than simply, you know, some sort of speculation

11   about the hose.  There's been actual inspections of the hose.

12   And even if a piece -- a piece of hose is gone, it was not

13   spoliation in any case.  And the rest of the home has been --

14   or the least of the hose has been inspected.  But I'm not going

15   to go through all of them, but I have pictures to show --

16          THE COURT:  That's enough.  Defendant.  It took you 17

17   pages, 13 exhibits, and 134 pages of exhibits to write this

18   motion.

19          MR. STAUSS:  This is very important to us, Your Honor.

20   The Mitchell residence, two alleged leaks, no hose preserved.

21   The Virnich residence, three alleged leaks, no hose preserved.

22   The Brinkler residence, four alleged leaks, one hose --

23          THE COURT:  Are -- are these incidents where the

24   person knew about the lawsuit and then discarded the product?

25          MR. STAUSS:  In Muftic -- well --

1           THE COURT:  Yes or no.

2           MR. STAUSS:  Not Malmgren -- yes.

3           THE COURT:  You knew about the lawsuit and you took

4    the defective hose and discarded it?

5           MR. STAUSS:  With Mitchell and Virnich, no,

6    Your Honor.  With Breaker, no.  With Malmgren, the Plaintiffs'

7    attorney, David Black was there, inspected it, didn't alert

8    defendants.  There was an incident just this past December 1,

9    in which the Muftic residence had an alleged leak.  We were

10   concerned so much about what was going on we sent out a letter,

11   I did, in early October, indicating, Listen, you have got to

12   stop removing hose pieces when you see them, and you are

13   claiming there is a defect, because, as you know, as we sat

14   here in classification hearing and demonstrated,

15   installationers are a big deal in this litigation.

16          THE COURT:  Yes, I thought so too.  Presentation was

17   fairly persuasive.

18          MR. STAUSS:  Thank you, Your Honor.  As I said, we are

19   concerned.  They had a guy name Tom Krochmal who in some cases

20   was a consulting expert and in other cases he was a fact

21   witness, and he was going around, he would pull this hose piece

22   off the Harris and Fritch residences, and those aren't part of

23   our motion, we have set those aside.  We were very concerned.

24   And then what happened two weeks ago with Muftic is she had an

25   alleged leak, had it repaired, had the hose piece removed and

 1   the hose piece was destroyed, Your Honor, it was torn apart, in

 2   two.

 3          THE COURT:  Okay.  I hear you.  Thank you.

 4          MR. BAILEY:  Do you wish any response to that,

 5   Your Honor?

 6          THE COURT:  No.  Next 166.  The Defendant's Motion To

 7   Exclude Testimony By Dr. John Moalli?  Seriously, gentlemen?

 8   You are going to wait until right before trial and try to knock

 9   out their expert that you have known about all along?  Maybe

10   that's your argument.

11          MR. BAILEY:  Well, that is my argument, and beyond

12   that, I would say that there was, at the class certification

13   hearing, there was an extensive Direct Examination of

14   Dr. Moalli and --

15          THE COURT:  I don't need to hear further from you on

16   this one.  Do you have anything further to justify this from

17   the Defendant side?

18          MR. BROOKS:  Your Honor, I would just hone in on the

19   very final argument that we make in the Moalli motion and that

20   is that with respect to the hose sections that were not

21   preserved, the ones that Mr. Stauss was referring to with

22   respect to Motion Number 165, it -- it would be our request

23   that the Court exclude any testimony by Dr. Moalli trying to

24   establish any sort of causal leak between the alleged defect

25   and whatever might have caused the damage to these sections of

1   hose.

2   THE COURT:  Well, how could he, if he doesn't have a

3   chance to look at it?

4   MR. BROOKS:  I agree, and that's the point that I want

5   to hone in on here.  I understand the Court's comments with

6   respect to the -- the more global portion of the motion.  But

7   the final argument --

8   THE COURT:  He can't give opinions about a specific

9   piece of hose if he hasn't seen it, right?

10   MR. BROOKS:  I believe --

11   THE COURT:  He can give his general opinion, and no

12   doubt will, that the hose is defective and will inevitably

13   fail.

14   MR. BROOKS:  That opinion is -- is something that we

15   also challenge, but we are specifically, at least for my

16   argument at this moment, focusing on those sections of hose.

17   THE COURT:  Seems to me that the two sides don't want

18   to go to trial; they want to win the case before trial.

19   Speaking of which, are you gentlemen definitely, definitely

20   going to trial on January 5th?

21   MR. BROOKS:  Yes.

22   THE COURT:  There is not going to be a settlement?  No

23   chance?

24   MR. THOMASCH:  May I address that for a second?

25   THE COURT:  Yes, I wish you would, Roger, because I

1    have another three-week case set to start January 12th, and

2    they are coming in for their trial preparation this afternoon,

3    and I am going to give them some bad news and say you guys are

4    first in line.

5         *MR. THOMASCH:*  Up until literally two days ago, there

6    had been no discussion of settlement.  Mr. Gary Mason, who is

7    one of the lead counsel for plaintiffs, and is not available to

8    be here today, was in our office in connection with the jury

9    instruction conference and pulled me aside and raised with me a

10   concept of settlement and asked that Goodyear consider it.

11        Goodyear is considering it, and I will tell you,

12   frankly, that the settlement concept is probably something that

13   could be worked with, although it's getting late in the day to

14   do it.  There is, however, an enormous problem, and I suspect

15   you probably know what it is, and wholly apart from the

16   settlement of the plaintiff's claims under the structure, this

17   enormous problem is going to keep the case from settling.

18        *THE COURT:*  Okay.  Well --

19        *MR. THOMASCH:*  But there has been a discussion,

20   something has been submitted to us, we are looking at it, it

21   might be workable as a concept, but we've got a big problem.

22        *THE COURT:*  Okay.  Well, I can't speculate and won't

23   on what your big problem is.  But here is my big problem, I

24   have got this other case right on your tail.

25        *MR. THOMASCH:*  Understood.

1    THE COURT:  And -- and I am going to do something with

2    them, on the assumption that you go to trial.  Here is my other

3    problem, I don't have staff next week, and so if something

4    happens, I need to know it, but don't email anything to

5    chambers, because it will just sit there in the email.  You

6    will either have on file something on ECF or email something

7    directly to me to communicate with me next week.  Okay.

8         MR. THOMASCH:  Yes, I -- given next week and the

9    Christmas holiday and so forth, it's highly unlikely there's

10   going to be any settlement next week.

11        THE COURT:  At least let your associates relax a

12   little bit during this coming week.

13        MR. THOMASCH:  I just felt, in fairness, I needed to

14   tell you that conversation occurred.

15        THE COURT:  Okay.  Thank you.  Okay, 167 is the last

16   one, that there is no response to, that is Plaintiffs' Motion

17   To Exclude Evidence Related To Entran 3 Installation Manuals or

18   Instructions.  Defendant, do you wish to comment?

19        MR. BAILEY:  Your Honor, what the Plaintiffs are

20   referring to is during the time periods at issue, Heatway

21   produced and published various installation manuals which

22   addressed, among other things, required installation techniques

23   and materials that must be used in order, for example, their

24   warranty to be valid.

25             Two very important examples from the class

1   certification hearing.  The manual said you can't bend this

2   hose too far; what's call the minimum bend radius --

3           THE COURT:  Okay.  I get all of that.

4           MR. BAILEY:  Yeah.  And the clamps are also in there.

5           THE COURT:  That isn't the point.  Their point is that

6   if the installer didn't have it, you can't expect him to follow

7   it.

8           MR. BAILEY:  Well, Your Honor, first of all, remember

9   there's an apportionment of fault component of this case, and

10  Heatway told Goodyear, at the beginning of the relationship,

11  that these systems were going to be installed by Heatway people

12  or at a minimum they were going to provide information and

13  supervise the installation, so the manuals go to that issue.

14          THE COURT:  You are fine.  Thank you.  All right.

15  Take out your pencils.  Here are the rulings on all of your

16  pending motions, and please don't file anymore.  If you file

17  anymore, I'm going to put my friend Roger in jail for

18  Christmas.

19          MR. THOMASCH:  We won't file anymore.

20          THE COURT:  All right.  And bear in mind here, lady

21  and gentlemen, a motion in limine asks for a pretrial ruling,

22  but there is always discretion on the part of the Court to

23  reconsider in the context of what actually happens at trial,

24  but this is how I see these motions at this time.

25          Motion Number 154, filed by the Defendant, Motion To

1    Exclude Expert Testimony of Edward Fronapfel.  The Court grants
2    the motion in part and denies the motion in part.  The motion
3    is denied as to Mr. Fronapfel's testimony as to industry
4    standards, however, the Court, of course, reserves the right to
5    reconsider that ruling if an adequate foundation for his
6    opinions is not provided at trial.  Based on what was presented
7    to the Court in the papers, it appeared as if there was a
8    foundation for his opinions, but if he can't establish that at
9    trial that's another thing.  Assuming that he puts on some
10   evidence of the foundation; that is, how he has knowledge of
11   what the standard was in the '92 and '96 timeframe, that still
12   is sufficient or fair game for Cross-examination, and goes to
13   the weight, not the admissibility.

14        However, the Court grants the motion to the extent
15   that the Defendant wishes to preclude Mr. Fronapfel from
16   speculating on Goodyear's state of mind.  He can point to
17   Goodyear documents and base opinions on what the documents
18   actually say, but it's not for him to be telling this jury what
19   Goodyear actually knew or what Goodyear actually understood.

20        Next, Number 155, Plaintiffs' Motion To Exclude Expert
21   Jorgen Bergstrom's Computer Model.  The Court grants the
22   motion.  The Court is not satisfied that that computer model
23   was adequately or timely disclosed in connection with his
24   expert reports.

25        Next, Plaintiffs' Motion -- Number 156, Plaintiffs'

1    Motion To Exclude Certain Testimony Dr. Bruce Strombom.   Court

2    grants the motion.   The Court considers that the letters or

3    survey, at least for the purpose of serving as a foundation for

4    extrapolation and expert opinion was, on its face, biased, and

5    that the response was small.   It's not a random or reliable

6    cross-section of Entran 3 homeowners.

7           Next, Number 157, Defendant's Motion To Preclude Any

8    Evidence Related To Any Entran II Claim, Lawsuit, Settlement Or

9    Judgment.   That is granted, but with an explanation.   And the

10   Court understands that necessarily there will be references in

11   this case to the Entran II.

12          Also, during voir dire, counsel may ask whether

13   prospective jurors have ever heard of Entran II or any

14   litigation regarding Entran II, or of course, whether they've

15   ever heard of Entran 3, or any litigation concerning Entran 3.

16          However, unless the Defendant opens the door, and

17   that's always an exception, the Court doesn't want evidence

18   concerning specific lawsuits, specific judgments, specific

19   settlements, none of that is relevant, and to the extent it

20   could be viewed as relevant, and Plaintiff makes a valued

21   effort to say it's, quote, part of the Entran story, I don't

22   think so, at least it's not a relevant part of the story, but

23   to the extent that there's any relevance, the Court finds it's

24   substantially outweighed by the danger of unfair prejudice.

25   We're going to try Entran 3.   We are not going to retry Entran

II.

Motion Number 158, Defendant Goodyear's Motion To Exclude Any Evidence Related To Any Claims Beyond Strict Liability For Design Defect, that motion is granted.

The Plaintiff seems to keep wanting to come back and, sort of, semi-renege on their statement made in court that their only claim is defect.  However, this doesn't exclude background evidence on the marketing of the product, that has to be part of the case, but if Plaintiff tries to introduce evidence suggesting breach of warranty, defect in manufacturing, et cetera, the Court will intervene and instruct the jury that it is -- it is to consider only a claim of defective design.

Next, Number 160, Plaintiffs' Motion For A Supplemental Juror Questionnaire.  Denied.  That is not to say that the Court is opposed to a questionnaire.  In fact, I am reasonably sure that I already told you that I wouldn't be opposed to a questionnaire, but I'm not impressed by the one that they submitted.  Just as in a general matter, the questionnaire should not be repeating the questions that the Court, through it's board, will be asking jurors.  It should not delve into religion or politics or ethics or things of that nature, and it should not ask metaphysical questions.

What I have done is I have taken a blue marker and I have highlighted all of those things in the proposed

1  questionnaire that I don't want to see in your questionnaire.

2  That includes the entire first page, all these instructions,

3  but it includes questions about employment, because that will

4  be something the Court gets into with the jurors.  Questions

5  about, as I say, ethical, religious, political or other beliefs

6  are questions about metaphysical things, like, What is your

7  opinion on the proposition that most bad things in life happen

8  with no one to blame or someone to blame?  No.  All of this

9  stuff about, How do you feel about the government versus

10  corporations?  All of this stuff about, Have you ever heard of

11  any of these people, and then there's a list of all of these

12  names and companies.  We will go through all of that.  Don't

13  worry.  And this thing, I affirm under penalties of perjury.

14  We're going to bring in these people right after New Years, but

15  we are not going to put them under -- we are not going to

16  threaten them with perjury.

17          So I will give this back to the Plaintiff and they can

18  take another crack at it.  Frankly, gentlemen and lady, I don't

19  really fully understand why you are so concerned about a

20  questionnaire, because it won't be filled out until the morning

21  of, and as you know, I allow you unlimited voir dire.  There's

22  no time limit.  You can ask any appropriate question you want

23  to ask, and if we have a questionnaire, and they have provided

24  information, I will expect that you won't just ask the same

25  questions again.  But if you really are hot and bothered and

24

1    need a questionnaire, I'm okay with it, but it's got to be

2    modified, so remind me and I will give it to the Plaintiff.

3           Okay.  Where was I, here?  Number 162, The Defendant

4    Goodyear's Motion To Exclude Testimony About Alleged Leaks Or

5    Hose Failures Where The Hose Was Not Preserved For Inspection?

6    That is denied, and the Court finds that that is the subject

7    for Cross-examination and goes to the weight not the

8    admissibility.  However, if there is evidence that the hose was

9    removed and discarded or destroyed, after the suit was filed by

10   someone who was aware of the suit, whether that is the

11   homeowner or an expert or a lawyer anybody who was aware of the

12   suit, if they took and discarded or destroyed the hose, the

13   Court will, in that circumstance, consider an adverse inference

14   instruction, and should probably know, those fall into two

15   different categories, a negligent spoliation of evidence or an

16   intentional spoliation of evidence.  And if there were evidence

17   that there was an intentional spoliation of evidence, the Court

18   will consider the type of instruction which says the jury

19   should assume that the received would have been hurtful to the

20   party who discarded or destroyed it.  But the mere fact that

21   hose might have been discarded, isn't enough.  As was said, it

22   could be that some homeowner had a leak, called in the plumber,

23   the plumber removed the hose and replaced it, and either the

24   homeowner or the plumber innocently discarded it, without any

25   knowledge of any lawsuit, and certainly that would not generate

1  a spoliation instruction.  It's fair game for the Defendant to

2  whine, and say well we couldn't expect it, but not to blame

3  somebody and get an instruction.

4       Number 166, Defendant's Motion To Exclude Testimony By

5  Plaintiffs' Expert Dr. John Moalli, that is denied.  As I

6  hinted to counsel, I think it's borderline offensive to wait

7  until December 18th, 2014, which is less than three weeks

8  before trial, and with the Christmas and New Year's holiday in

9  between, to seek exclusion of an expert whom the Defendant has

10  known to be one of Defendant's primary experts for many months.

11  In addition, the Court is satisfied, based on Dr. Moalli's

12  testimony at the class certification hearing on February 28th,

13  2014, that his opinions are sufficiently relevant and reliable

14  to be admissible under Rule 702, and therefore, an additional

15  *Daubert* hearing is not necessary with respect to Dr. Moalli.

16  The criticisms about his lack of an appropriate scientific

17  basis go to weight, not admissibility, and can be commented by

18  opposing experts as well.

19       I think that's all.  Isn't it?  No.  There's 167.

20  Motion In Limine By The Plaintiff To Exclude Evidence Related

21  To Entran 3 Installation Manual Or Instruction.  That motion is

22  denied.  If the installers didn't receive the manual, where

23  there's no evidence that they did, that can be pointed out by

24  the Plaintiffs.  In fact, I can imagine how it could even be

25  pointed in the Plaintiffs' favor, but it's not a basis to

26

1    exclude the evidence, because the evidence shows what the

2    Defendant's position was on how the product should be

3    installed.  Those are the rulings on all of the pending motions

4    in limine.

5           Jury instructions.  We just got them.  Guess what, I

6    was tied up with motions in limine, so I'm going to have to

7    wing it.  Take them from the top.  And I am not criticizing

8    you, I know that you had a lot of things on your plate.  So,

9    Proposed Jury Instructions Agreed Upon By The Parties.  At a

10   glance that looks fine.

11          Next, instructions on evidence can be considered.  And

12   you have got your note about admissions and stipulations, and I

13   agree if we have that we can modify it, but either way it's

14   fine.

15          Credibility, fine.  Direct and circumstantial is fine.

16   Expert witnesses, it's fine.

17          Just for your information, and if either side

18   disagrees I would be happy to hear what you have to say, but

19   just in recent trials, and I have been in trial a lot, I just

20   got out of trial earlier this week, and I have been in lots of

21   trials lately, I have changed my practice a little bit.  For

22   years and years the expert would be qualified, the other side

23   would say no objection or state an objection if they had one,

24   and if I disagreed with the objection or if there was no

25   objection, I would say, for example, Dr. Moalli is accepted by

1   the Court as an expert in the field of X, Y, Z and permitted to

2   express opinions.  More recently I haven't been doing that.  I

3   have simply said okay or fine or onward or something like that,

4   without putting the stamp of approval from the Court, Okay, he

5   is an expert and he can express opinions as an expert.

6        I don't really care.  If you folks want me to do

7   something different, I will.  Other than that, I will probably

8   just do what I have been doing lately.  Any opinions on that?

9        MR. THOMASCH:  That would be fine with us.  What you

10  have been doing lately is square with what we would prefer.

11       MR. BAILEY:  That's fine, Your Honor.

12       THE COURT:  Next; yeah you don't need that, I -- maybe

13  we should just pause here and talk about, as a practical

14  matter, how things tend to go in my trials.  I start with the

15  jury, and tell them a little bit about what the case is about,

16  and somewhere, fairly early, I will have the lawyers introduce

17  themselves, and whomever is with them at the tables.  I mainly

18  do that just to kind of break the ice for you guys.  And we

19  talk about the schedule and things like that.  I will talk with

20  them about -- at some point or other -- I don't have any script

21  or outline, I just have done it enough times, but I will talk

22  about not doing research, you know, cell phones, not

23  broadcasting the trial through social media as we go, not

24  looking things up on the Internet.  At some point I will say no

25  one is going to have any contact with them, if they see them in

 1    the elevator, et cetera, it's not an expression of discourtesy.

 2    I will tell them about notes.  I will tell them they can ask

 3    questions.  I will explain how the process of questioning

 4    works.  All of those things.  And we will take them through the

 5    board.

 6         The board is very simple, name, occupation.  I always

 7    tell them they don't have to tell us exactly where they work if

 8    they don't want to.  Spouse, spouse's occupation.  Prior jury

 9    duty.  Any reason they can't serve.  One or two other things on

10    there.  Real basic.  All of that usually takes about 45 minutes

11    and then I turn it over to you.  And sometimes I forget some of

12    those things and then you remind me.  I have even forgotten to

13    swear the jury in.  It's embarrassing, but it's okay.

14    Everything can be fixed.  Any questions about any of that?

15         *MR. BAILEY:*  No, Your Honor.

16         *THE COURT:*  Don't ever be shy about asking about

17    procedural questions because I'm happy to talk with you about

18    it and change my procedure, or at least consider it.  If you

19    want.

20         Okay.  So you can pull this one.  We don't need this

21    one on the notes.  Nothing wrong with it, but just one of the

22    things I'm sure of.

23         Okay.  Some evidence is admitted for a limited purpose

24    only.  That may or may not turn out to be relevant, but it's

25    fine.  But only if I have done that.  Verdict must be

1    unanimous.  Duty to consult with one another.  You know, this

2    is interesting, even the second paragraph here in Colorado

3    state practice shouldn't be given unless and until the jury

4    indicates they are unable to reach a decision.  And then you

5    give them this second paragraph.  But here in Federal Court I

6    found out this is just standard stuff.  Now, you guys want to

7    go one step further and give this last paragraph here, which

8    under Colorado state practice couldn't be done.  That would be

9    reversible.  Can you guys live with leaving it out until

10   there's a problem?

11          MR. BROOKS:  Yeah, we can, Your Honor.  Absolutely.

12          THE COURT:  Let's hope that there won't be.  Okay.

13   Plaintiffs' Proposed Instructions Opposed By The Defendant.

14   Wow, what's wrong with that one.

15          MR. BROOKS:  Our instruction on page 25 and 26,

16   encompasses the text that is included on pages 12 and 13, and

17   so because our instruction folds a lot of that in, we thought

18   that ours should be given.  The text of the language on page 12

19   is not objectionable in itself.

20          THE COURT:  You just want to put it in to instruction

21   number one?

22          MR. BROOKS:  Yeah.

23          THE COURT:  Plaintiff, what is your thought on that?

24          MR. RATHOD:  We're -- we would be okay with folding it

25   into the next instruction.  We would like to keep our

1    Instruction 13.  So we're fine considering them together.  We

2    don't have any opposition to that, but maybe we can talk about

3    12 and 13 versus their 25 and 26, would be the most productive

4    way to approach it.

5         THE COURT:  Okay.  So I just made a note that that

6    will be included in what I call Instruction Number 1, the

7    claims and defenses of the parties instructions.  Okay.

8         All right.  Thirteen.  This is where, you -- you want

9    it one way, and they want it another way.  All right.

10   Defendants, the first paragraph here, fine, so far as it goes,

11   but it doesn't go far enough.

12        MR. BROOKS:  The first paragraph on page 13.

13        THE COURT:  Hm-hm.

14        MR. BROOKS:  The -- the first paragraph on page 13,

15   just, I will explain the claims and defenses of each party to

16   the case --

17        THE COURT:  No.  I meant the second paragraph.

18        MR. BROOKS:  The text of the second paragraph is -- is

19   not dissimilar from what we have in our -- our 25 and 26.  We

20   would want to have -- there's some language --

21        THE COURT:  You want this -- on 25 -- what I said when

22   it's not enough, you want the second paragraph for sure?

23        MR. BROOKS:  You are talking about page 25 or page 13?

24        THE COURT:  Page 25.  I have got them both open here.

25        MR. BROOKS:  Yeah.  We want the second paragraph on

1    ours.

2         THE COURT:  What's the difference between your first

3    paragraph and their first big paragraph?

4         MR. BROOKS:  Our first paragraph introduces both of

5    the parties.  So it identifies what is a Plaintiff.  What is a

6    Defendant.

7         THE COURT:  You think they won't know that by the time

8    I give that instruction?

9         MR. BROOKS:  Well --

10        THE COURT:  Unless I instruct at the beginning of the

11   case.

12        MR. BROOKS:  Right.

13        THE COURT:  As part of my introductory stuff I will

14   say these are the Plaintiff lawyers, and they are the ones that

15   have brought the suit.  These are the Defendant lawyers, they

16   are the one -- I mean, I tell them that.

17        MR. BROOKS:  The wording of the second full paragraph

18   on page 13 is not, by itself, a problem for us, but when you

19   look on our page 25, we would want our second paragraph to

20   follow that.  The fact that this case is proceeding as a class

21   action does not mean any decision has been made about the

22   merits of the case, and you may not infer --

23        THE COURT:  That's fine, right, Plaintiff?

24        MR. RATHOD:  I don't completely object to it, but I

25   just think that it's unnecessary, and I think our instruction

 1    when read as a whole is much more streamline particularly for

 2    an introductory.

 3            THE COURT:  It's definitely more streamlined.  That's

 4    a good thing.

 5            MR. RATHOD:  Absolutely.

 6            THE COURT:  But we'll add the second paragraph on page

 7    25, to the end of the second paragraph, that is, This is a

 8    civil case, paragraph on page 13.

 9            All right.  Then the next paragraph is the way you

10    want to describe your claim, right?

11            MR. RATHOD:  Yes, Your Honor, and to the extent that

12    we led you to believe that we were running away from the strict

13    liability, we want to make clear we are hugging it with open

14    arms, now.

15            THE COURT:  I saw that.

16            MR. RATHOD:  And we also -- to the extent that we gave

17    up negligence, we also think that the Defendant should give up

18    negligence in terms of its defenses.  And so we've put what you

19    characterize in their class cert order as the best defense,

20    which was causation, that's in there, but we don't think it's

21    appropriate to add the other affirmative defenses, particularly

22    in the liability phase, rather than the damages phase.

23            MR. BROOKS:  Before we go there, Your Honor, in terms

24    of the discussing the defenses, their third paragraph, on

25    page --

33

1            *THE COURT:*  This case concerns?

2            *MR. BROOKS:*  Yes.  That -- this case concerns ..., I

3    think that the text, to extent they are describing their theory

4    of the case, you know is -- is probably fine.  I would say in

5    the second to the last sentence, the word tubing should be

6    replaced with the word hose, because it is a hose not a tube,

7    and just to be consistent throughout the instructions, I think

8    both sides, except for this one spot refer to it as a tube.

9            *THE COURT:*  That's fine.  We're going to strike out

10   the reference to class certification order page --

11           *MR. BROOKS:*  Yes, absolutely.  And then we can talk

12   about, if the Court wants to hear additional arguments on the

13   damages piece or on the defense's piece as well.

14           *THE COURT:*  Well, let me read it.  I generally let you

15   describe your defense any way you want, but let me read it.  So

16   let's see, where are -- where is your part?

17           *MR. BROOKS:*  So for -- on Goodyear's instruction, our

18   first one, with regard to the defenses, if you start at the top

19   of page 26.

20           *THE COURT:*  Tell me, what's the -- what's the law on

21   comparative negligence, when they are limited to strict

22   liability?

23           *MR. BROOKS:*  Under the statute, comparative negligence

24   is a legitimate defense.

25           *THE COURT:*  To strict liability?

1          MR. BROOKS:  Yes, Your Honor.  Under the -- the --

2          THE COURT:  What does it say?

3          MR. RATHOD:  If I could read a quote from an opinion

4    on that.  It's the *Welch v F.R. Stokes*, District of Colorado

5    from 1983, this is Judge Kane, said, To apply the statute on

6    the question of liability would disembowel the statute on

7    strict liability.  I think you are speaking about negligence

8    there, that it would disembowel, if we apply negligence

9    principles to strict liability, and I think that's the law,

10   particularly in the liability phase.  There conceivably could

11   be something at the damages phase.

12          Now, as to Heatway, I do think that's a common issue,

13   but for Defendant to get the instruction on comparative fault,

14   they would have to prove each of the elements of strict

15   liability against Heatway.  They can, in fact, become the

16   Plaintiff and they would need to tender an instruction to show

17   that and that comes from -- trying to find the case here.

18          THE COURT:  Heatway is a nonparty tortfeasor?

19          MR. RATHOD:  Right.  To extent that they want that.

20          THE COURT:  Yes.  They have the burden of proof.

21          MR. RATHOD:  Right.  Absolutely.

22          THE COURT:  With respect to the nonparty tortfeasor.

23          MR. RATHOD:  Absolutely.

24          THE COURT:  They have to establish that nonparty

25   tortfeasor has liability.

35

1          *MR. RATHOD:*  Right.  That's the *Barton v Adams Rental*

2     case, Colorado -- strict liability, right.  That's a State

3     Supreme Court case 1997 decision.

4          *THE COURT:*  But let's get back to where we were.

5          *MR. RATHOD:*  Sure.

6          *THE COURT:*  And that is whether they are permitted to

7     argue, as a defense, comparative negligence, to a strict

8     liability claim?

9          *MR. RATHOD:*  I don't think so, Your Honor.

10         *THE COURT:*  They said the statute says you can.

11         *MR. BROOKS:*  13-21-406, this is part of the product

12    liability statute for Colorado.  In any product liability

13    action, the fault of the person suffering the harm, as well as

14    the fault of all others who are parties to the action for

15    causing the harm shall be compared by the trier of fact in

16    accordance with this section.  And then it goes on, The fault

17    of the --

18         *THE COURT:*  Read that again.

19         *MR. BROOKS:*  Sure.  In any product liability action,

20    the fault of the person suffering the harm, as well as the

21    fault of all others who are parties to the action for causing

22    the harm, shall be compared by the trier of fact in accordance

23    with this section.  And the Colorado standard jury

24    instructions, particularly, the 14:29 instruction, contemplates

25    the use of comparative fault or negligence instruction, with

1    regard to the comparative faults of the Plaintiff.  With

2    respect -- if the Court wants to hear argument on nonparties I

3    can address that, as well.

4         THE COURT:  So what we can do -- now misuse of the

5    product, is that different from or separate from comparative

6    fault?

7         MR. BROOKS:  Yes.

8         THE COURT:  How?

9         MR. BROOKS:  Comparative fault is a -- is a

10   non-barring defense.  It requires an allocation of a percentage

11   share of fault, taking 100 percent as the total share.  Misuse

12   is a barring defense.

13        MR. RATHOD:  Plaintiffs would just point out, I think

14   misuse is a proper -- I shouldn't say proper, but you can use

15   it in strict liability context.  But comparative negligence,

16   particularly at the liability --

17        THE COURT:  I'm going to take the word negligence out.

18   I didn't hear him say negligence, in that statute.

19        MR. RATHOD:  With comparative fault, as Mr. Brooks

20   stated, at the class certification hearing, should be heard in

21   the damages phase, and it only applies when negligence

22   principles apply not when strict liability principles apply.  I

23   believe the case I was reading from, Judge Kane was referring

24   to that very statute, I believe, in which the title has the

25   word damages in it.

1          THE COURT:  You say only in the damages phase.  Why?

2          MR. RATHOD:  It goes to the --

3          THE COURT:  We are litigating strict liability and

4     causation.

5          MR. RATHOD:  Correct.

6          THE COURT:  Aren't we?

7          MR. RATHOD:  Yes, Your Honor.

8          THE COURT:  Roger, you look puzzled.

9          MR. THOMASCH:  We are, Your Honor.  You may recall at

10    the conference in your chambers we distinguished between

11    general causation and specific causation.  There's no doubt

12    that in this trial we will have to deal with whether the

13    inevitable defect that Dr. Moalli will talk about is capable of

14    causing loss of the hose.  But if we ever get to individual

15    trials, it would be a specific causation question as to each

16    Plaintiff.

17         THE COURT:  Right.  So we instruct the jury, that to

18    find for the Plaintiff they must find; one, defect in design;

19    and two, a defect if design was a cause of injuries, damages or

20    losses.

21         MR. BROOKS:  That's part of it.  The --

22         THE COURT:  Injuries, damages or losses to whom?  To

23    the plaintiffs.  But what we aren't going to ask them to do is

24    to decide, specifically, as to any Plaintiff or class member,

25    what they get.

1              *MR. RATHOD:*  That's correct Your Honor --

2              *THE COURT:*  Wait a minute.  He has the floor.

3              *MR. BROOKS:*  At the last status conference, this is

4    the one on June 25th, in chambers, that Mr. Thomasch was

5    talking about, the Court said, on page seven, The Helmers and

6    Muftic, and everything about the Helmers and Muftics, except

7    the money, will be tried, right?  Answer, Yes, by Mr. Lenyo.

8    So the concept is that everything about the Helmer plaintiffs

9    and the Muftic plaintiffs, except for the actual itemization of

10   the amount of damages is in play, in this case, now.  And that

11   includes the comparative fault, the misuse, the nonparty fault

12   of the installers, all of those issues are in play, and we stop

13   at the allocation of fault, and you will see that in our re--

14   reflected in our verdict forms.

15             *THE COURT:*  What do you mean you stop at the

16   allocation of fault?

17             *MR. BROOKS:*  Well, in a typical product --

18             *THE COURT:*  It's okay, you don't have to button your

19   coat, unless you feel better.  You can take it off, as far as

20   I'm concerned.

21             *MR. BROOKS:*  Just hold habit.  In the typical product

22   liability verdict form, you would go through the elements as

23   the Court described, the causation piece.  The allocation of

24   fault piece.  So the fault of the Defendant, any fault of the

25   Plaintiff, fault of designated nonparties has to equal a

1    hundred percent, and then you -- then you would have to ask,

2    What is the amount of damages?

3           *THE COURT:*  And that is -- we don't get to that one.

4           *MR. BROOKS:*  Precisely, that's where we are stopping.

5           *THE COURT:*  But you emphasize, we're only going to

6    decide Helmer and Muftic, no.  We're deciding liability for --

7    on a class-wide basis.

8           *MR. BROOKS:*  We are deciding the defect and the defect

9    question on the class-wide basis.

10           *THE COURT:*  Liability on the class-wide basis.

11           *MR. BROOKS:*  Right.  But -- and we're deciding the

12    certain aspects of causation piece for the individual-named

13    Plaintiffs, including the comparative fault piece.

14           *THE COURT:*  Well, let me put it a different way.  All

15    we are not deciding is whether Helmer, Muftic, or John Does one

16    through a million, actually suffered damage.

17           *MR. BROOKS:*  I think it's the amount of the damages.

18           *THE COURT:*  An amount of damage.  Damage, which could

19    be zero, or it could be an amount.

20           *MR. BROOKS:*  Right.

21           *THE COURT:*  There's no line to put in a dollar sign

22    zero or a dollar sign a million.

23           *MR. BROOKS:*  And that's correct, Your Honor.

24           *THE COURT:*  But everything else we're deciding now.

25           *MR. BROOKS:*  Yes.

1          THE COURT:  Do you guys disagree with that, Plaintiff?

2          MR. RATHOD:  We don't disagree.  I have a few comments

3     on that.  First of all, with causation, it's definitely

4     class-wide causation, except as to certain specific pieces.  If

5     someone's hose is bent, you know, an incredible amount, that

6     wasn't present for anyone at the hearing, then they could

7     possibly present that, but --

8          THE COURT:  I didn't follow that.

9          MR. BROOKS:  Sorry.  So for the first -- the first

10    piece is that there's certain pieces of specific causation that

11    won't be tried, but there -- everything that is put in -- so if

12    they put in evidence about clamping, and the jury says, Hey, we

13    didn't buy the clamping defense, then they are not allowed on

14    the follow-along hearings to use clamping to push off damages

15    on to an individual plumber or somebody else, because they had

16    their shot at that defense and they didn't prevail.  There's no

17    need to re-litigate an individual actions --

18         THE COURT:  Clamping is a defense?

19         MR. RATHOD:  As improper installation defense to the

20    extent they claim that --

21         THE COURT:  That's their misuse defense.

22         MR. RATHOD:  Correct.  And so to the excellent

23    that's -- with that resolved in this hearing, with -- in this

24    trial, they don't get a second shot at it, in the individual

25    trials.  And you have, I believe, ordered that, with your class

41

1    certification order, and your order -- now that the damages

2    piece -- we think that damages are -- they are completely dealt

3    with in the second phase, and that includes apportionment

4    between different parties.   To the extent that if Goodyear is

5    just 5 percent liable, they are liable, and that's what we're

6    deciding here, and then there are follow-up hearings that

7    decide the extent to which damages could be apportioned.

8          THE COURT:   All right.   So let's say that the jury

9    comes back and says the product was defective, but part of the

10   fault belongs to Heatway.   So 50 percent to Goodyear and 50

11   percent to Heatway.   Or they could say 50 percent to Goodyear,

12   25 percent to Heatway, 25 percent to any Plaintiff who

13   improperly installed it.

14         MS. VAN DYCK:   Your Honor, I think that that's where

15   the confusion as to whether this is -- whether damages are

16   relevant here comes in.   The jury here is not deciding the

17   apportionment -- apportionment of damages.   They are not

18   deciding whether Heatway is 25 percent or 50 percent or zero

19   percent or a hundred percent responsible, and what I think is

20   happening here is that the defendants are blurring the lines

21   between their defense of misuse and comparative fault.   Yes,

22   misuse is a defense to liability.   So evidence of issues such

23   as improper installation, which Your Honor has ruled are

24   relevant in this case, however that's different from

25   apportioning damages.   That's different from a comparative

 1    fault instruction and a comparative fault defense.  Is clamping

 2    relevant?  Yes.  But that doesn't mean that the jury is going

 3    to decide at this trial whether or not that is -- whether or

 4    not the clamping results in an apportionment of damages of, you

 5    know, something like 50 percent to the Plaintiff and 50 percent

 6    to the Defendant or some other percentage.  We're talking about

 7    a liability defense versus a defense to damages.  Comparative

 8    fault is a defense to damages, misuse is a defense to

 9    liability.  We're not deciding damages here.

10         And that was -- there's a case, *US vs. Gypsum* -- *US*

11    *vs. Gypsum* case that I can pull up for you, where this very

12    issue was decided, and the Court allowed the misuse and found

13    that the misuse instruction was proper and the comparative

14    fault was improper.  It's a Tenth Circuit decision.

15         *THE COURT:*  There are three different kinds of

16    comparative fault or misuse going on, aren't there?  One is, as

17    between Goodyear and Heatway.

18         *MS. VAN DYCK:*  Yes, Your Honor.

19         *THE COURT:*  The other is, as to between Goodyear and

20    Heatway, potentially, and the homeowners.  Because, well if the

21    product was installed improperly, without the proper clamps, or

22    with a big bend in the hose right by the nozzle, whose fault is

23    that?

24         *MR. RATHOD:*  Your Honor, at that point we would have

25    failed to carry our burden of proof on our strict liability

43

1    claim, and so that's their defense, is that they -- it's a

2    causation defense.

3              MS. VAN DYCK:  And that goes to their misuse defense.

4              THE COURT:  But that's going to vary from house to

5    house.

6              MS. VAN DYCK:  Correct.

7              THE COURT:  Let's say that the jury is persuaded that

8    if the product was installed properly, there's nothing wrong

9    with it, but if it was installed improperly, it fails.

10             MS. VAN DYCK:  I think --

11             THE COURT:  What's the implication of that?

12             MS. VAN DYCK:  I think that goes to the broader issue

13   of defendants trying to rebut Dr. Moalli's testimony that the

14   cause of the leak was the degradation of the EPDM, it's

15   defendant's defense to that is it's a common issue, it's going

16   to be EPDM degradation was not the cause of the -- of the leak

17   and that therefore there's no design defect.  The cause was in

18   fact these individual issues --

19             THE COURT:  Moalli's opinion is that this hose is

20   defective, and it's defective in its design and it will fail,

21   inevitably, during its lifetime, right?

22             MS. VAN DYCK:  Yes.

23             THE COURT:  Moalli is going to say it really doesn't

24   matter whether it was installed properly or not.  That might

25   affect how soon it fails, but it's going to fail either way.

44

1    It's just inherently defective.  That's your case?

2         MS. VAN DYCK:  Yes, Your Honor.

3         THE COURT:  Their case is, there's nothing wrong with

4    the hose, and it's not going to fail, unless whomever installed

5    it, installed it wrong, that's your defense?

6         MR. BROOKS:  That's a part of our defense, yes.

7         THE COURT:  What's the other part of your defense?

8         MR. BROOKS:  Well, in addition, even if the jury finds

9    that the hose contained a defect, there still may be an

10   apportionment of fault between Goodyear, Heatway, the

11   Plaintiffs and the designated nonparties.

12        THE COURT:  How can the Plaintiffs be at fault if the

13   jury finds that the hose was defective?

14        MR. BROOKS:  Well, there still could be

15   comparative-fault issues with respect to installation, even if

16   the jury finds that the hose is defective.  The two factors

17   can -- together, combined to cause the alleged damage.  That --

18   and the -- the Court recognized and the Plaintiffs recognized

19   during the last --

20        THE COURT:  Is that the way you are going to present

21   your defense?  You are going to say, it's the goat.  If it's

22   not the goat, it's the cabbages?

23        MR. BROOKS:  No.  No.  There are -- we will present a

24   significant amount of evidence with respect to installation

25   problems, focusing on the named plaintiffs whose cases are --

1          *THE COURT:*  Your defense is going to be, I thought,

2     there's nothing wrong with the hose at all.

3          *MR. BROOKS:*  And that is our principle defense.

4          *THE COURT:*  But then you are going to go to the jury

5     and say, But, ladies and gentlemen, if you find there's

6     something wrong with the hose then...

7          *MR. BROOKS:*  The Heatway comparative-fault piece has

8     always been a portion of our defense, and we -- whether it

9     means that it's a completely barring defense; that is, it

10    eliminates all liability, because there is no defect or there

11    is a share of fault that is borne by Heatway, as a designated

12    nonparty, just as there's a share of fault to be borne by the

13    installers, as designated nonparties, and those are all wrapped

14    up in the causation piece.

15         *THE COURT:*  You can out cute yourself to the point

16    that you are going to give the Plaintiff a gift.  Ladies and

17    gentlemen, it is not defective, but if it is defective, it

18    wasn't our fault it was Heatway's fault.  And if it wasn't our

19    fault or Heatway's fault, then it's the Plaintiffs' fault.

20         *MR. BROOKS:*  But I think our verdict form shows

21    exactly how we, you know, intend to move down this -- this

22    stream.  And the first question involves whether there is a

23    defect.  If the answer to that question is, no, it's skip

24    directly to the signature line in the verdict form and you are

25    done.

46

1          THE COURT:  Well, of course, of course.

2          MR. BROOKS:  But if the answer is yes, there are

3    defenses that Goodyear is entitled to interpose, including

4    misuse.

5          THE COURT:  Hey, I'm not going to save you from

6    yourself, if that's the way you want to present your defense,

7    that's fine.  The Plaintiffs won't object, I assume.

8          MR. RATHOD:  Your Honor, there's no competent evidence

9    in the record that either --

10         THE COURT:  There's no evidence in the evidence at

11   all.

12         MR. RATHOD:  Right.  Okay.  Fair enough.  There's no

13   plausible way that Defendant could say that a plumber designed

14   the hose in this manner that will inevitably fail or even that

15   Heatway did that.  They may have had that defense with Entran

16   II, but with Entran 3 it was Goodyear that designed the hose,

17   and this is a design-defect case, and this is a

18   strict-liability case, and intervening cause, which is what

19   opposing counsel is trying to introduce, is also a negligence

20   concept, and it's a negligence defense that is improper in a

21   strict liability.

22         THE COURT:  Well, we just heard him read the statute.

23         MR. BROOKS:  Yeah.  Under Colorado law, in the

24   *Loughridge* case, *Louhridge vs. Goodyear*, Judge Babcock

25   addressed the interplay between the comparative-fault statute

1    and the nonparty-fault statute, and found that effectively what

2    we have is a -- I mean strict product liability claims, is a

3    situation where it's -- it's pure several liability, that the

4    Defendant has its percentage share, and that's reflected in the

5    title -- or the Chapter 14 instructions, and the verdict forms.

6            THE COURT:  Well, what we've got, frankly, is, way

7    back in the day, when the defense industry persuaded the

8    legislature to adopt what loosely was called tort reform, the

9    products liabilities statute was kind of, you know, made into a

10   camel instead of a horse, and you mixed together these concepts

11   of strict liability and fault in a way that the inventors of

12   strict liability never envisioned, but it's there.

13           MR. BROOKS:  It is.

14           THE COURT:  And this is a state law case, and I have

15   to follow it.

16           MR. RATHOD:  Can I just point to one other authority

17   on this, which is *White v Caterpillar*, Appellate Court

18   Colorado, the quote is, Intervening cause is a negligence

19   concept that relieves the Defendant from liability if the

20   intervening cause was not reasonably foreseeable, it is not a

21   defense to a strict liability claim.  Your Honor that predates

22   the tort reform --

23           MR. BROOKS:  That's Judge Rotherberg's opinion.  It's

24   at 867 -- and we know that case.  It does not stand for the

25   proposition that intervening cause is never a defense to strict

1    liability.

2         THE COURT:  Okay.  All right.  Let's focus on the task

3    here.  And we were talking about Goodyear's defenses.  And

4    Goodyear says, We deny all of the claims and assert the

5    following defenses, statute of limitations.  Are you going with

6    that?

7         MR. BROOKS:  We have a viable statute of limitation

8    with respect to the Helmer and Muftic Plaintiffs.

9         THE COURT:  My question is, are you going with that?

10        MR. BROOKS:  And I defer to the trial team, and I

11   think we are going with that defense at this time.  Yes.

12        THE COURT:  Misuse of the product.  That is your

13   improper installation?

14        MR. BROOKS:  It's one of the improper installations

15   defenses.  The other is the comparative fault, nonparty fault

16   piece, but yes.

17        THE COURT:  Fault of others is Heatway.

18        MR. BROOKS:  And the installers.  We have specific

19   designated nonparties at fault that are identified.

20        MR. RATHOD:  Actually, Your Honor, I don't believe

21   they specifically identified specific plumbers.  They said

22   plumbers, generally, but --

23        MR. BROOKS:  No.

24        THE COURT:  Okay.  So here is what we will do, at this

25   stage anyway, before the evidence has ever been presented, we

49

1   can draft this instruction to say statute of limitations,

2   misuse of the product, but let's say what the misuse is, ie,

3   improper installation, that's it, right?

4           MR. BROOKS:  That's fine.

5           THE COURT:  Comparative fault, ie, the Defendant

6   contends that the fault, if any, is shared by Heatway --

7           MR. BROOKS:  Well, actually the -- this one would be

8   Plaintiffs.

9           THE COURT:  By Plaintiffs.

10          MR. BROOKS:  By plaintiffs, period.  Or semicolon.

11          THE COURT:  That's going to be a difficult one for you

12  to sell, I think.

13          MR. BROOKS:  Number four is --

14          THE COURT:  Fault of others.

15          MR. BROOKS:  Fault of others.

16          THE COURT:  IE, there's where you have your list of

17  thousands.  Heatway.

18          MR. BROOKS:  No.  It's Heatway, and I can give you the

19  specific names, as to the Helmers, it's Power Plumbing and

20  Mount Power Plumbing and Heating.

21          THE COURT:  Why don't you just say Heatway and or

22  installers?

23          MR. BROOKS:  Fair enough.

24          THE COURT:  Now you, Plaintiffs, shouldn't be

25  objecting to this.

50

1          MR. BAILEY:  Your Honor, we can live with the

2     language.

3          THE COURT:  The more they goop it up, the better your

4     chances, in my opinion.

5          MR. RATHOD:  We will take it.

6          THE COURT:  So I'm on page 26 still.  We're going to

7     strike the last paragraph on page 13, and we're going to say

8     insert from page 26.  So let's look at what we're going to

9     insert.  You have got the top paragraph figured out and then

10    you say, You have learned, that's okay, right?

11         MR. BROOKS:  I'm sorry, I was just --

12         THE COURT:  That second paragraph on page 26 you want

13    that as part of your --

14         MR. BROOKS:  Yes, Your Honor.

15         THE COURT:  And Plaintiff, do you object?

16         MR. RATHOD:  We object to "Heatway designing," page

17    26.

18         MR. FLANNERY:  The word design in there is troublesome

19    to us, Your Honor.

20         MR. BROOKS:  There's going to be evidence that Heatway

21    designed heating systems, and also that it -- later abdicated

22    its responsibility to --

23         THE COURT:  They didn't design Entran 3?

24         MR. BROOKS:  No, but.

25         THE COURT:  Out.

1          MR. BROOKS:  The word designed is out?

2          THE COURT:  Yes.  Heatway manufactured, installed and

3    promoted.

4          MR. FLANNERY:  Your Honor, again, in my view, the

5    "installed," is troublesome for some of the same reasons we

6    have talked about this morning.  So I -- in that instruction --

7          THE COURT:  Didn't Heatway install?

8          MR. FLANNERY:  Heatway sold the system, but as we've

9    said in one of -- you denied our motion to exclude certain

10   evidence relating to instruction manuals, but the -- the system

11   was sold, and Goodyear -- I think it's Goodyear's burden to be

12   able to show that the installers, who were not necessarily

13   Heatway, they were -- they were independent contractors or

14   plumbers, would have received those installation

15   instructions --

16         THE COURT:  So you are saying in some instances

17   Heatway installed and other instances other people installed?

18         MR. FLANNERY:  So far as I'm aware, based on the

19   evidence I have seen, Your Honor, here in the homes that we've

20   gotten in Colorado and seen and looked at, it wasn't Heatway

21   that was --

22         THE COURT:  Remember, this is a class action now.

23         MR. FLANNERY:  Understood, Your Honor.  I -- yeah --

24   agreed.  I'm just --

25         THE COURT:  Did Heatway install any of them?

1            *MR. FLANNERY:*  Not that -- not that I'm aware of.

2            *THE COURT:*  Did Heatway install any of them,

3    Defendants?

4            *MR. BROOKS:*  We are not aware of any Entran 3 systems

5    where Heatway --

6            *THE COURT:*  Then why did you put installed in there?

7            *MR. BROOKS:*  They did install -- well they did have

8    heating systems that they had installed.  It is part of their

9    overall course of business between Goodyear and Heatway.

10           *THE COURT:*  Okay.  But we're talking about the Entran

11   3.

12           *MR. BROOKS:*  So we can take out "installed."

13           *THE COURT:*  Yes, sir.  Manufactured is correct, isn't

14   it?

15           *MR. FLANNERY:*  No.

16           *THE COURT:*  That's not right either.  They didn't make

17   it?  Who made it?

18           *MR. FLANNERY:*  Goodyear.

19           *MR. BROOKS:*  The hose.

20           *THE COURT:*  I'm talking about the hose.

21           *MR. BROOKS:*  The paragraph refers to the -- to

22   hydronic radiant heating systems containing the hose.  And

23   their heating systems included a number of components other

24   than hose.  They include manifolds, they include clamps, they

25   include fittings, and Heatway either manufactured or solicited

1   the manufacture of those other component products.

2          THE COURT:  All right.  We will just say manufactured

3   hydronic radiant heating systems containing Entran 3 hose,

4   that's good enough.

5          The system circulated, blah, blah, blah.  Goodyear

6   sold.  Okay.  The rest of this paragraph is correct, right?

7   Plaintiff?  Yes?  Okay.

8          MR. FLANNERY:  Your Honor, can I just add, and I would

9   ask for one clarification, I do think it's important, since

10  this is a design-defect case about the hose, that that sentence

11  make it clear that the manufacture -- they are saying Heatway

12  manufactured the system containing the hose.  What I want --

13  what I want the jury to understand is that Goodyear

14  manufactured the hose.

15         THE COURT:  Okay.  Look, this is Instruction Number 1.

16  Unless I give all of these instructions at the beginning of the

17  trial, are you concerned by the end of the trial they won't

18  know who manufactured the hose?

19         MR. FLANNERY:  No, Your Honor.  I absolutely am not.

20         THE COURT:  You guys have completely blown it if you

21  haven't at least established that.

22         MR. FLANNERY:  I agree.  I just -- maybe --

23         THE COURT:  Will you have a happier Christmas if I

24  say, "but not the hose"?

25         MR. BROOKS:  Or, Your Honor, in the second to the last

 1    sentence of that paragraph it says, "Goodyear sold."  I would

 2    be okay if we interposed the words "manufactured and sold."

 3              THE COURT:  How about that, Mr. -- Mr. -- Mr.,

 4    Mr. Whomever.

 5              MR. FLANNERY:  Mr. Flannery.

 6              THE COURT:  Yes.  Every -- every trial team has one

 7    Nervous Nellie.  Are you it?

 8              MR. FLANNERY:  I hope I am not it.

 9              MR. BAILEY:  I am.

10              MR. FLANNERY:  But I think I can -- we can live with

11    that language.

12              THE COURT:  Okay.  Tammy, do you want a break?

13              THE COURT REPORTER:  Sure, Judge.

14              THE COURT:  Sure, Judge.  Do you want one or not?

15              THE COURT REPORTER:  Yes, please.

16              THE COURT:  All right.  Let's take ten minutes here.

17         (Recess at 10:28 a.m.)

18         (In open court at 10:41 a.m.)

19              MR. THOMASCH:  May I have a moment of lectern before

20    we move to the next point?

21              THE COURT:  What, a point of personal privilege?

22              MR. THOMASCH:  No.

23              THE COURT:  Yes, Roger, you may.

24              MR. THOMASCH:  Your Honor, as the discussion went on

25    between yourself and other counsel, I became concerned that

 1    we're coming up with a confusing set of instructions, confusing

 2    to the jury, in that we are, primarily, first and foremost in

 3    this case, asking them if there's a defect, but then we're

 4    mixing in with that defenses that only apply in the event they

 5    find there is a defect and move on to Helmer/Muftic; namely,

 6    statute of limitations, apportionment of fault, comparative

 7    fault.  Those are only in play if there's a defect and the jury

 8    now has to move to the Helmer/Muftics.

 9         THE COURT:  Sounds like you are more in agreement with

10    the Plaintiffs than you are with your own --

11         MR. THOMASCH:  I may be.  I would like to suggest that

12    to simplify the instructions and to simplify the task for the

13    jury and maybe for ourselves, that in the first instance, the

14    instructions given to the jury are purely the instructions that

15    are necessary to find whether or not there is a defect.  And

16    that would include misuse, but it wouldn't have to include

17    statute of limitations, comparative fault, negligence of

18    others, all of that.  If they come back and say no defect, case

19    over.  If they come back and say defect, the Court would then

20    say, I now need to give you further instructions as to defenses

21    that -- you know, as to the Muftics and Helmers, and go back

22    and decide these as to the Muftics and Helmers only.  But we

23    wouldn't even have to get to that if they find no defect.

24         I'm just concerned that we're mixing up two different,

25    if you will, phases of the case.  The big global issue, defect

1    or no defect; and on the other hand, if there is a defect, here

2    are a few questions as to these two plaintiffs.

3          I would respectfully suggest that we just split those

4    things.  And we start out instructing them on defect, go back

5    in there and find out if there's a defective product.  If they

6    say, yes, then we will let them decide as to the Muftics and

7    the Helmers, how much goes to the plumbers and how much goes...

8     You see my suggestion.

9          THE COURT:  Yeah.  I understand your suggestion.  I'm

10   not sure the Plaintiffs will disagree with you, but I'm not

11   sure it really saves too much time, because your whole defense

12   is going to include the idea that what is causing leaks is

13   improper installation.

14         MR. THOMASCH:  And I didn't mean to imply that there

15   would be any abridgment of evidence.  All of the evidence would

16   go in, just as it does now.  I'm just concerned that the jury's

17   going to go into the jury room and talk about things like

18   statute of limitations, comparative fault, negligence of

19   others, did the plumber do this?  Did the plumber do that?  All

20   of which is irrelevant to their main job, which is to figure

21   out whether it's defective or not.  I would rather have them

22   carry their main job out, and then get to the other stuff,

23   which applies to only two people out of like 16,000

24   installations.

25         THE COURT:  Why?

1           *MR. THOMASCH:*  Because the comparative fault of any

2    given plumber, for example, if the Helmer's plumber, if we got

3    a finding of defect and they went back in, and we suggested

4    that in the case of the Helmers, the plumber ought to take 25

5    percent of the fault, and they agreed, that would apply to

6    anybody else out there in the universe who didn't have that

7    plumber.

8           *THE COURT:*  If Helmer or Muftic are barred by the

9    statute of limitations, they wouldn't be adequate

10   representatives as a class, would they?

11          *MR. THOMASCH:*  There is also that.

12          *THE COURT:*  On the other hand, you don't want the

13   Defense to be presenting that to the jury on the defect claim,

14   because it looks like you are hiding from your defect if you

15   do?

16          *MR. THOMASCH:*  Well, I take that point, and I agree

17   with you, but my main point is that I just don't know that we

18   should be instructing them on and having them worry in the jury

19   room about statute of limitations, and how much goes to a

20   plumber when all of that only comes into play if they first

21   come back and tell it's a defective product.

22          *THE COURT:*  So you wouldn't even want me to tell them

23   that there were other questions, potentially, still to be

24   answered?  You want to make me the most unpopular person in the

25   State of Colorado, because just when the jury thought the case

```
 1    was over, I would say, No, you have got another week to go.

 2          MR. THOMASCH:  Well, we wouldn't have a week to go,

 3    because there would be no more evidence.  There would be no

 4    more evidence.  I actually -- I would have thought, and I don't

 5    have a strong feeling, but I would have thought you might have

 6    said to them, if you return with a verdict of defect --

 7          THE COURT:  Then we have further questions for you.

 8          MR. THOMASCH:  We will have further questions for you,

 9    correct.

10          THE COURT:  Plaintiff?

11          MR. FLANNERY:  Your Honor, this is the first we've

12    heard of this.  I would like a chance to talk with my

13    colleagues.  I just -- this is the -- totally new proposition

14    --

15          THE COURT:  Right.

16          MR. FLANNERY:  -- and I am not really sure I want to

17    respond off the cuff.

18          THE COURT:  That's okay.  You don't have to.

19          MR. FLANNERY:  Do you want us to take five minutes to

20    confer?

21          THE COURT:  If you want to.  You have got until noon

22    then you lose me.  I have got the other case coming in this

23    afternoon.

24          MR. FLANNERY:  Do you want to take a few minutes to

25    talk about, what Mr. Thomasch just proposed?  All right.  If
```

```
 1   you give us five to ten minutes?

 2           THE COURT:  Sure.

 3           MR. FLANNERY:  Thank you, Your Honor.

 4           THE COURT:  Okay.  See you in five or ten minutes.

 5   Now you have thrown one more load of sand in the wheels,

 6   Mr. Thomasch.

 7           MR. THOMASCH:  I should have thought earlier,

 8   Your Honor, I admit that.

 9       (Recess at 10:48 a.m.)

10       (In open court at 10:58 a.m.)

11           THE COURT:  All right.

12           MR. FLANNERY:  Your Honor, we conferred.  I think it's

13   probably the best way to describe this is to say what we -- we

14   believe and understand that we need to do, and are duty-bound

15   to do, as the class lawyers, as you know we sent out notice and

16   we told the members of the prospective class what we would be

17   doing at this trial.

18           THE COURT:  I don't remember what you said you would

19   be doing.

20           MR. FLANNERY:  So what I think we -- what we should be

21   doing, at the close of the trial, is -- and what we should be

22   doing in the trial is resolving all of the elements of a

23   strict-liability claim, all of the defenses to that, and

24   that -- and that -- so that when we are finished on a

25   class-wide basis, those elements of that claim and those
```

1    defenses and the causation defenses that everything that --

2    that Goodyear wants to raise in this trial are fully and

3    finally decided on a class-wide basis.

4         If they want to then proceed to a separate proceeding,

5    separate trial, I'm not really sure I understood the --

6    specifically, but we do believe that statute of limitations,

7    comparative fault, those are -- our view is those are issues

8    for later proceedings having to do with damages.  But what we

9    do think is, and I don't know whether Mr. Thomasch was

10   proposing this, but what we want to have, at the end of the

11   day, is a fully and finally decided trial by this jury of those

12   elements on a strict liability, design-defect claim, all the

13   defenses, and every element of causation that they want to

14   challenge.  If that's what he is proposing, then I think

15   we're -- we may be on the same page.

16        THE COURT:  I think that's what he is proposing.  He

17   just wants to do it in two phases instead of one, that's all.

18   That's what's going to happen, put it that way.  All that's

19   going to be left at the end of this case, if anything, is

20   individual settlements or some type of hearings on a

21   class-member-by-class-member basis, as to their own individual

22   damages.

23        MR. FLANNERY:  That is my understanding as well,

24   Your Honor.

25        THE COURT:  That's mine, too.  Now, the question is,

1    do you agree or not agree with Mr. Thomasch's proposal?  And

2    your answer is, You don't know because you are not sure you

3    still understand his proposal, and my answer is, okay, you two

4    can talk, but we've got less than an hour, and I need to use

5    this time.

6         MR. FLANNERY:  The answer is, we don't agree to the

7    proposal.  I think that's the answer.

8         THE COURT:  I don't think it's something that we have

9    to decide today anyway.

10        Now, before we get back to business here, I need to

11   ask you a question, and I need to say something about

12   settlement, my question is, how long is this case going to take

13   to try?

14        MR. BAILEY:  Your Honor, Plaintiffs -- we have

15   discussed this with Defendants, and we both, I think, agree,

16   three weeks to try.

17        THE COURT:  Full three weeks?

18        MR. BAILEY:  Full three weeks.

19        MR. THOMASCH:  I think that's right, Your Honor.  I

20   think there's one intervening holiday, Martin Luther King

21   holiday, a Court holiday?

22        THE COURT:  Yes.

23        MR. THOMASCH:  That is in the three weeks.

24        THE COURT:  Okay.  Second, a proposed settlement, for

25   what it's worth, you perhaps remember that the Magistrate Judge

1    that happened to be assigned to this case, was Michael Hegarty,

2    some of you, locally at least, are aware that Hegarty is

3    probably as good as anybody in town in terms of settlement, and

4    I have checked with him, and although he wasn't planning,

5    necessarily, to be here, he will be here, make himself

6    available to you, if you want, on either December 29 or 30.  So

7    if you decide you want him, you have got to let us know, or at

8    least let him know.

9         MR. FLANNERY:  Thank you, Your Honor.  We will confer

10   about that.

11        THE COURT:  All right.  Now, we're still on

12   Instruction Number 1.  We've actually gone through some other

13   instructions, as well.  We were on page 26, and at this point

14   I'm ready to move forward to the paragraph that starts, "During

15   the trial", and that paragraph seems fine to me.  What's wrong

16   with it?

17        MR. RATHOD:  Your Honor, we had a separate instruction

18   about Entran II in number 16.

19        THE COURT:  Okay.  We will get there.  I'm on

20   Instruction Number 1.  I'm on page 26.  And I will short

21   circuit.  I think that paragraph is fine.  I think the last

22   paragraph is fine.  So page 26 will be inserted on page 13.

23        Okay.  Next.  Page 14, objected to by somebody.  The

24   Plaintiff.

25        MR. BROOKS:  Goodyear objects.

1          THE COURT:  "Case involves individuals and a

2     corporation."   What is your objection?  I would have thought

3     that would be one that you would want.

4          MR. BROOKS:  Actually, this is different from the one

5     that we objected to at the earlier conference.  I think they

6     have made some revisions to it, and in light of that, I don't

7     have a problem with this one.  When we -- when we discussed it

8     at the charge conference the instruction appeared here was a

9     little different.

10          THE COURT:  Page 15.  What is your objection?

11          MR. BROOKS:  I think -- two things.  One, the

12     discussion of the class is unnecessary.  What we already did in

13     Instruction 1; but secondly, I don't think it's accurate.

14     The -- not every aspect of this trial would be applicable to

15     the entire class.  If Mr. Helmer's contractor hit 30 percent

16     liability it's not going to affect Muftic or the others.

17          THE COURT:  What's your defense to this instruction?

18          MR. RATHOD:  I think what Mr. Flannery said at the

19     very beginning, we think all of the elements and defenses are

20     in, and the second thing is you should not hold physical

21     absence of any class member against class plaintiffs.  A lot of

22     times jurors will have an impression if it's a class action

23     everyone should be here.  If we only present --

24          THE COURT:  A lot of times?  How many cases have you

25     tried that were class actions?

 1          *MR. RATHOD:*  My apologies, Your Honor.  I have tried

 2     zero.  The antitrust litigation used this instruction about the

 3     absence of any class member.  That was a class action with the

 4     Tenth Circuit.  Class -- class action Kansas affirmed by the

 5     Tenth Circuit.

 6          *THE COURT:*  All right.  If you go to page 25, that

 7     paragraph that we agreed would be inserted on the first

 8     instruction, we will add -- let's say, By definition, the

 9     members of the Class, other than Plaintiff Helmer and

10     Ms. Muftic will not be present during the trial.  Mr. Helmer,

11     and Ms. Muftic represent the class.  How is that?

12          *MR. FLANNERY:*  Could you read it for me?

13          *THE COURT:*  By definition the members of the Class,

14     other than Mr. Helmer and Ms. Muftic, will not be present

15     during the trial.  Mr. Helmer and Ms. Muftic represent the

16     class.

17          *MR. FLANNERY:*  That's fine, Your Honor.  I -- Mr.

18     Bailey is pointing out that other members of the class may be

19     present --

20          *THE COURT:*  Are they being called as witnesses?

21          *MR. FLANNERY:*  Yes.  We do have a few other

22     homeowners.

23          *THE COURT:*  I will say will not necessarily be

24     present.

25          *MR. FLANNERY:*  I think that would clarify.  That would

1    be satisfactory, Your Honor.

2         THE COURT:  Okay.  Defendants?

3         MR. BROOKS:  We are okay with it.

4         THE COURT:  So then the page 15 instruction is out.

5         Page 16.  What is the Defendant's objection here?

6         MR. BROOKS:  Well, it -- it -- it twice refers to the

7    prior determinations and other litigation of Entran II being

8    found defective and --

9         THE COURT:  Yeah.  That's not going to be in.  I

10   already ruled on that.

11        MR. BROOKS:  Right.  So that -- we -- we already

12   introduced the concept of Entran II, or we proposed that

13   introduction in our instruction on page 25 -- well, actually,

14   no, it's on 26 --

15        THE COURT:  All right.  Those two sentences come out.

16   Other than that, is 16 okay?

17        MR. RATHOD:  I think it's duplicative of their 26.  We

18   would prefer our language inserted in there, but -- the one

19   that we just -- I think it's 26.

20        THE COURT:  Twenty-six is the Statement of the Claims,

21   that's Instruction Number 1.  This is a a different

22   instruction.  Is there anything wrong --

23        MR. RATHOD:  We will keep it.

24        THE COURT:  Take out the third -- one, two, three,

25   fourth sentence and the last sentence.

66

1          MR. FLANNERY:  Your Honor, we can live with that.

2          THE COURT:  Defendants?

3          MR. BROOKS:  It's fine as is.  The -- what counsel is

4     saying that is on page 26 --

5          THE COURT:  I've already dealt with 26.  I'm saying if

6     we take out these two sentences --

7          MR. BROOKS:  Then it's fine.

8          THE COURT:  Okay.  Page 17.  Defendants, why don't you

9     just point to me what your objection is, other than the fact

10    that it's single spaced?

11         MR. BROOKS:  Other than -- well, our instruction has

12    the defenses.  The CJI contemplates that at the end of the

13    elements instruction, this is 14:1 Instruction, that you would

14    have an identification of what to do once the jury reaches its

15    decision.  And so if you look on page 28 and 29, the elements

16    that we've described of the claim are effectively the same as

17    the Plaintiffs do, but the Plaintiffs end with, "If you find

18    all of these statements have been proved, your verdict must be

19    for the Plaintiff on this claim."  Doesn't say what to do if

20    they haven't been proved, and it doesn't tell the the jury what

21    defenses exist.  So on page 29 you see the expression of what

22    happens if the defenses have not been proved, and we would like

23    the language on page 29 to be added to the elements instruction

24    for strict product liability.

25         MR. RATHOD:  I think the Plaintiffs' position is just

67

1    that if you could reserve your ruling on that, assuming there's

2    no pre-instruction.

3         THE COURT:  Paragraphs one through nine on page 28,

4    are they the same or substantially the same as your paragraphs

5    one through nine?

6         MR. BROOKS:  They are substantially the same.  There's

7    some minor verbiage differences.

8         THE COURT:  All right.  So at the bottom of 28, if you

9    find that one or more of these nine statements have not been

10   proved, your verdict must be for Goodyear.  That's right.  If

11   you find that all nine of these statements have been proven,

12   then you must consider Goodyear's affirmative defenses.  That's

13   right.  If you find that one or more of the affirmative

14   defenses has been proved, your verdict must be for Goodyear.  I

15   guess that's right.  Because they don't have their comparative

16   fault there.  If you find that none of these affirmative

17   defenses have been proved, your verdict must be for -- okay.

18   Talk to me Plaintiffs.  What's wrong with their 28 and 29?

19        MR. FLANNERY:  So, my trial mates may have additional

20   points, but at a minimum I have a problem with the reference to

21   the damages or losses.  I mean, our  -- this was one of the

22   differences.  We talked about injuries.

23        THE COURT:  Okay.  What are you looking at here?

24        MR. FLANNERY:  I'm looking down at eight -- eight and

25   nine.  And we were --

1          THE COURT:  You said, "The defect was a cause of

2     Plaintiffs' injuries," and they say, "The defect was the cause

3     of the damages or losses claimed."

4          MR. FLANNERY:  So that was one of the differences.  I

5     thought our language was more clear in terms of what was at

6     issue, but if we could say damages, injuries or losses.

7          THE COURT:  Yeah, of course.  "The defect in the

8     Entran 3 hose was a cause of the injuries, cause of, strike out

9     the injuries, damages or losses claimed by Plaintiffs."

10         MR. FLANNERY:  Yes, Your Honor.

11         THE COURT:  That solves one problem.  What else are

12    you objecting to?

13         MR. BROOKS:  Your Honor, injuries imports a sense of

14    bodily injury or some sort of injury to person; not to --

15         THE COURT:  It's just an expression.  If you don't

16    want it, I don't care.  Injuries, damages or losses is just a

17    way that it's usually expressed.  If you don't want injury we

18    will take it out.

19         MR. BROOKS:  We would prefer damages or losses.

20         THE COURT:  You are not claiming anybody got hurt?

21         MR. FLANNERY:  We are not, Your Honor.

22         MR. BAILEY:  The property.

23         MR. FLANNERY:  We are not talking personal injury.

24         THE COURT:  What else?

25         MR. FLANNERY:  The other issue, they refer to

69

1  Mr. Helmer, Mr. and Mrs. Muftic.  I would be more comfortable

2  with Plaintiffs.

3          THE COURT:  I said Plaintiffs.

4          MR. BROOKS:  We're fine with that.

5          MR. FLANNERY:  In eight and nine.  Eight, nine -- yes,

6  eight, nine and ten.  Sorry.  Eight, nine and ten.

7          THE COURT:  That's fine.  Plaintiffs, everybody will

8  know who they are.  Plaintiffs.

9          MR. BROOKS:  Your Honor, I'm sorry.  Just for clarity,

10  are we working off their page 17?

11          THE COURT:  We are working off yours.

12          MR. BROOKS:  That's fine.  Thank you.

13          MR. FLANNERY:  Your Honor, the only -- or one of the

14  other points, I guess, on 29 now, we -- again this goes back to

15  our point about comparative fault and negligence.  We think

16  those are -- to the extent they are applicable, it's only in

17  the damages phase.  So we object to that and would actually

18  take that out --

19          THE COURT:  I will take out the words "negligence or."

20          MR. BROOKS:  That's fine.

21          MR. FLANNERY:  I think that would be satisfactory,

22  Your Honor.

23          MR. BROOKS:  So the words "negligence or" are stricken

24  in the last line on page 29?

25          THE COURT:  That's correct.

70

1          MR. BROOKS:  Okay.

2          THE COURT:  I'm going to strike out 17, and say, use

3     28, 29.  Now, 18.

4          MR. RATHOD:  Your Honor, on the last one, we will just

5     preserve our objection as to those affirmative defenses not

6     being in this trial.

7          THE COURT:  Yeah.  I'm not asking anybody to waive

8     objections.  If you say it's fine, then you have waived

9     objections but -- if you want to preserve objections, that's

10    fine.  So, yes, you can do that.

11         We will have an instruction conference during the

12    trial, don't worry.  What we're doing today is to try to avoid

13    having to do it all then.

14         When are you having your baby, by the way?

15         MS. VAN DYCK:  I'm due on April 6th, Your Honor.

16         THE COURT:  I just had a trial where I thought she was

17    going to deliver right during the trial.

18         MS. VAN DYCK:  I cleared it with my doctor first.

19         THE COURT:  Okay.  In the trial we just had, the

20    expert, one of the experts for the Defendant, at the conclusion

21    of all of the examination by the Plaintiff lawyer, who was

22    very, obviously expecting, said to her, Thank you, mom, and she

23    went like that.  Well that set off a debate with -- within my

24    staff whether he was just being friendly or whether that was an

25    insult.  Okay.  That was a distraction, a diversion, a rabbit

1     trail.

2            Next, "A product is unreasonably dangerous because of

3     a defect in its design if it creates a risk of harm to property

4     that would not ordinarily be expected or is not outweighed by

5     the benefits to be achieved from such design."  And Plaintiffs

6     say that is just right out of the book.

7            MR. BROOKS:  We object to it, because it includes both

8     the risk-utility test and the consumer-expectation test.  This

9     is a case involving primarily technical and scientific

10    information to design and defect.  The Tenth Circuit has held,

11    quote, We interpret Colorado law and the question is as

12    follows, where a case is defined primarily by technical and

13    scientific information, the Court must use only the

14    risk-benefit test.  It may not use the consumer-expectation

15    test, and it may not use both tests together.  That's *Kokins*

16    *vs. Teleflex*, 621, F.3d, 1290, and it's cited in the *Montage*

17    case.  Our instruction, on page 30, concludes only the

18    risk-utility test, and it is Goodyear's position that it is

19    error to instruct on both the consumer-expectation test and the

20    risk-benefit test in a case such as this, where the means by

21    which the parties intend to either prove or disprove the theory

22    of defect rests specifically on, quote, technical and

23    scientific information.

24            THE COURT:  Plaintiff.

25            MR. RATHOD:  Your Honor, the model instruction permits

1     you to instruct on both and in addition --

2                THE COURT:  The which?

3          MR. RATHOD:  Sorry.  CJI 14:3, allows you to give both

4     the consumer expectation and the risk-benefit instruction.  In

5     addition, we -- we would point -- the case law that that's

6     based on is case *Biosera v Forma Scientific*, and that's -- in

7     that case the Court gave both instructions, even though it

8     involves a complex freezer, the Court there said, even though

9     it can implicate some scientific evidence, the primary issue,

10    it was easy to switch on and off.  We think here too, although

11    scientific evidence is at issue, that the defect is

12    straightforward.  That you don't put -- that rubber degrades

13    when it's exposed to hot liquid.  So we don't think it's

14    subject to the same scientific scrutiny as a pharmaceutical

15    drug or something else where you use the risk benefit.

16         MR. BROOKS:  The case to which counsel is referring

17    *Biosera vs. Forma Scientific*, at 941 P.2d, 284, is an

18    intermediate appellate court decision that is not binding on

19    this Court.  The *Kokins vs. Teleflex* case, which I cited, is a

20    Tenth Circuit case construing Colorado law.  It is a later case

21    than *Forma Scientific*, and it specifically held that in the

22    context of the technical and science-rich evidence that was at

23    stake there, that we would submit is very similar to that which

24    the Plaintiffs and Goodyear intend to proffer here, that it

25    would be error to allow the jury to be charged on the

1    consumer-expectation test.

2         THE COURT:  Well, we don't want to err, do we?  Nobody

3    wants err.  If you look up at the ceiling here, figuratively,

4    up there somewhere is my boss.  Actually, they are across the

5    street, but they are up there, and if I don't do what they tell

6    me, I get spanked.  You don't want that.  It's bad.  I have

7    tasted their steel.  It doesn't taste good.

8         Now, he is right or wrong that the Circuit said do

9    what he said?

10        MR. RATHOD:  His case law is correct, but it was a

11   different set of facts, and here we think that exposing rubber

12   to hot liquid and -- that would cause the rubber to degrade is

13   a straightforward thing.  Just like in the other case that I

14   mentioned, that although it implicated a complex freezer, the

15   defect was easy to understand, which is that there's a switch,

16   it could be switched off pretty easily.  And in both cases it

17   does implicate scientific evidence, but it's so -- it

18   doesn't -- it's not the same weighing that there is with a

19   complex pharmaceutical drug or a motherboard of a computer or

20   any number of highly complex products that involves scientific

21   evidence.

22        THE COURT:  If that were true, then why do you need an

23   expert at all?

24        MR. RATHOD:  Defendants have put it at issue.

25        MR. BROOKS:  Your Honor, perhaps the best way, I

74

1    brought some extra copies of the *Kokins* case.  It's --

2         THE COURT:  I mean, Plaintiffs, the one thing that you

3    don't want is to get your big verdict and have it taken away by

4    the Circuit.

5         THE COURT:  It's Judge Holmes, even.

6         MR. RATHOD:  What page would you be looking at?

7         THE COURT:  I especially don't want to get overruled

8    by Judge Holmes, because my law clerk is going to work for

9    Judge Holmes next year, that would be very embarrassing.

10        MR. BROOKS:  So if we look at the text of the opinion,

11   beginning at headnote 8 is where the -- the Court really delves

12   into that issue.  The facts of that case are also interesting,

13   because they do address a -- a piping-type product, and it's

14   a -- the product involved here in this case is a cable that was

15   alleged to have been defectively designed, because it allowed

16   water to evade the cable causing the carbon steel core to rust.

17   There were a couple of theories about why the problem occurred,

18   but, in essence, the plaintiffs have a theory that it involves

19   a -- a tubing or rubber hose that allows water to intrude.

20   There's a similarity.

21        THE COURT:  All right.  I do think that -- and I find

22   that this is a case defined primarily by technical and

23   scientific information, therefore, under this case, I agree

24   with the Defendant that the instruction a page 18 should be

25   given and not the instruction -- not -- the instruction at page

1   30 should be given instead of the instruction at page 18.   And

2   I don't think it's going to make much of a difference, but I

3   want it to be right.

4        Okay.   Next.   Page 19.   What's wrong with that?

5        MR. BROOKS:   Well, the last sentence simply says, none

6   of this stuff matters, and we don't, generally, instruct the

7   jury on things that don't matter.   So the jury is going to be

8   told, factually, that these things happened, and these are

9   really just facts.   The jury will be told the facts, there will

10  be Cross-examination and that will be the end of it.   But

11  instructing them that these facts exist and then saying, these

12  circumstances don't affect liability, in any way is

13  superfluous.

14       THE COURT:   Well, you agree that the first sentence is

15  accurate?

16       MR. BROOKS:   I agree it's accurate, as a matter of

17  fact, but we're instructing the jury on the law.

18       THE COURT:   Plaintiff, isn't the second sentence

19  overbroad?   It could be read as excluding their argument that

20  the intermediary distributor is what -- and its installation is

21  what caused the hose to fail.

22       MR. RATHOD:   Plaintiffs don't believe that Heatway

23  installed these units, and further that the evidence shows that

24  Goodyear designed the product, and because it's a design-defect

25  claim those facts suggest that Heatway -- it doesn't affect

76

1    Goodyear's liability in any way.

2            THE COURT:  Instead of saying, These circumstances do

3    not affect Goodyear's liability to Plaintiff in any way, what's

4    wrong with saying, That fact is not determinative of Goodyear's

5    liability which is to be decided according to other

6    instructions?

7            MR. FLANNERY:  I think that would be fine, Your Honor.

8            MR. BROOKS:  I don't have a problem with that change

9    to the second sentence, but I would say that the first one also

10   is that Goodyear sold it to Heatway, who sold it to

11   distributors, who sold it to the consumers, and so, as a

12   factual matter, there is at least one link in the chain of

13   commerce here that is missing; and that is, Heatway, and there

14   may have been more than one distributor, because, Goodyear sold

15   to Heatway; Heatway sold to plumbing supply houses; plumbing

16   supply houses probably sold to plumbers; and then plumbers

17   installed in the consumers' house.  So there's probably one and

18   probably two factual links in the chain that are missing here.

19           Again, this is something that there will be testimony

20   on, to identify exactly how many links.  It just doesn't seem

21   like an instruction on the law that governs the claims.  And so

22   we would oppose it --

23           THE COURT:  So when you told me a few moments ago,

24   maybe a couple minutes ago, that the first sentence was

25   accurate, factually.

77

1        MR. BROOKS:  I was mistaken, and I am sorry about

2   this.

3        THE COURT:  Was all this hose sold to Heatway?

4        MR. BROOKS:  Goodyear sold the hoses exclusively to

5   Heatway.

6        THE COURT:  One hundred percent, and then Heatway did

7   what with it?

8        MR. RATHOD:  They distributed or sold it.

9        MR. BROOKS:  To plumbing supply house, who then sold

10  it to plumbers, who then installed it.

11       MR. RATHOD:  I think that makes them a distributor,

12  Your Honor.

13       MR. BROOKS:  But there's a couple of chains in the

14  causation that are missing.

15       THE COURT:  So Heatway sold it to whom?

16       MR. BROOKS:  Plumbing supply houses or distributors.

17       THE COURT:  And what did they do with it.

18       MR. BROOKS:  They either sold it to other downstream

19  distributors or they sold it directly to the plumbers or

20  installers who installed the hose.  Depending on how the

21  installation went.

22       THE COURT:  All right.  The evidence shows that

23  Goodyear did not sell?

24       THE COURTROOM DEPUTY:  That's a cell phone or

25  something that's on the table.  If you guys could just -- thank

1   you.

2          THE COURT:  Who's guilty.

3          MS. VAN DYCK:  That was me, Your Honor.  I apologize.

4          THE COURT:  So she is throwing herself on the sword.

5          MR. RATHOD:  I thought he got anxious.

6          MS. VAN DYCK:  I apologize, Your Honor.  It's put

7   away.

8          THE COURT:  Maybe that was your doctor calling,

9   telling you not to become involved in a stressful situation.

10          "The evidence shows that Goodyear did not sell the

11   Entran heating hose at issue directly to the Plaintiffs, but

12   rather sold it to Heatway, which in turn sold it to

13   distributors or plumbing supply houses, who in turn sold it to

14   others before it was finally installed.  This chain of sales

15   does not preclude a finding that the hose was defective in its

16   design, which you will determine according to other

17   instructions and the evidence in the case."

18          MR. FLANNERY:  That's fine Your Honor.

19          MR. BROOKS:  That's fine with us.  Just a technical

20   question, Your Honor.  Is the Court making these changes or --

21   because -- if we're making them --

22          THE COURT:  I'm making them today, just by writing on

23   these, but I'm going to give this to whomever the instruction

24   person is, to be put into your computer.

25          MR. RATHOD:  Okay.

1          *MR. FLANNERY:*  We will meet and confer, make sure they

2     all get in there.

3          *MR. BROOKS:*  We'll work together.

4          *THE COURT:*  Well good.  Nothing that warms my ears

5     better than we will meet and confer.

6          *MR. THOMASCH:*  Your Honor, the "does not preclude"

7     bothers me a little bit.  Could we say "does not affect one way

8     or the other?"  Does not preclude seems, to me, to suggest that

9     they ought to be finding that way.  It does not affect one way

10    or the other would have --

11         *THE COURT:*  Okay.  Let's see, I need to, apparently,

12    go down the line of the four defense lawyers and ask them one

13    at a time, first one, second, okay, second one says --

14         *MR. BROOKS:*  He is the boss.

15         *THE COURT:*  -- he wants to change the wording.  How

16    about number three?

17         *MR. STAUSS:*  I will agree with Roger.

18         *THE COURT:*  How about number four?

19         *MR. LENYO:*  I agree with Roger.

20         *THE COURT:*  Do you get my point?

21         *MR. BROOKS:*  Yes.

22         *THE COURT:*  Plaintiffs, they want to say affect

23    instead of preclude.

24         *MR. RATHOD:*  We are fine either way, Your Honor.

25         *THE COURT:*  Does not affect whether.

1          MR. RATHOD:  Could you read the last part back?

2          THE COURT:  "The chain of sales does not affect

3     whether the hose was defective in its design, which you will

4     determine according to other instructions and evidence in the

5     case."

6          Plaintiff are happy -- Plaintiffs are happy, Roger is

7     happy.

8          MR. THOMASCH:  Thank you, Your Honor.

9          THE COURT:  Everybody is happy.  Page 20.  What is

10    wrong with 20, Defendants?

11         MR. BROOKS:  The --

12         THE COURT:  You want the third paragraph, that's what

13    you want.

14         MR. BROOKS:  The third paragraph.

15         THE COURT:  Plaintiffs, what's wrong with the third

16    paragraph that you omitted?

17         MR. RATHOD:  Your Honor, we believe that's a

18    negligence principle not appropriate for a strict liability

19    design defect, Your Honor.  Particularly because we don't

20    expect Defendants to introduce evidence that the design defect

21    could combine with plumber error in some way to create a defect

22    or to create a leak.

23         THE COURT:  I don't agree.  I agree with the

24    Defendant.  So we will give 31 instead of 20.

25         Page 21.  What's wrong with that?

1          MR. BROOKS:  I have written down it's unnecessary, but

2     we don't have a problem it.

3          THE COURT:  Is there another one on credibility?

4          MR. BROOKS:  I thought that one of the stock

5     instructions that we had agreed to talked about credibility.

6          THE COURT:  It's page five.

7          MR. BROOKS:  Oh, it's the common-knowledge issue.  The

8     word common knowledge -- we prefer common sense.

9          THE COURT:  Common sense is always a good thing.

10          MR. BROOKS:  It's common sense instead of common

11     knowledge and experience.

12          MR. RATHOD:  Plaintiffs are fine with that change.

13          THE COURT:  Common sense and experience.

14          MR. BROOKS:  Yep.

15          THE COURT:  How about if we just add it to the

16     instruction at page five?

17          MR. RATHOD:  Plaintiffs are fine with that,

18     Your Honor.  Page 22.

19          MR. BROOKS:  We object to this.  There's -- the -- the

20     model instructions for Colorado don't contemplate a specific

21     instruction being given on impeachment.  The instruction that's

22     presented at page five is close to the -- to the stock

23     instruction, in terms of talking about inconsistency or

24     discrepancies in testimony.  We think that that is sufficient

25     for purposes of instructing on this, and we also have problems

82

 1    with the wording.  I think the witness' credibility may be

 2    attacked, not withstanding what the Court in Kansas apparently

 3    allowed.  I just don't think that this is an appropriate way to

 4    instruct the jury about what constitutes impeachment or the

 5    effects of impeachment.  I think the instruction on page five

 6    adequately covers inconsistencies in testimony, and this ought

 7    not be given at all.

 8         THE COURT:  You must be worried about some of your

 9    deponents.

10         Plaintiff?

11         MR. RATHOD:  Your Honor, the Court in Kansas did give

12    that instruction and we think it's appropriate, and that was --

13    those jury instructions were affirmed by the Tenth Circuit just

14    a few months ago.  So to turn back to our friends in the sky,

15    we might want to defer to them.

16         MR. BROOKS:  I don't know that this particular

17    instruction was the subject of appellate review, but we can

18    research that issue.  The --

19         THE COURT:  It's not worth your time.  The word attack

20    bothers them.  Do you have another word that you can live with?

21         MR. FLANNERY:  Challenged.

22         THE COURT:  Challenged.  Is that better, Defendant?

23         MR. BROOKS:  Yes, Your Honor.

24         THE COURT:  All right.  And can we put this in that

25    credibility instruction, as well?

83

1          *MR. RATHOD:*  Yes.

2          *MR. BROOKS:*  Yes.

3          *THE COURT:*  Twenty-three.

4          *MR. BROOKS:*  Basically the same as the last sentence

5    on page five.  "The weight of the evidence is not necessarily

6    determined by the number of witnesses testifying to the

7    existence or nonexistence of a fact."  Just redundant.

8          *MR. RATHOD:*  Your Honor, we didn't realize that

9    redundancy.  My apologies.

10         *THE COURT:*  Out.  Page 24.  Verdict form.

11         *MR. BROOKS:*  We have our own.  If that's what

12   Plaintiff wants?  Yes or no, that's it?

13         *MR. RATHOD:*  Yes.

14         *THE COURT:*  No specifics.  No information.  Just yes

15   or no.  I don't think.  Out.

16         Now we get into the Defendant's instructions.  Number

17   25, we've already gone over.

18         *MR. BROOKS:*  Yes.

19         *THE COURT:*  Page 27.

20         *MR. BROOKS:*  This instruction was my alternative to

21   their page 14.  The language in here that we would like,

22   it's -- that is not redundant -- is, You should consider and

23   decide this case as a dispute between parties of equal

24   standing, rather -- regardless whether the party is a person or

25   a business entity.  Similarly, you should not be guided --

84

1    sympathy language is already covered.

2         The language that I just read you, this comes out of

3    this Court's instructions in the *Jeff Benton and Zoo Fans vs*

4    *Avedon Engineering* case, I think you gave us at the first

5    charge -- at the first conference a set of those instructions

6    and I took that from that.

7         THE COURT:  It's fine.  We will use page 27 instead of

8    page 14.

9         Page 28, we've already talked about.

10        MR. BROOKS:  Yeah, that's the element, 28 and 29.

11        THE COURT:  Twenty-nine we talked about.  Thirty.

12        MR. BROOKS:  Thirty we covered.

13        THE COURT:  Thirty-one.

14        MR. BROOKS:  We covered.

15        THE COURT:  We covered.

16        MR. BROOKS:  Yep.

17        THE COURT:  Yes on 31, right?

18        MR. BROOKS:  That's -- yes.

19        MR. BAILEY:  Your Honor, since I haven't said

20   anything, may I speak for just a second?  On pages 28, 29 and

21   31 the phrase "damages or losses," I just want to understand or

22   make a point for the record, we're not talking about having to

23   put proof on about dollar amounts.  That's what Plaintiff -- or

24   Defendant is intending.

25        MR. BROOKS:  That is absolutely correct.  We are not

1    expecting them to put on dollar amounts, and in fact, we -- we

2    were ready to put on a challenge, if they were going to try to

3    introduce evidence as to dollar amounts of damages.  The fact

4    of damages is at issue.  The amount of damages is --

5            THE COURT:  Right, right.  That's -- we've all

6    understood that.

7            Page 32.

8            MR. FLANNERY:  Your Honor, we oppose this

9    state-of-the-art instruction.  Certainly, at the -- if -- if

10   the Court were to give any pre-instructions, we would oppose it

11   at that time, but we also feel that it's objectionable in the

12   sense that it's much more appropriate in the context of a

13   failure-to-warn case, which this is not, and we also believe

14   there's already substantial evidence in the record, which we

15   think will be borne out at trial, that the foreseeability

16   aspect of this particular instruction is -- is belied by

17   Bergstrom's report, expert reports from the Defendants, and

18   multiple examples of evidence already in the record that --

19   that Goodyear's own testing and other indications are that this

20   was entirely foreseeable, so that this state-of-the-art

21   instruction wouldn't be appropriate, even if there -- even in

22   the context of the alternative-design discussion in the

23   risk-benefit analysis.  So we would oppose it, and -- and we

24   believe that will be borne out by evidence at trial.

25           Just one other point, Your Honor, I -- in looking at

1    the case law in this, I was looking at the *Fen-Phen* case from

2    the Supreme Court Colorado, '93, and that case involved

3    asbestos claims, and that -- in my mind, this kind of

4    instruction makes much more sense in that context, where

5    there's a seriously long passage of time which is not present

6    here.

7            THE COURT:  Well, it's been since '92 to '96, right?

8            MR. BROOKS:  Your Honor, may I be heard.

9            THE COURT:  Before you say anything, does this

10   instruction open the door to the admission of Entran II

11   evidence that I have otherwise excluded?

12           MR. BROOKS:  I don't believe the instruction does.

13   No.  The -- the question about whether Entran 3 represents the

14   state of the art at the time is -- is an issue in this case,

15   and an Entran II case, it might very well be, it's a different

16   issue about state of the art, because the Entran 3 did

17   represent the state of the art at that time, but here --

18           THE COURT:  I'm just asking whether, for example, they

19   could put in evidence that Entran II was found to be defective

20   even before Entran 3, and the defects were the same.

21           MR. BROOKS:  The testimony I think that Dr. Moalli

22   will offer is that he cannot say that the defects were the

23   same.  His theory of defect in the Entran II litigation talked

24   about a process of thermal oxidative degradation.  One of the

25   points of our motion to exclude him here is, that he could not

1    say that the leeching of the plasticizer and the thermal

2    oxidative degradation process that he observed in Entran II was

3    present in Entran 3 house.

4         But those are factual issues, and there's a couple of

5    threshold legal issues that I think justify keeping this

6    instruction in, at this point; and that is, that statutorily

7    this instruction, as well as the instructions on pages 33,

8    which is the presumption ten-year use of product, and 34,

9    presumption compliance with government standards, are all

10   statutory instructions, and they do not -- the giving of these

11   instructions does not swing on whether the case is a

12   failure-to-warn case, as counsel suggested.  Rather, under

13   section 13-21-403, Subsection 1, titled Presumptions, it says

14   in any product-liability action, it shall be rebuttably

15   presumed that the product which caused the injury, death or

16   property damage was not defective, and that the manufacturer or

17   seller thereof was not negligent if the product; A, prior to

18   the date of sale by the manufacturer conformed to the state of

19   the art as distinguished from industry standards applicable to

20   the -- such product in existence at the time of sale.  And

21   that's a statutory presumption that exits.

22        THE COURT:  Well, why didn't you put in here that this

23   is a rebuttable presumption?

24        MR. BROOKS:  Well, the 14:6 instruction that was

25   promulgated by the Supreme Court committee on civil jury

1   instructions uses this specific language to address the

2   state-of-the-art issue.  It uses different language to address

3   the statutory presumptions that exist, with respect to the

4   ten-year presumption.

5           THE COURT:  Do you happen to have the statute book

6   here?

7           MR. BROOKS:  I have both the statute book and the --

8   and the instruction book.  Would you --

9           THE COURT:  May I borrow your statute book for a

10   second?  Or I can go get my own.

11           MR. BROOKS:  No, no, no.  I'm going to bring ...

12           THE COURT:  Thank you.

13           MR. BROOKS:  Did you want the instruction?

14           THE COURT:  Well, yeah.  I can get my own on that too.

15   All right.  Presumptions.

16           Okay.  Why can't we just craft an instruction right

17   out of the statute?  If the statute is what you are relying on,

18   and it's a very good good thing to rely upon; why not use the

19   language the statute came up with?

20           MR. BROOKS:  We certainly can craft an instruction

21   based on that language.

22           THE COURT:  So, for example, paragraph one, In any

23   product-liability action it shall be rebuttably presumed that

24   the product which caused the property damage was not defective,

25   period.  Actually A, prior to -- if -- shall be rebuttably

1   presumed not defective if; A, prior to sale it conformed to the

2   state-of-art as distinguished from industry standards

3   applicable to such product; B, complied with the code.  That

4   probably doesn't apply.

5       MR. BROOKS:  Right, Your Honor.  The B and C ones are

6   taken care of --

7       THE COURT:  There isn't a C.

8       MR. BROOKS:  Well, I'm sorry.  The code compliance and

9   the ten-year presumption in subsection three, are taken care of

10  in two separate instructions on pages 33 and 34.

11      THE COURT:  Why do we have to have separate

12  instructions?  Why can't we just have an instruction right out

13  of the statute book here?

14      MR. BROOKS:  Well, I think there are separate

15  presumptions that are involved there, and the -- the stock

16  instructions, the -- the CJIs, in 14:6, 14:5A, and 14:5B, which

17  are in the orange book in front of the Court, contemplate

18  breaking it out into three separate instructions.  I think for

19  the sake of not having a lengthy recitation, but we could --

20      THE COURT:  No, it's not very lengthy, even in the

21  statute book.  Plaintiff, what's wrong with the law as the

22  General Assembly has given to us?  You may not like it, I'm not

23  sure I like it that much, but that's what they did.

24      MR. BAILEY:  May I ask, would these be given as a

25  pre-instruction, or would they be kept for the end?

1          THE COURT:  That's a different question.  If I give

2     any pre-instruction at all I would be inclined to give the

3     whole set.

4          MR. BAILEY:  Well, so our first point on this and then

5     the other two is that they -- we would object to them being

6     given as a pre-instruction because there's no indication, at

7     all, that there -- that they should be applicable.  We did file

8     memos on the other two, as to why they are not applicable.  The

9     code one is not applicable --

10          THE COURT:  Well, it does say, to your benefit, in

11     paragraph four in the statute, any product liability action in

12     which the Court determines by a preponderance of evidence that

13     the necessary facts giving rise to a presumption have been

14     established, the Court shall instruct the jury concerning the

15     presumption.  So I suppose you could view that as saying the

16     instruction can't be given until the evidence has been

17     presented.

18          It really depends on what you guys want.  Do you want

19     the jury to be in the dark throughout the whole three weeks or

20     not?  If I were the Plaintiffs I wouldn't, and if I were the

21     Defendants, I wouldn't.

22          MR. BAILEY:  With regard to the elements of design

23     defect, strict liability, no we would not.  We don't believe

24     that the jury should be --

25          THE COURT:  Just tell them about your side, but not

91

1   the Defendant's side.

2       MR. BAILEY:  No, not just about our side, but

3   presumptions are a different matter.  You know, if there are

4   defenses that are appropriate, then that would be fine to

5   instruct on those.  But the presumptions, which, you know,

6   indicate to the -- to the jury as to what the burdens of proof

7   might ultimately be or what they should assume, we think that

8   would be confusing until the end.

9       THE COURT:  Well, what you surely don't want is for me

10  to give a pre-instruction that says, If the Court determines by

11  preponderance of evidence that the necessary facts giving rise

12  to a presumption have been established, then the following will

13  be rebuttable presumptions.  That's the last thing that you

14  want, because then the implication is, if I give the rebuttable

15  presumptions later, that means I found, by a preponderance of

16  evidence, that they apply, right?  You don't want that.  You

17  don't want pre-instructions at all, is what you are saying?

18      MR. BAILEY:  Prefer not to have pre-instructions at

19  all, but with regard to --

20      THE COURT:  Maybe the Defendants prefer that too, and

21  then that's easy.  In fact, I have always said if both sides

22  can't agree on pre-instructions, I don't pre-instruct.  The

23  only people that like pre-instructions are; one, the jurors;

24  two, the Court, because it means we have to sharpen our pencil

25  before the trial starts; and three, lawyers who want to be able

92

```
1    to use the pre-instructions in their opening statement.  But if

2    you guys object to them, either side, I won't do it.  Are you

3    sure that's what you want?

4        MR. RATHOD:  Your Honor, particularly with these

5    presumptions, they are so factually intensive, we filed the two

6    memos that we think contain facts that we will be able to show

7    would -- because of -- they would not trigger the presumptions.

8        MR. BROOKS:  The instructions that were done on pages

9    33 and 34 say, You must consider the presumptions together with

10   all of the other evidence in the case in deciding whether

11   Entran 3 is defective.

12       THE COURT:  Yes.  But what about this paragraph, the

13   one little bone that was thrown to the Plaintiff bar, when this

14   product-liability statute was revised is, in a

15   products-liability action in which the Court determines by a

16   preponderance of evidence, that the necessary facts giving rise

17   to a presumption have been established, the Court shall

18   instruct the jury concerning the presumption.  How can I

19   determine that in advance?

20       MR. BROOKS:  Truthfully, I don't -- I don't know

21   that -- and I hadn't thought about this in the context of

22   pre-instructions, but I think that it does, under Subsection 4

23   of the statute, require a factual finding being made as to the

24   existence of the threshold facts before the instruction be

25   given; that is true, and they are correct in that.  And --
```

1        THE COURT:  That's what it says.

2        MR. BROOKS:  And if those threshold facts are

3   presented, then the instruction is mandatory.

4        THE COURT:  All right.  So here is what we're going to

5   do.  Right now, I'm going to assume I'm not going to

6   pre-instruct.  I think you guys are giving up an opportunity,

7   but whatever.

8        MR. BROOKS:  Well --

9        THE COURT:  But I will give an instruction, assuming

10  that the evidence, to a preponderance, establishes that there's

11  a factual basis for it, a presumption instruction with these

12  presumptions, but it has to say there's a rebuttable

13  presumption.

14       MR. BROOKS:  And that's fine.  With respect to

15  pre-instruction, you know, while we recognize that these

16  presumptions, because of Subsection 4 of the statute, would not

17  be an appropriate subject for pre-instruction, Goodyear does

18  not oppose pre-instruction in general, so that these

19  instructions might be kept out until the end, if the Court

20  makes that threshold finding.  Is -- that's Goodyear's

21  position.

22       THE COURT:  Now how does Plaintiff feel about it?

23       MR. BAILEY:  We -- I would suggest that we work with

24  the Defendants see if we can agree on a set of pre-instructions

25  leaving out the --

94

 1          THE COURT:  We are agreeing on the set right now,

 2    except the presumptions will not be in.

 3          MR. BROOKS:  We are willing to hold the presumptions

 4    until the end.

 5          THE COURT:  But if we get to it, it's got to be out of

 6    the statute.

 7          MR. BROOKS:  Okay.  We will do that.

 8          THE COURT:  All right.  I'm about to turn into a

 9    pumpkin here, so either wrap it up pretty quickly.  I don't

10    mind going through the lunch hour, but I don't want to do that

11    to the court reporter, plus I have to do the same thing, the

12    other three-week trial, right behind yours, wasn't quite as

13    obnoxious, but they filed two or three motions yesterday or the

14    day before.

15          Okay.  Now we get to page 35, because -- 32 through 34

16    are covered by what we've just discussed.  Thirty-five, Fact of

17    damage does not establish defect.  What's wrong with that,

18    Plaintiff?

19          MR. RATHOD:  Plaintiffs believe that it's -- it's

20    cumulative of the prejudice instruction, and that it's just

21    unnecessary.  It's redundant.

22          THE COURT:  It's given in virtually every case in

23    Colorado.  And this will be another one.  Usually it's given

24    with another instruction, but that wouldn't apply here, and

25    that is, The difficulty in determining the precise amount of

1     damages, doesn't preclude an award of damage.  They are usually

2     given together, but that second one wouldn't apply here.

3     Statute of limitations.  Plaintiff?

4          MR. BAILEY:  We think that the statute of limitations

5     defense is confusing, because we're talking about a class

6     action here, in that this is more properly considered and taken

7     up in the separate damages trials and proceedings.

8          THE COURT:  Okay.  If we assume that we're going to go

9     ahead and put all of the defenses in here, tell me if you

10    object to the form of this.

11         MR. BAILEY:  Not certain about the date, Your Honor,

12    that that's the correct date.  If it is the correct date, then

13    that is fine, but again.

14         THE COURT:  Let me ask, though, a question to the

15    Defendants.  Suppose the jury were to find that Mr. Helmer

16    and -- Mr. and Mrs. Muftic knew or should have known, so that

17    their claims are barred by the statute of limitations, how does

18    that result in a verdict in favor of Goodyear on all of the

19    class members?

20         MR. BROOKS:  The way that we've crafted it in the

21    verdict form, it would not affect the defect finding applicable

22    to the class.  What it would do is zero out or preclude -- more

23    accurately preclude a follow-on damages trial for Helmer and

24    Muftic.  So that the -- in our verdict forms, which, you know,

25    we will come to, the verdict -- the statute of limitations

1   defense will not be addressed until after the jury has already

2   determined whether there's a defect, and the only time that

3   they get to the statute of limitations defense is if they have

4   answered yes to the defect question, and then you -- then they

5   are directed to go directly to the Helmer and then the Muftic

6   individualized verdict forms.  So it would not impact that

7   class issue.

8            THE COURT:  It wouldn't impact anybody but these two.

9            MR. BROOKS:  Precisely.

10           MR. BAILEY:  The instruction, though, says If you find

11   that the affirmative defense of expiration of the statute of

12   the limitations is proved, then your verdict must be for

13   Goodyear.  I think that --

14           THE COURT:  Why don't we strike that sentence and let

15   the verdict take care of it?

16           MR. BROOKS:  That's fine.  The verdict form is clear

17   on that point.

18           THE COURT:  All right.  Fair enough.  Plaintiff?

19           MR. BAILEY:  Well, we disagree with the verdict form,

20   as well, so.

21           THE COURT:  Well, okay.  I'm not going to get to their

22   verdict form.  It's too late.

23           All right.  Next, Assembler's duty as to parts

24   obtained from other sources.  Plaintiff?

25           MR. FLANNERY:  Your Honor, we oppose this instruction.

1    This is a -- this is an instruction that we -- my understanding

2    Goodyear already lost in the E II case.  They tried to get this

3    in the *Vista Resorts* case, 117 P.3d, 60, 2004 opinion.  You

4    will see that the Court denied this instruction, and I think

5    there's a good reason why.  That instruction really comes out

6    of dicta from the *Bond* case, 868 P.2d, 1114, which -- where, in

7    dicta, examining a negligence claim, the Court used some

8    language that indicated this might be appropriate, but the --

9    again the Court in *Vista* denied that.  This is really -- flows

10   out of negligence concepts, and frankly, really, in my view,

11   confuses the issues, because it goes -- it talks about

12   Heatways, assembler.  They changed the statute -- the CJI

13   refers to manufacturer, not assembler, and in my view the --

14   the elements instruction gets confused, and because this is

15   so -- this is focused on design defect, strict liability, this

16   instruction is entirely inappropriate.

17          *THE COURT:*  All right.  Let me read it.

18          All right.  Defendant, how do you defend this?

19          *MR. BROOKS:*  This instruction is part of Goodyear's

20   theory that has a component part of manufacturer; that is to

21   say that the Entran 3 hose was a component of heating systems

22   that Heatway was effectively selling to the plumbing supply

23   houses that Goodyear's liability is affected by that, and that

24   Heatway is responsible for undertaking the duty to test and to

25   make sure that -- and users are appropriately instructed.  So

1    we substituted assembler for manufacturer.

2           THE COURT:  All right.  Goodyear manufactured the

3    hose.  Let's assume that the hose was defective.  You are

4    saying even if we manufactured a defective hose, if Heatway

5    didn't inspect it and figure that out, it's their fault, not

6    ours?

7           MR. BROOKS:  It goes to the comparative -- pardon

8    me -- the fault-of-others defense, because Heatway is the --

9           THE COURT:  I disagree.  That's out.  Thirty-eight.

10          MR. FLANNERY:  Your Honor, as with some of the other

11   instructions that we discussed, I -- the misuse instruction, in

12   my view, is inappropriate in advance.  And again, we think

13   there's going to be extensive information.  There's going to be

14   extensive information already in the record, and it will be

15   borne out at trial, that will show that there's -- they lack --

16   they lack the ability to show the foreseeability, and they lack

17   the ability to show that the Plaintiff was warned against this.

18   This goes to the installer, the installer issue, the

19   instruction issue, the fact that those instruction manuals

20   differed, and that, in fact, at some point, Goodyear and

21   Heatway actually promoted these -- these systems as

22   do-it-yourself.  So for all of those reasons -- and then more

23   specifically the very end, "On the other hand," that language

24   at the very -- in the last sentence, that's also -- we think

25   inappropriate language, aimed at comparative fault, not

1   appropriate for this proceeding and more appropriate at a

2   damages stage.

3           So for all of those reasons we would oppose this

4   instruction.

5           MR. BROOKS:  This instruction is based on Statute

6   13-21-402.5 and the stock instruction that's referenced.

7           THE COURT:  I think the instruction is perfectly

8   appropriate.

9           Thirty-nine, comparative fault based on negligence.

10  No.  Not going to do that.  I'm not going to get into

11  negligence.  Statute doesn't say negligence.  The statute says

12  comparative fault.  It says fault.

13          MR. BROOKS:  And we can -- in light of what we have on

14  page 40, we can live without Instruction 39.

15          MS. VAN DYCK:  Your Honor, Plaintiffs still object to

16  any language about comparative fault in the jury instructions.

17  There's --

18          THE COURT:  I just decided that this instruction will

19  not be given.

20          MS. VAN DYCK:  Oh.

21          THE COURT:  If you want to keep talking --

22          MS. VAN DYCK:  I thought you were simply deleting the

23  negligence language from it.

24          MR. BROOKS:  Thirty-nine is out.

25          THE COURT:  She is attempting to snatch defeat from

1   the jaws of victory.

2          *MS. VAN DYCK:*  I misunderstood, Your Honor.  But that

3   gets us to the next --

4          *THE COURT:*  How many more of these do we have?  Forty.

5   We are almost at the end, 43 is the last one.  Forty,

6   comparative fault.  Is this right out of the statute?

7          *MR. BROOKS:*  It is right out of CJI Civ 1432 --

8          *THE COURT:*  Answer my question --

9          *MR. BROOKS:*  Yeah.  It's based on the statute.

10         *THE COURT:*  It's not right out of the statute.  Every

11  time you base one on the statute, I get suspicious.

12         *MR. BROOKS:*  It's right out of the instruction, and

13  the Court has the instruction book, it's 14:32.

14         *THE COURT:*  Paragraph one, we are going to strike

15  "negligent or," paragraph two we will strike "negligent or,"

16  paragraph three we will strike "negligent or."  We will do that

17  all through, then we will come back and see if there's

18  something else we need to modify.

19         So we've got all of those stricken.  Now, what else do

20  you object to?

21         *MS. VAN DYCK:*  Your Honor, the Plaintiffs object to

22  any language in the jury instructions about comparative fault.

23  There's case law, such as the *US v Gypsum* case, that was handed

24  down by the Tenth Circuit, also *Jackson vs. Harsco Corp*, that's

25  a Colorado Supreme Court case, where they discuss the fact that

1  fault is not simply an aspect of -- is simply not an aspect of

2  strict liability.

3          THE COURT:  Under the Colorado statute, seems to be.

4          MR. BROOKS:  Correct.

5          THE COURT:  I agree with you.  It shouldn't be, but

6  that's the way the statute reads.

7          MS. VAN DYCK:  Your Honor, the issue here is that the

8  fault -- the comparative fault doesn't go to have the ultimate

9  liability of Goodyear, it goes to the damages that they are

10  responsible for, as a result of that liability, so --

11          THE COURT:  Says who?

12          MS. VAN DYCK:  I'm sorry, Your Honor?

13          THE COURT:  Says who?  That isn't what the statute

14  says, is it?

15          MS. VAN DYCK:  That's my understanding of the statute,

16  Your Honor.  My understanding is that if they want to ask for

17  this instruction at a trial on damages --

18          THE COURT:  Well, I have got the statute right here.

19  Now which section is it?

20          THE COURT:  Which section is it?

21          MS. VAN DYCK:  I don't have the statute.

22          THE COURT:  I took his book away.

23          MR. BROOKS:  There's two statutes at issue and I'm

24  going to go by memory, 13-21-111.5 is the general pro rata

25  liability statute and then I think it's 13-21-406.

1          *MS. VAN DYCK:*  Yes.

2          *MR. BROOKS:*  Is the comparative-fault statute, in

3     the --

4          *THE COURT:*  I just want the products-liability

5     statute.

6          *MR. BROOKS:*  13-21-406.

7          *THE COURT:*  "In any products liability action, the

8     fault of the person suffering the harm as well as the fault of

9     all others who are parties to the action for causing the harm

10    shall be compared by the trier of fact in accordance with this

11    section."  What -- what do I do with that?

12         *MS. VAN DYCK:*  Then, Your Honor, the -- the next

13    sentence is, The fault of the person suffering the harm shall

14    not bar such person or a party bringing an action from

15    recovering damages, but the award of damages shall -- but the

16    award of damages to such person or the party bringing the

17    action shall be diminished.

18         *THE COURT:*  Yes.  I agree with you.

19         *MS. VAN DYCK:*  So that goes to my point this is not an

20    appropriate instruction for a trial on liability as it is an

21    appropriate instruction for a trial on damages.  This is not a

22    trial on damages.

23         *THE COURT:*  See I don't necessarily agree with that.

24    Let me read the rest of this instruction.  Yeah.  You get down

25    to the bottom and it does talk about damages.

1      MR. BROOKS:   Well, the -- the notion, from our

2   perspective, and we come back to that last status conference,

3   is that we were trying everything, except for the monetary

4   amount of the damages for these plaintiffs.  So in this trial

5   we would have it out on the apportionment-of-fault issue as to

6   Goodyear, the Plaintiffs, Heatway and the nonparties, so that

7   we could get that pro rata determination.  And then if there is

8   a follow-up proceeding, they would address the amount that it's

9   going to take to fix their home -- homes, and then we apply the

10   apportionment to that, and this's what they would get.

11      THE COURT:   How does comparative fault of Muftic or

12   Helmer apply to anybody else in the class, but them?

13      MR. BROOKS:   It doesn't.  And that's why -- if we do

14   get to the verdict form -- we have three verdict forms.  The

15   first one addresses the class-wide issue of design defect.  The

16   second and third address the Helmer and Muftic specific issues,

17   and they stop at -- they stop at the apportionment.  They never

18   ask that line-item question about how much money is at stake

19   and that's consistent with what the Court said, which is, We

20   are trying everything in this case as to the Helmers and the

21   Muftics, except for the money, and that's what we've done.  We

22   have stopped at the apportionment and I think that's where we

23   need to stop.

24      MS. VAN DYCK:   But, Your Honor, this instruction

25   implies that Goodyear somehow is at liability as a result of

 1   apportionment of fault, and they are not.

 2         THE COURT:  I don't think so.  All it does is say

 3   jury, you decide if there was a defect in this hose, then you

 4   decide whether Helmer and Muftic, had some fault that

 5   contributed to the problem.  And if you decide they did, then

 6   you express as percentage of a hundred percent, and any damages

 7   that might be awarded to them in the future will be adjusted

 8   according to that percentage.  I don't even understand why you

 9   don't want that.

10         Do you want to explain that to me?  Why you don't want

11   that?

12         MR. RATHOD:  Your Honor, to clarify, it's my

13   understanding that designated a nonparty at fault, that

14   Goodyear would bear the burden of proof as to each element of

15   strict liability against the nonparty.  Is that -- I believe

16   that's correct.

17         MR. BROOKS:  No.  I think that the argument would be

18   that Goodyear would bear the burden of establishing basis of a

19   claim of fault by the designated nonparty.  It doesn't have to

20   be the same fault, the same species of fault as Goodyear is

21   alleged to have had.  So a strictly liable manufacturer can

22   prove the fault of a nonparty, based upon -- the -- the conduct

23   of the nonparty that constitutes negligence installation.

24         THE COURT:  I have added a little bit, but it's okay.

25   Agency defined, page 42.  Plaintiff.

1          *MR. RATHOD:*  With the agency instructions we just

2    don't know how they are applicable to this statute.

3          *THE COURT:*  How are they?

4          *MR. BROOKS:*  We are asserting that the installers and

5    plumbers who may have installed and/or repaired the heating

6    system of the Plaintiffs are the agents of the Plaintiffs.

7          *THE COURT:*  You didn't put that in any other

8    instruction.

9          *MR. BROOKS:*  We have -- we have not had other specific

10   instructions on that.

11         *THE COURT:*  This is a definition which doesn't fit

12   into any other instruction.

13         *MR. BROOKS:*  We have two other instructions that talk

14   about the agency/principle relationship, and we could craft

15   another instruction that makes it explicit, but we just wanted

16   to have these here so that when -- you know, if we're able to

17   present evidence about the relationship between the installers,

18   the plumbers and the homeowners.

19         *THE COURT:*  At this point, this instruction and the

20   next two pages make no sense to a jury.

21         *MR. BROOKS:*  Would the Court consider striking them

22   without prejudice to address them again at the end of the case?

23         *THE COURT:*  Of course.  It's all without prejudice.

24         All right.  That gets us through all of the

25   instructions.  I do not have time or patience, probably, to go

1    through the verdict form, and I am not as concerned about the

2    verdict form, right now, as I am about the instructions.   So

3    who wants this package back?   Plaintiff?

4            MR. FLANNERY:   Your Honor --

5            THE COURT:   Or Defendant?

6            MR. FLANNERY:   We put together the final package -- we

7    put together the final package and so I will take it, I think,

8    and -- and we will -- can we take the questionnaire, as well?

9            THE COURT:   Yeah.

10           MR. FLANNERY:   Thank you, Your Honor.

11           THE COURT:   And I am going to give these two books

12   back to my friend who gave them to me, temporarily, and ask

13   you, counsel, if there's anything else that you need to ask me

14   or put on the record today?

15           MR. BAILEY:   Just, Your Honor, the procedure that we

16   should use to let you know whether or not we want

17   pre-instructions?

18           THE COURT:   If you want -- if you want to communicate

19   with me at all, between now and the end of the year, really,

20   communicate with me either by putting it on the system or by

21   email to me, directly.

22           THE COURTROOM DEPUTY:   Your Honor, if I can interrupt,

23   I will be here to check the chambers email when Mary is out,

24   and she will be here when I'm out.

25           THE COURT:   Oh really.

1          *THE COURTROOM DEPUTY:*  So they can --

2          *THE COURT:*  I thought Mary is out all week?

3          *THE COURTROOM DEPUTY:*  She is.

4          *THE COURT:*  You won't be here Thursday.

5          *THE COURTROOM DEPUTY:*  I won't be here Thursday.  I

6    can check the email from home on Friday.

7          *THE COURT:*  So I can email chambers.

8          *MR. FLANNERY:*  The only other clarification that I had

9    was about the settlement discussion and the magistrate.  Should

10   we communicate directly with you or should we communicate with

11   him, to the extent we say that's something we want to do?

12         *THE COURT:*  I don't know how you would communicate

13   with him.  Why don't you communicate with us, and then we will

14   communicate with him.

15         *MR. FLANNERY:*  Very good, Your Honor.

16         *THE COURT:*  But don't wait until, you know, the night

17   of the December 28th at midnight and say, we want Hegerty to

18   hold a settlement conference tomorrow morning at 9 o'clock.

19         *MR. FLANNERY:*  Understood, Your Honor.  I think with

20   that we have nothing further.

21         *MR. THOMASCH:*  Very quickly, Your Honor.  I just want

22   to be sure we are all in agreement on this.  Are we agreed that

23   the jury -- whether -- let's say through argument of counsel,

24   can be told that the consequence of their verdict would be to

25   find that all Entran 3 hose in Colorado is defective?

1          *THE COURT:*  Sure.

2          *MR. RATHOD:*  Your Honor --

3          *THE COURT:*  You don't want that?  You want just some

4   of it to be defective?

5          *MR. RATHOD:*  No, Your Honor.  I think it misapprehends

6   the class-action device, in that the jury would find that the

7   Helmer and Muftic's hose is defective, and this's binding on

8   all class members.  Because a class only acts through its class

9   members.  So the jury would be instructed as to whether the

10  Helmers and Muftics hose is defective.

11         *THE COURT:*  The jury is going to find and tell us

12  whether that hose is defective or not, period.  What are you

13  worried about?  That that's going to be a precedent outside of

14  Colorado?  Yeah.  It might be.  You lose this case on whether

15  the hose is defective, you're hosed.  Is that your concern?

16         *MR. RATHOD:*  No, Your Honor, that's not the concern.

17  I -- we will work with it.

18         *THE COURT:*  You will consult --

19         *MR. RATHOD:*  Right.

20         *THE COURT:*  -- among your group, but my expectation is

21  what you said.

22         *MR. THOMASCH:*  Okay.  Thank you.

23         *THE COURT:*  Anything else?

24         *MR. THOMASCH:*  Nothing.

25         *MR. FLANNERY:*  No Your Honor.

1          *THE COURT:*  All right.  I hope you have a wonderful

2     Christmas or holiday.

3          *MR. FLANNERY:*  Thank you, Your Honor, you, as well.

4          (Recess at 12:26 p.m.)

5                    **REPORTER'S CERTIFICATE**

6          I certify that the foregoing is a correct transcript from

7     the record of proceedings in the above-entitled matter.  Dated

8     at Denver, Colorado, this 29th day of December, 2014.

9

10                                      *S/Tamara Hoffschildt*
                                        Tamara Hoffschildt
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25